**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| TERRY W. BETTIS, Individually and On Behalf of All Others Similarly Situated,<br><br>                     Plaintiff,<br><br>        v.<br><br>ENVISION HEALTHCARE CORPORATION f/k/a ENVISION HEALTHCARE HOLDINGS, INC., CHRISTOPHER A. HOLDEN, WILLIAM A. SANGER, CLAIRE M. GULMI, and RANDEL G. OWEN,<br><br>                 Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>**Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Terry W. Bettis ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Envision Healthcare Corporation f/k/a Envision Healthcare Holdings, Inc. ("Envision" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Envision securities between March 2, 2015 and July 21, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Envision Healthcare Corporation provides health care services. The Hospital offers surgery, pharmacy, medical imaging, emergency care, and other related health care services. Envision Healthcare serves patients in the United States.

3.      Founded in 1992, the Company is headquartered in Nashville, Tennessee. Envision's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "EVHC."

4.      At all relevant times, EmCare Holdings, Inc. ("EmCare") has been one of the Company's primary operating subsidiaries.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) EmCare routinely arranged for patients who sought treatment at in-network facilities to be treated by out-of-network physicians; (ii) EmCare accordingly billed these patients at higher rates than if the patients had received treatment from in-network physicians; (iii) the Company's statements attributing EmCare's Class Period growth to other factors were therefore false and/or misleading; (iv) Envision's EmCare revenues were likely to be unsustainable after the foregoing conduct came

to light; and (v) as a result of the foregoing, Envision's public statements were materially false and misleading at all relevant times.

6.     On July 24, 2017, *The New York Times* reported that hospitals associated with Envision's subsidiary EmCare were disproportionately likely to engage in "surprise billing," in which patients who sought treatment at in-network facilities were treated by out-of-network physicians and subsequently billed at higher rates.

7.     On this news, Envision's share price fell $2.33, or 3.72%, to close at $60.28 on July 24, 2017.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Envision's principal executive offices are located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired Envision securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Envision is headquartered in Nashville, Tennessee, with principal executive offices located at 1A Burton Hills Boulevard, Nashville, Tennessee 37215. Envision's shares trade on the NYSE under the ticker symbol "EVHC."

15.     Defendant Christopher A. Holden ("Holden") has served as the Company's Chief Executive Officer ("CEO") since December 2016.

16.     Defendant William A. Sanger ("Sanger") served as the Company's CEO from May 2011 until December 2016.

17.     Defendant Claire M. Gulmi ("Gulmi") has served as the Company's Chief Financial Officer ("CFO") since December 2016.

18.     Defendant Randel G. Owen served as the Company's CFO from February 2005 to December 2016.

19.     The defendants referenced above in ¶¶ 15-18 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

4

20.    Envision Healthcare Corporation provides health care services. The Hospital offers surgery, pharmacy, medical imaging, emergency care, and other related health care services. Envision Healthcare serves patients in the United States.

21.    At all relevant times, EmCare has been one of the Company's primary operating subsidiaries.

## Materially False and Misleading Statements Issued During the Class Period

22.    The Class Period begins on March 2, 2015, when Envision filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").  For the quarter, Envision reported net income of $27.38 million, or $0.53 per diluted share, on revenue of $581.81 million, compared to net income of $19.56 million, or $0.61 per diluted share, on revenue of $279.1 million for the same period in the prior year.  For 2014, Envision reported net income of $53.7 million, or $2.06 per diluted share, on revenue of $1.62 billion, compared to net income of $72.7 million, or $2.28 per diluted share, on revenue of $1.06 billion for 2013.

23.    In the 2014 10-K, Envision stated, in relevant part:

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

 **Capitalize on Organic Growth Opportunities.**    Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives, provide us with competitive advantages to continue to grow our business. We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors. ***We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs. We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers.*** At AMR, we believe market share

5

gains will be driven by our strong clinical expertise, high-quality service, strong brand recognition and advanced information technology capabilities. In particular, our proprietary clinical database of patient transports, including detailed tracking of mortality rates and resuscitation metrics, provides analytical support to AMR's differentiated clinical results and has been a key factor in obtaining new contracts. We anticipate driving significant organic growth in Evolution Health by adding new contracts to meet the demand for physician-led care management solutions outside the hospital.

**Grow Complementary and Integrated Service Lines.**   Our continued focus on cross-selling and offering integrated services across the patient continuum has helped hospital systems, communities and payors to realize economic benefits and clinical value for patients. We continue to enter complementary service lines at both EmCare and AMR that leverage our core competencies. At EmCare, we continue to expand and integrate our ED, anesthesiology, hospitalist, post-hospital, radiology, tele-radiology and surgery services. Our ability to cross-sell EmCare services is enhanced by our national and regional contracts that provide preferred access to certain healthcare facilities throughout the United States. In addition, our Complete Care package, which is an integrated offering of ED and hospitalist services in primarily rural communities, has been one of our most successful recent growth initiatives. ***These factors, among others, have increased the percentage of healthcare facilities utilizing multiple EmCare service lines from 11% in 2009 to 24% in 2014.*** At AMR, we have expanded service lines, such as our managed transportation operations, fixed-wing air transportation services and community paramedic programs, with both new and existing customers. We expect Evolution Health to be a catalyst for cross-selling our services across all of our businesses and not just within a particular segment or service line.

(Emphases added.)

24.     The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Sanger and Owen, certifying that "the information contained in the [2014 10-K] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

25.     On May 8, 2015, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").  For the quarter, Envision reported net income of $21.04 million, or $0.39 per diluted share, on revenue of $570.45 million, compared to net income of $17.2 million, or $0.54 per diluted share, on revenue of $259.56 million for the same period in the prior year.

6

26.     In the Q1 2015 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the three months ended March 31, 2015, approximately 76% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 5% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and 1% from other hospital management services. Approximately 84% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 16% was generated from billings to hospitals and affiliated physician groups for professional services.

27.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q1 2015 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

28.     On August 3, 2015, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  For the quarter, Envision reported net income of $33.68 million, or $0.65 per diluted share, on revenue of $641.95 million, compared to net income of $18.96 million, or $0.59 per diluted share, on revenue of $278.23 million for the same period in the prior year.

29.     In the Q2 2015 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the six months ended June 30, 2015, approximately 76% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 6% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 84% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 16% was generated from billings to hospitals and affiliated physician groups for professional services.

7

30.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q2 2015 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

31.     On November 3, 2015, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, Envision reported net income of $42.66 million, or $0.83 per diluted share, on revenue of $650.23 million, compared to a net loss of $9.83 million, or $0.26 per diluted share, on revenue of $503.23 million for the same period in the prior year.

32.     In the Q3 2015 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the nine months ended September 30, 2015, approximately 74% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 6% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and 2% from other hospital management services. Approximately 83% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 17% was generated from billings to hospitals and affiliated physician groups for professional services.

33.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q3 2015 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

34.     On February 29, 2016, Envision filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  For the quarter, Envision reported net income of $65.57 million, or $1.24 per diluted share, on revenue of $704.26 million, compared to net income of $27.38 million, or $0.53 per diluted share, on revenue of $581.81 million for the same period in

8

the prior year. For 2015, Envision reported net income of $162.95 million, or $3.16 per diluted share, on revenue of $2.57 billion, compared to net income of $53.7 million, or $3.16 per diluted share, on revenue of $1.62 billion for 2014.

35. In the 2015 10-K, Envision stated, in relevant part:

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

**Capitalize on Organic Growth Opportunities.** Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives, provide us with competitive advantages to continue to grow our business. We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors. *We believe that EmCare is well‑positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data‑driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs. We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers.* At AMR, we believe market share gains will be driven by our strong clinical expertise, high-quality service, strong brand recognition and advanced information technology capabilities. In particular, our proprietary clinical database of patient transports, including detailed tracking of mortality rates and resuscitation metrics, provides analytical support to AMR's differentiated clinical results and has been a key factor in obtaining new contracts. We anticipate driving significant organic growth in Evolution Health by adding new contracts to meet the demand for physician-led care management solutions outside the hospital.

**Grow Complementary and Integrated Service Lines.** Our continued focus on cross-selling and offering integrated services across the patient continuum has helped hospital systems, communities and payors to realize economic benefits and clinical value for patients. We continue to enter complementary service lines at both EmCare and AMR that leverage our core competencies. At EmCare, we continue to expand and integrate our ED, anesthesiology, hospitalist, post-hospital, radiology, tele-radiology and surgery services. Our ability to cross-sell EmCare services is enhanced by our national and regional contracts that provide preferred access to certain healthcare facilities throughout the United States. In addition, our Complete Care package, which is an integrated offering of ED and hospitalist services in primarily rural communities, has been one of our most successful recent growth initiatives. *These factors, among others, have increased the percentage of healthcare facilities utilizing multiple EmCare service lines from 11% in 2010 to*

9

***22% in 2015.*** At AMR, we have expanded service lines, such as our managed transportation operations, fixed-wing air transportation services and community paramedic programs, with both new and existing customers. We expect Evolution Health to be a catalyst for cross-selling our services across all of our businesses and not just within a particular segment or service line.

(Emphases added.)

36.     The 2015 10-K contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [2015 10-K] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

37.     On May 6, 2016, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  For the quarter, Envision reported net income of $30.86 million, or $0.53 per diluted share, on revenue of $724.68 million, compared to net income of $21.04 million, or $0.39 per diluted share, on revenue of $570.45 million for the same period in the prior year.

38.     In the Q1 2016 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the three months ended March 31, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 12% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 79% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 21% was generated from billings to hospitals and affiliated physician groups for professional services.

39.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q1 2016 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

10

40.     On August 3, 2016, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, Envision reported net income of $46.07 million, or $0.80 per diluted share, on revenue of $758.50 million, compared to net income of $33.68 million, or $0.65 per diluted share, on revenue of $641.95 million for the same period in the prior year.

41.     In the Q2 2016 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the six months ended June 30, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 12% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 79% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 21% was generated from billings to hospitals and affiliated physician groups for professional services.

42.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q2 2016 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

43.     On November 3, 2016, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q3 2016 10-Q").  For the quarter, Envision reported net income of $39.95 million, or $0.69 per diluted share, on revenue of $822.22 million, compared to net income of $42.66 million, or $0.83 per diluted share, on revenue of $650.23 million for the same period in the prior year.

44.     In the Q3 2016 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the nine months ended September 30, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 11% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 2% from our surgery services, 1% from our radiology/tele-radiology services, and less than 1% from other hospital management services. Approximately 80% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 20% was generated from billings to hospitals and affiliated physician groups for professional services.

45.    The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q3 2016 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

46.    On March 1, 2017, Envision filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2016 10-K").  For the quarter, Envision reported a net loss of $135.5 million, or $1.84 per diluted share, on revenue of $1.39 billion, compared to net income of $65.57 million, or $1.24 per diluted share, on revenue of $704.26 million for the same period in the prior year.  For 2016, Envision reported a net loss of $18.6 million, or $0.47 per diluted share, on revenue of $3.7 billion, compared to net income of $162.95 million, or $3.16 per diluted share, on revenue of $2.57 billion for 2015.

47.    The 2016 10-K contained signed certifications pursuant to SOX by Defendants Holden and Gulmi, certifying that "the information contained in the [2016 10-K] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

48.    On May 5, 2017, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q").  For the quarter, Envision reported a net loss of $445.2 million, or $3.84 per

diluted share, on revenue of $1.88 billion, compared to net income of $30.86 million, or $0.53 per diluted share, on revenue of $724.68 million for the same period in the prior year.

49. The Q1 2017 10-Q contained signed certifications pursuant to SOX by Defendants Holden and Gulmi, certifying that "the information contained in the [Q1 2017 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

50. The statements referenced in ¶¶ 22-49 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) EmCare routinely arranged for patients who sought treatment at in-network facilities to be treated by out-of-network physicians; (ii) EmCare accordingly billed these patients at higher rates than if the patients had received treatment from in-network physicians; (iii) the Company's statements attributing EmCare's Class Period growth to other factors were therefore false and/or misleading; (iv) Envision's EmCare revenues were likely to be unsustainable after the foregoing conduct came to light; and (v) as a result of the foregoing, Envision's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

51. On July 24, 2017, *The New York Times* reported that hospitals associated with Envision's subsidiary EmCare Holdings Inc. were disproportionately likely to engage in "surprise billing," in which patients who go to in-network hospitals are treated by out-of-network doctors and subsequently billed at higher rates. The article stated, in part:

> A study released Monday by researchers at Yale found that the rate of out-of-network doctor's bills for customers of one large insurer jumped when EmCare entered a hospital. The rates of tests ordered and patients admitted from the E.R.

13

into a hospital also rose, though not as much. The use of the highest billing code increased.

. . .

In the study, the researchers examined nearly nine million visits made to emergency rooms run by a variety of companies between 2011 and 2015, using data from a single insurance company that does business in every state. In exchange for access, the researchers agreed not to identify the insurer. Insurers and health care providers typically sign contracts forbidding them to reveal the prices they have agreed to, and the national trends in surprise billing detected by the Yale team are consistent with a broader study by government researchers.

The new data suggests that EmCare, part of publicly traded Envision Healthcare, did not sign contracts with the insurance company and was able to charge higher prices.

Fiona Scott Morton, a professor at the Yale School of Management and a co-author of the paper, described the strategy as a "kind of ambushing of patients." A patient who goes to the emergency room can look for a hospital that takes her insurance, but she almost never gets to choose the doctor who treats her.

52.    On this news, Envision's share price fell $2.33, or 3.72%, to close at $60.28 on July 24, 2017.

53.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

54.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Envision securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

14

55.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Envision securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Envision or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

57.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Envision;

- whether the Individual Defendants caused Envision to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

15

- whether the prices of Envision securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

60.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Envision  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Envision securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

61.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

16

62.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

65.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Envision securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Envision securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

17

66.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Envision securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Envision's finances and business prospects.

67.     By virtue of their positions at Envision , defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

68.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Envision, the Individual Defendants had knowledge of the details of Envision's internal affairs.

69.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

18

Envision. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Envision's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Envision securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Envision's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Envision securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

70.     During the Class Period, Envision securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Envision securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Envision securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Envision securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

71.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

73.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.     During the Class Period, the Individual Defendants participated in the operation and management of Envision, and conducted and participated, directly and indirectly, in the conduct of Envision's business affairs.  Because of their senior positions, they knew the adverse non-public information about Envision's misstatement of income and expenses and false financial statements.

75.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Envision's financial condition and results of operations, and to correct promptly any public statements issued by Envision which had become materially false or misleading.

76.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Envision disseminated in the marketplace during the Class Period concerning Envision's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Envision to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Envision within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Envision securities.

77.     Each of the Individual Defendants, therefore, acted as a controlling person of Envision. By reason of their senior management positions and/or being directors of Envision, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Envision to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Envision and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

78.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Envision.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

21

D.      Awarding such other and further relief as this Court may deem just and proper.


### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: August 4, 2017

                                                  Respectfully submitted,

                                                  **s/***Paul Kent Bramlett*
                                                  Paul Kent Bramlett #7387
                                                  **BRAMLETT LAW OFFICES**
                                                  Paul Kent Bramlett TN #7387/ MS #4291
                                                  Robert Preston Bramlett #25895
                                                  40 Burton Hills Blvd., Suite 200
                                                  P. O. Box 150734
                                                  Nashville, TN 37215
                                                  Telephone:      615.248.2828
                                                  Facsimile:      866.816.4116
                                                  E-Mails:
                                                          PKNASHLAW@aol.com

                                                          Robert@BramlettLawOffices.com

                                                  **POMERANTZ LLP**
                                                  Jeremy A. Lieberman
                                                  J. Alexander Hood II
                                                  600 Third Avenue, 20th Floor
                                                  New York, New York 10016
                                                  Telephone:  (212) 661-1100
                                                  Facsimile:  (212) 661-8665
                                                  Email:  jalieberman@pomlaw.com
                                                          ahood@pomlaw.com

                                                  **POMERANTZ LLP**
                                                  Patrick V. Dahlstrom
                                                  10 South La Salle Street, Suite 3505
                                                  Chicago, Illinois 60603
                                                  Telephone:  (312) 377-1181
                                                  Facsimile:  (312) 377-1184
                                                  Email:  pdahlstrom@pomlaw.com

                                                  *Attorneys for Plaintiff*