UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| In re ENVISION HEALTHCARE CORPORATION SECURITIES LITIGATION | ) ) ) | Civil Action No. 3:17-cv-01112 (**Consolidated with Case Nos. 3:17-cv-01323 and 3:17-cv-01397**) |
| This Document Relates To: | ) ) ) | CLASS ACTION |
| ALL ACTIONS. | ) ) ) | Honorable William L. Campbell, Jr. |

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

1437037_1

# TABLE OF CONTENTS

**Page**

I.      Introduction & Overview ............................................................................1

        A.      Factual Background ......................................................................3

        B.      Standard of Review......................................................................8

II.     Defendants Violated Section 10(b) of the 1934 Act ...................................9

        A.      Defendants' Scheme and Wrongful Course of Business .........................9

        B.      Defendants Made Materially False and Misleading Statements and
                Omissions Concerning Envision's Business.........................................14

                1.      Defendants Falsely Claimed that EmCare's Revenue and EBITDA
                        Increases Were the Result of Organic Growth Factors, Rather than
                        Its Unsustainable Billing Scheme ................................................15

                2.      Defendants Concealed EmCare's Reliance on Out-of-Network
                        Charges to Drive Growth, Then Claimed that the Transition to In-
                        Network Status Would Not Impact Revenues ...........................23

                3.      Defendants Falsely Claimed that EmCare's Quality of Care Drove
                        Envision's Revenue and EBITDA Growth..................................27

                4.      Defendants Concealed Negatively-Performing Contracts While
                        Boasting About the Purported Reliability of Their Pre-Contract
                        Due Diligence Procedures...........................................................29

        C.      The Complaint Pleads a Strong Inference of Scienter in Support of Lead
                Plaintiffs' Fraud-Based 1934 Act Claims ............................................31

                1.      Defendants' Extraordinary Insider Trading Supports a Finding of
                        Scienter ....................................................................................33

                2.      Defendants' Intentional Concealment of Meaningful Metrics
                        Supports a Finding of Scienter...................................................35

                3.      The Importance of EmCare's Physician Services Revenue to the
                        Company Supports a Finding of Scienter ...................................36

                4.      Defendants' False and Misleading Statements Were Made Close in
                        Time to the Ultimate Revelations ..............................................39

                5.      The Divergence Between Envision's Internal Information and Its
                        External Statements Is Further Indicia of Defendants' Scienter...............40

6.     Envision's Quick Capitulation to the Related False Claims Act Case also Supports a Finding of Scienter ....................................42

7.     Defendants' Self-Interested Motivation in Saving Their Jobs Supports Finding Defendants' Scienter ....................................43

8.     The Complaint Does Not Rely on "Group Pleading" ...............44

9.     There Are No Competing Inferences ....................................44

III.    The Complaint Meets the Notice Pleading Standards for Lead Plaintiffs' Non-Fraud Claims Under the 1933 Act ....................................45

    A.    Plaintiffs' Section 11 Claims Are Not Subject to a Heightened Pleading Standard ....................................46

    B.    Plaintiffs' Section 11 Claims Are Not Subject to the PSLRA Safe Harbor ..........49

IV.    Loss Causation Is Plausibly Plead in Support of the 1934 Act Claims, and Is Presumed For the 1933 Act Claims ....................................50

    A.    Missed 3Q15 Earnings Resulting from Poorly-Performing Contracts Revealed the Weaknesses in Envision's Due Diligence Practices ....................................51

    B.    2017 Stock Price Declines Accompanying News of Envision's Inflated Billing Practices Support Loss Causation ....................................52

        1.     The July 2017 Price Declines Caused by the *New York Times* Article and the NBER Study Are Properly Alleged ....................................53

        2.     The September 18, 2017 Price Decline Following the Resignation of Executives Responsible for the Business Unit Where Fraud Occurred Support Loss Causation ....................................54

        3.     The 42% Stock Drop Following the October 31, 2017 Announcement of an Earnings Miss and Guidance Reduction Resulting from the Impact of the Discontinuance of Defendants Illicit Billing Scheme ....................................55

    C.    Loss Causation Is Presumed Under the 1933 Act, and Not Negated by the Pleadings ....................................58

V.    Lead Plaintiffs' Section 20A Insider Trading Claims Are Adequately Stated ....................................59

1437037_1

A.     Lead Plaintiffs Have Adequately Alleged a Predicate Violation of the 1934 Act as All the Named Defendants Traded on Material, Non-Public Information ................................................................................................. 60

   1.   CD&R ................................................................................................. 60

   2.   The Envision Individual Defendants ............................................... 62

B.     Lead Plaintiffs Have Met Section 20A's "Contemporaneity" Requirement Under Any Definition ......................................................... 63

VI.    The Remaining Claims Are All Adequately Pled ............................................. 64

A.     The Complaint Alleges the Required Elements of a Violation of Section 14(a) of the 1934 Act .................................................................... 64

B.     Defendants Are Statutory Sellers Subject to Liability Under Section 12(a)(2) of the 1933 Act ................................................................ 68

C.     Lead Plaintiffs' Control Person Claims Meet the Notice Pleading Standards Under the 1933 and 1934 Acts ................................................... 69

   1.   To State a §20(a) Claim, Plaintiff Need Only Plausibly Allege Some "Indirect Means of Discipline or Influence" ...................... 70

   2.   Lead Plaintiffs' Section 15 Claims Are Adequately Pled ............ 73

VII.   If the Court Grants Defendants' Motion in Any Respect, Lead Plaintiffs Should Be Granted Leave to Amend .................................................................. 74

VIII.  Conclusion ......................................................................................................... 75

# TABLE OF AUTHORITIES

Page

## CASES

*Adams v. Standard Knitting Mills, Inc.*,
   623 F.2d 422, 430 (6th Cir. 1980) ........................................67

*Albert Fadem Tr. v. Am. Elec. Power Co.*,
   334 F. Supp. 2d 985 (S.D. Ohio 2004) ...........................22, 41, 42, 49

*Anderson v. Young Touchstone Co.*,
   735 F. Supp. 2d 831 (W.D. Tenn. 2010)................................74

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................8

*Avon Pension Fund v. GlaxoSmithKline PLC*,
   343 F. App'x 671 (2d Cir. 2009) ........................................34

*Azzolini v. Corts Tr. II for Provident Fin. Tr. I*,
   No. 103CV1003, 2005 WL 3448053
   (E.D. Tenn. Dec. 14, 2005)................................................59

*Beach v. Healthways, Inc.*,
   No. 3:08-0569, 2009 WL 650408
   (M.D. Tenn. Mar. 9, 2009)...........................................60, 63

*Beck v. Dobrowski*,
   559 F.3d 680 (7th Cir. 2009) ...........................................66

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).....................................................8, 9

*Bentley v. Highlands Hosp. Corp.*,
   No. CV 15-97-ART, 2016 WL 7234757
   (E.D. Ky. Dec. 13, 2016) ................................................48

*Braun v. Eagle Rock Energy Partners, L.P.*,
   223 F. Supp. 3d 644 (S.D. Tex. 2016) ................................22

*Central Laborers' Pension Fund v. Envision Healthcare Corp.*,
   No. 3:17-cv-01397 (M.D. Tenn. Oct. 23, 2017)....................31

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
   957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013).........................31

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ........................................ *passim*

- iv -

*City of Painesville v. First Montauk Fin. Corp.*,
178 F.R.D. 180 (N.D. Ohio 1998) ......................................................................73

*Demoss v. Kretz*,
No. 3:07-0405, 2009 U.S. Dist. LEXIS 853
(M.D. Tenn. Jan. 7, 2009) ..............................................................................72

*Doshi v. Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) ............................................................................43

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)............................................................................14, 50, 51

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
594 F.3d 783 (11th Cir. 2010) ............................................................................61

*Envision Heathcare Corp. v. United Healthcare Ins. Co.*,
No. 18-cv-60530 (S.D. Fla. Apr. 6, 2018) ..........................................................74

*Fidel v. Farley*,
392 F.3d 220 (6th Cir. 2004) ........................................................................42, 43

*Fradkin v. Ernst*,
571 F. Supp. 829 (N.D. Ohio 1983)......................................................................66

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ..........................................................31, 32, 33, 44

*Freeland v. Iridium World Commc'ns, Ltd.*,
545 F. Supp. 2d 59 (D.D.C. 2008)........................................................................25

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
No. 3:09-00882, 2011 WL 1335803
(M.D. Tenn. Mar. 31, 2011)................................................................... *passim*

*Gaynor v. Miller*,
273 F. Supp. 3d 848 (E.D. Tenn. 2017)..........................................................58, 59

*Grae v. Corrs. Corp. of Am.*,
No. 3:16-cv-2267, 2017 WL 6442145
(M.D. Tenn. Dec. 18, 2017)................................................................... *passim*

*Gruhn v. Tween Brands, Inc.*,
No. 2:07-CV-852, 2009 WL 1542795
(S.D. Ohio June 2, 2009) ....................................................................................61

*Halford v. AtriCure, Inc.*,
   No. 1:08cv867, 2010 U.S. Dist. LEXIS 144377
   (S.D. Ohio Mar. 29, 2010) .............................................................................73

*Harden v. Raffensperger, Hughes & Co., Inc.*,
   65 F.3d 1392 (7th Cir. 1995) .......................................................................21

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ............................................................ *passim*

*Hensley v. Gassman*,
   693 F.3d 681 (6th Cir. 2012) .......................................................................48

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983).............................................................................45, 49

*Ind. State Dist. Council v. Omnicare, Inc.*,
   719 F.3d 498 (6th Cir. 2013) .......................................................................67

*In re Almost Family, Inc. Sec. Litig.*,
   No. 3:10-CV-00520-H, 2012 WL 443461
   (W.D. Ky. Feb. 10, 2012) .................................................................. *passim*

*In re Am. Serv. Grp. Inc.*,
   No. 3:06-0323, 2009 WL 1348163
   (M.D. Tenn. Mar. 31, 2009).............................................................. *passim*

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004).........................................................52

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010)..........................................30, 67, 68

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
   No. 09 MD 2058(PKC), 2012 WL 1353523
   (S.D.N.Y. Apr. 12, 2012)............................................................................30

*In re BioScrip, Inc. Sec. Litig.*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015)...........................................................18

*In re Cardinal Health Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) .............................................. *passim*

*In re Century Bus. Servs. Sec. Litig.*,
No. 1:99-cv-2200, 2002 U.S. Dist. LEXIS 26964
(N.D. Ohio June 27, 2002) ................................................................................34

*In re Compuware Sec. Litig.*,
301 F. Supp. 2d 672 (E.D. Mich. 2004)............................................................20

*In re Cybershop.com Sec. Litig.*,
189 F. Supp. 2d 214 (D.N.J. 2002) ...................................................................35

*In re Diebold Sec. Litig.*,
No. 5:05CV2873, 2008 U.S. Dist. LEXIS 64641
(N.D. Ohio Aug. 22, 2008) ..........................................................................33, 41

*In re Direct Gen. Corp. Sec. Litig.*,
398 F. Supp. 2d 888 (M.D. Tenn. 2005).......................................................11, 71

*In re DVI, Inc. Sec. Litig.*,
No. 2:03-CV-05336, 2010 U.S. Dist. LEXIS 92888
(E.D. Pa. Sept. 3, 2010), *aff'd* 639 F.3d 623 (3d Cir. 2011)............................57

*In re EveryWare Glob., Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd sub nom.*
*IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*,
849 F.3d 325 (6th Cir. 2017) .............................................32, 43, 47, 48

*In re Fannie Mae Sec., Derivative & ERISA Litig.*,
503 F. Supp. 2d 25 (D.D.C. 2007) ....................................................................63

*In re Faro Techs. Sec. Litig.*,
534 F. Supp. 2d 1248 (M.D. Fla. 2007)............................................................45

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008)...............................................................17

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004).......................................................20, 48

*In re Ford Motor Co. Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004) .............................................................................28

*In re Fuwei Films Sec. Litig.*,
634 F. Supp. 2d 419 (S.D.N.Y. 2009)...............................................................19

*In re Gas Nat., Inc.*,
No. 1:13-CV-02805, 2015 WL 3557207
(N.D. Ohio Sep. 24, 2014) ...............................................................52, 64

*In re Gen. Motors ERISA Litig.*,
No. 05-71085, 2007 WL 2463233
(E.D. Mich. Aug. 28, 2007) ......................................................................49

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ......................................................23

*In re Gilead Scis. Sec. Litig*,
536 F.3d 1049 (9th Cir. 2008) ..................................................................57

*In re Glob. Crossing, Ltd. Sec. Litig.*,
471 F. Supp. 2d 338 (S.D.N.Y. 2006)........................................................73

*In re Glob. Crossing, Ltd., Sec. Litig.*,
No. 02 Civ. 910 (GEL), 2005 U.S. Dist. LEXIS 16232
(S.D.N.Y. Aug. 8, 2005) ......................................................................72, 73

*In re Grand Casinos, Inc. Sec. Litig.*,
988 F. Supp. 1273 (D. Minn. 1997)......................................................39, 40

*In re Home Depot, Inc. S'holder Derivative Litig.*,
223 F. Supp. 3d 1317 (N.D. Ga. 2016) ......................................................65

*In re KBC Asset Mgmt. N.V.*,
572 F. App'x 356 (6th Cir. 2014) ..............................................................54

*In re Kosmos Energy Ltd. Sec. Litig.*,
955 F. Supp. 2d 658 (N.D. Tex. 2013) ................................................72, 73

*In re Motorola Sec. Litig.*,
505 F. Supp. 2d 501 (N.D. Ill. 2007) ........................................................51

*In re Musicmaker.com Sec. Litig.*,
No. CV 00-2018 CAS, 2001 U.S. Dist. LEXIS 25118
(C.D. Cal. June 4, 2001) ............................................................................49

*In re Mylan N.V. Sec. Litig.*,
No. 16-CV-7926 (JPO), 2018 WL 1595985
(S.D.N.Y. Mar. 28, 2018) ..........................................................................16

*In re Nat'l Century Fin. Enters., Inv. Litig.*,
    504 F. Supp. 2d 287 (S.D. Ohio 2007) ...........................................................69, 72

*In re NationsMart Corp. Sec. Litig.*,
    130 F.3d 309 (8th Cir. 1997) ...........................................................................47

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ......................................................................39, 40

*In re Omnicom Grp. Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ...............................................................................54

*In re Petco Animal Supplies Inc. Sec. Litig.*,
    No. 05-CV-0823-H(RBB), 2006 WL 6829623
    (S.D. Cal. Aug. 1, 2006) ...................................................................................61

*In re Phycor Corp. Sec. Litig.*,
    No. 3:98-0834 (M.D. Tenn. Feb. 17, 2000) ......................................................20

*In re Prison Realty Sec. Litig.*,
    117 F. Supp. 2d 681 (M.D. Tenn. 2000) ................................................. *passim*

*In re Regions Morgan Keegan Sec., Derivative, & ERISA Litig.*,
    743 F. Supp. 2d 744 (W.D. Tenn. 2010) ............................................................58

*In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*,
    No. 2:09-2009 SMH V, 2012 U.S. Dist. LEXIS 197352
    (W.D. Tenn. Mar. 30, 2012) .......................................................................68, 69

*In re Sirrom Capital Corp. Sec. Litig.*,
    84 F. Supp. 2d 933 (M.D. Tenn. 1999) ...............................................23, 47, 48

*In re SmarTalk Teleservs., Inc. Sec. Litig.*,
    124 F. Supp. 2d 527 (S.D. Ohio 2000) ..............................................................34

*In re Sofamor Danek Grp., Inc.*,
    123 F.3d 394 (6th Cir. 1997) ............................................................................13

*In re St. Jude Med. Inc. Sec. Litig.*,
    836 F. Supp. 2d 878 (D. Minn. 2011) ...............................................................51

*In re UNUMProvident Corp. Sec. Litig.*,
    396 F. Supp. 2d 858 (E.D. Tenn. 2005) .......................................................17, 51

1437037_1

Case 3:17-cv-01112   Document 131   Filed 06/11/18   Page 10 of 94 PageID #: 3199

*In re Yum! Brands, Inc. Sec. Litig.*,
    73 F. Supp. 3d 846 (W.D. Ky. 2014)......................................................................59

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
    583 F.3d (6th Cir. 2009) ........................................................................46, 58, 66

*J & R Mktg. v. GMC*,
    549 F.3d 384 (6th Cir. 2008) ..................................................................................60

*Johnson v. Aljian*,
    490 F.3d 778 (9th Cir. 2007) ..................................................................................62

*Kasper v. AAC Holdings, Inc. et al.*,
    No. 3:15-0923 (M.D. Tenn. Jul. 1, 2016) ...............................................................59

*Konkol v. Diebold, Inc.*,
    590 F.3d 390 (6th Cir. 2009) ..................................................................................31

*Kyrstek v. Ruby Tuesday, Inc.*,
    No. 3:14-cv-01119, 2016 U.S. Dist. LEXIS 43523
    (M.D. Tenn. Mar. 31, 2016)......................................................................13, 23, 70

*Ley v. Visteon Corp.*,
    543 F.3d 801 (6th Cir. 2008) ..................................................................................53

*LLDVF L.P. v. Dinicola*,
    No. 09-1280 (JLL), 2010 WL 3210613
    (D.N.J. Aug. 12, 2010)............................................................................................72

*Local 295/Local 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund*
    *v. Fifth Third Bancorp*,
    731 F. Supp. 2d 689 (S.D. Ohio 2010) .............................................................48, 71

*Local 703, I B of T. Grocery & Food Emples. Welfare Fund*
    *v. Regions Fin. Corp.*,
    No. CV: 10-2847-IPJ, 2011 U.S. Dist. LEXIS 60761
    (N.D. Ala. June 7, 2011) .........................................................................................56

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
    238 F.3d 363 (5th Cir. 2001) ..................................................................................47

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ..................................................................................30

1437037_1

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ...................................................................................................9, 12

*McMahan & Co. v. Wherehouse Entm't*,
  65 F.3d 1044 (2d Cir. 1995) ..............................................................................................58

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ........................................................................................54

*Miller v. Champion Enters., Inc.*,
  346 F.3d 660 (6th Cir. 2003) ......................................................................................20, 22

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970) ..........................................................................................................65

*Morse v. McWhorter*,
  200 F. Supp. 2d 853 (M.D. Tenn. 2000) ...........................................................................14

*Morse v. McWhorter*,
  290 F.3d 795 (6th Cir. 2002) ............................................................................................74

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
  929 F. Supp. 2d 740 (M.D. Tenn. 2013) .............................................................44, 51, 69, 71

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys.*,
  877 F.3d 687 (6th Cir. 2017) ..............................................................................9, 16, 33, 54

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys.*,
  No. 3:11-00433, 2016 WL 4098584
  (M.D. Tenn. June 16, 2016),
  *rev'd on other grounds by* 877 F.3d 687 ....................................................................14, 16

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  830 F.3d 376 (6th Cir. 2016) ........................................................................................ *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  __ U.S. __, 135 S. Ct. 1318 (2015) ................................................................................ *passim*

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012) ..............................................................................................13

*Perez v. Higher One Holdings, Inc.*,
  No. 3:14-cv-755(AWT), 2016 WL 6997160
  (D. Conn. Sept. 13, 2016) .................................................................................................17

1437037_1

*Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*,
 940 F. Supp. 1101 (W.D. Mich. 1996) ...........................................................45, 61

*Police & Fire Ret. Sys. v. SafeNet*
 645 F. Supp. 2d 210, 239 (S.D.N.Y. 2009)...............................................................66

*PR Diamonds, Inc. v. Chandler*,
 364 F.3d 671 (6th Cir. 2004) ...............................................................31, 32, 36, 72

*Provenz v. Miller*,
 102 F.3d 1478 (9th Cir. 1996) ................................................................................53

*Pullins v. Klimley*,
 No. 3:05-CV-082, 2008 WL 85871
 (S.D. Ohio Jan. 7, 2008) ...................................................................69, 70, 71, 73

*S.E.C. v. Das*,
 723 F.3d 943 (8th Cir. 2013) ..................................................................................67

*Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*,
 973 F.2d 474 (6th Cir. 1992) ..................................................................................72

*Schuh v. HCA Holdings, Inc.*,
 947 F. Supp. 2d 882 (M.D. Tenn. 2013)...................................................................13

*Smith v. Robbins & Myers*,
 969 F. Supp. 2d 850 (S.D. Ohio 2013) ...............................................52, 65, 66, 71

*Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc.*,
 552 U.S. 148 (2008)................................................................................................10

*Tefft v. Seward*,
 689 F.2d 637 (6th Cir. 1982) ..................................................................................74

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007).....................................................................................8, 32, 44

*Thomas v. Magnachip Semiconductor Corp.*,
 167 F. Supp. 3d 1029 (N.D. Cal. 2016) ..................................................................73

*TSC Indus. v. Northway*,
 426 U.S. 438 (1976)...........................................................................................12, 64

*United States ex rel. Bledsoe v. Cmty. Health Sys.*,
 342 F.3d 634 (6th Cir. 2003) ..................................................................................74

1437037_1

*United States ex rel. Marlar v. BWXT Y-12, L.L.C.*,
   525 F.3d 439 (6th Cir. 2008) .................................................10

*United States v. Semrau*,
   693 F.3d 510 (6th Cir. 2012) .................................................12

*Va. Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991).................................................64

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   845 F.3d 384 (8th Cir. 2016) .................................................13

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
   No. 09-12830, 2010 WL 4184465
   (E.D. Mich. Oct. 21, 2011) .................................................53, 71

*Willis v. Big Lots, Inc.*,
   No. 2:12-CV-604, 2016 WL 8199124
   (S.D. Ohio Jan. 21, 2016) .................................................55, 61

*Wilson v. Great Am. Indus.*,
   855 F.2d 987 (2d Cir. 1988).................................................66

*Winslow v. BancorpSouth, Inc.*,
   No. 3:10-00463, 2011 U.S. Dist. LEXIS 45559
   (M.D. Tenn. Apr. 26, 2011) ................................................. *passim*

*Wright v. MetroHealth Med. Ctr.*,
   58 F.3d 1130 (6th Cir. 1995) .................................................11

*Zwick Partners, LP v Quorum Health Corp.*,
   No. 3:16-cv-2475 (M. D. Tenn. Apr. 19, 2018).................................................18, 25

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §77k(a) .................................................45
   §77k(e) .................................................58
   §77l .................................................2, 45
   §77l(a)(2) .................................................2, 45, 68
   §77l(b).................................................58
   §77o.................................................2, 45
   §77o(a) .................................................73
   §77z-2(b)(2)(D).................................................49
   §77z-2(c)(1) .................................................20

15 U.S.C.

    §78j(b) ............................................................................................................. *passim*

    §78n ................................................................................................................. *passim*

    §78n(e) ....................................................................................................................64

    §78o.................................................................................................70, 71, 73, 74

    §78t(a) .............................................................................................................. *passim*

    §78t-1 ............................................................................................................... *passim*

    §78t-1(a) ..................................................................................................................59

    §78u-4(b)(1) ..............................................................................................................9

    §78u-4(b)(2) ..............................................................................................................9

    §78u-5(c)(1) .............................................................................................................20

17 C.F.R.

    §229.303(a)(3)(ii) ....................................................................................................13

    §240.10b-5 .................................................................................................................9

    §240.10b-5(a) ....................................................................................................10, 13

    §240.10b-5(b) ..........................................................................................................14

    §240.10b-5(c) ....................................................................................................10, 13

Federal Rules of Civil Procedure

    Rule 8 ................................................................................................................48, 69

    Rule 8(a) ....................................................................................................................9

    Rule 9(b) .......................................................................................................... *passim*

    Rule 10b-5 ..............................................................................................................2, 9

    Rule 10b5-1(a) ........................................................................................................14

    Rule 10b5-1(c) ........................................................................................................14

    Rule 12(b)(6) ...............................................................................................8, 58, 69

    Rule 14a-9 ............................................................................................................2, 66

    Rule 15 .....................................................................................................................74

Private Securities Litigation Reform Act of 1995 .....................................9, 25, 27, 49

1437037_1

# I.    Introduction & Overview

This case arises out of one of the largest securities frauds ever committed in the Middle District of Tennessee.  Throughout the Class Period, defendants artificially inflated the price of Envision stock through practices described by Yale University researchers as "the health equivalent of a carjacking."  Defendants' misconduct included: (i) intentionally staffing emergency rooms with out-of-network physicians so Envision could bill patients and insurers at vastly inflated rates; (ii) "up coding," whereby Envision's physicians billed patients and insurers for services that were more expensive than those the patient actually required or was provided; and (iii) arbitrarily increasing hospital admission rates and imaging rates without regard to medical necessity.

These improper practices allowed Envision's senior executives and the private equity firm that hired them to offload *$4.5 billion* of Envision stock to unsuspecting investors, while falsely attributing Envision's success to a "patient-centric model" that "uniquely positioned" Envision to "improve service and quality" and "lower costs."  When the truth about defendants' "unfair and deceptive" business practices was revealed, Envision's stock price plummeted, falling almost 80% below its Class Period high, causing billions of dollars of losses to plaintiffs and the other members of the class who acquired Envision stock at prices inflated by defendants' wrongdoing.

Plaintiffs allege both fraud and strict liability claims against Envision, CD&R and certain of their respective officers or directors under the Securities Exchange Act of 1934 ("1934 Act") and the Securities Act of 1933 ("1933 Act"),[1] including:

---

[1]    The Envision Officer Defendants are:  Sanger, Owen, Wilson and Zimmerman.  Defendants Burt, Mactas, Riggs, Schnall, Shelton, Smith and Williams, each served as an Envision Board member prior to the Merger (collectively, with Sanger, the "Envision Director Defendants," and collectively with the Envision Officer Defendants, the "Envision Individual Defendants").  The AmSurg Officer Defendants are:  Holden, Gulmi and Eastridge. Defendants Cigarran, Deal, Gawaluck, Geringer, Herr, Jacobs, Lavender, Miller and Popp each served as a member of the Board of AmSurg at the time of the Merger (collectively, with Holden and Gulmi, the "AmSurg Director Defendants," and collectively, with Holden, Gulmi and Eastridge, the "AmSurg Defendants").

1437037_1

- Claims under the anti-fraud (§10(b)) provisions of the 1934 Act and Securities and Exchange Commission ("SEC") Rule 10b-5 brought by all plaintiffs against Envision, the Envision Officer Defendants and the AmSurg Officer Defendants, who disseminated false and misleading statements about Envision's business, by failing to disclose the billing practices described above, among other things (ECF No. 88, Count I);

- Claims under the control person (§20(a)) provision of the 1934 Act brought by all plaintiffs against the Envision Individual Defendants and the AmSurg Defendants (other than defendants Cigarran, Herr and Popp) who controlled the decision-making of the Company, including the content and dissemination of the false and misleading statements (*id.*, Count II);

- Claims under the insider selling provisions (§20A) of the 1934 Act brought by the UFCW Pension Fund against defendants CD&R, Williams, Sanger, Owen and Zimmerman, who collectively sold more than $4.5 billion of securities at prices artificially inflated by defendants' undisclosed billing practices (*id.*, Count III);

- Strict liability claims under §§11, 12(a)(2) and 15 of the 1933 Act brought by all plaintiffs against Envision and the Envision Individual Defendants, each of whom was responsible for the false and misleading statements and omissions in the Joint Proxy Registration Statement for the AmSurg merger (*id.*, Counts IV-VI);

- Negligence-based claims under §§14(a) of the 1934 Act and SEC Rule 14a-9 brought by all plaintiffs against Envision, the Envision Individual Defendants and the AmSurg Defendants, who were responsible for the false and misleading statements and omissions in the Joint Proxy Registration Statement or otherwise responsible for effecting the completion of the AmSurg merger (*id.*, Counts VII); and

- Claims under the control person (§20(a)) provision of the 1934 Act brought by all plaintiffs against CD&R, the Envision Individual Defendants and the AmSurg Defendants, who controlled the decision-making of the Company, including the content and dissemination of the false and misleading Joint Proxy Registration Statement (*id.*, Count VIII).

While defendants spill a significant amount of ink in their 65 pages of briefing, they simply ignore the Complaint's detailed allegations. Notably, defendants also rely almost exclusively on out-of-circuit authority in their carefully crafted attempt to avoid responding to plaintiffs' claims on the merits. The motions to dismiss should be denied.

1437037_1

## A. Factual Background

This is a federal securities class action brought on behalf of persons who purchased or acquired the common stock of Envision Healthcare Corporation and Envision Healthcare Holdings, Inc. ("Envision" or the "Company") between February 3, 2014 and October 31, 2017, inclusive (the "Class Period"), against Envision, certain of its senior insiders, and its former controlling shareholder for violations of the federal securities laws. ¶1.[2]

The Complaint alleges that defendants misled investors about the strength of Envision's operations and future prospects. ¶¶48-69. Defendants told investors that Envision's growth was the product of "integrated service offerings, . . . data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs." ¶¶71, 73, 77, 91. They also stated that Envision's "patient-centric model" delivered "the best quality and cost," and that this would drive the Company's growth. ¶¶118. And for a time it appeared Envision's strategy was successful – Envision's largest operating unit, EmCare,[3] showed double-digit compounded annual growth in net revenue and adjusted earnings ("adjusted EBITDA" or "EBITDA"), with EmCare's net revenue increasing from $2.3 billion in FY13 to approximately $4.2 billion in FY16. ¶¶48-49.

In truth, however, EmCare was able to report strong revenue and EBITDA growth by manipulating its out-of-network billing, engaging in unlawful upcoding and improperly increasing hospital admissions and procedures to garner new hospital contracts. ¶¶48-69.

First, EmCare contracted with hospitals to staff their emergency departments ("EDs") with out-of-network physicians, enabling EmCare to bill both health insurers and patients at vastly higher

---

[2] All "¶" or "¶¶" references are to the Consolidated Class Action Complaint for Violation of Federal Securities Laws ("Complaint") (ECF No. 88). All capitalized terms not defined herein have the same meaning as they are defined in the Complaint. Throughout, all emphasis is added and citations are omitted, unless noted otherwise.

[3] During the Class Period, EmCare accounted for approximately 63% to 67% of Envision's total net revenue, and 60% to 66% of Envision's total adjusted EBITDA. ¶171.

rates than its industry peers. ¶¶51-58. A July 2017 National Bureau of Economic Research ("NBER") study entitled: *Surprise! Out-of-Network Billing for Emergency Care in the United States*, revealed that the rate of out-of-network billing for most other hospitals was less than 5%, while the rate of out-of-network billing for hospitals managed by EmCare was more than twelve times higher, or 62%. ¶56. The NBER study found that once EmCare entered a hospital, "out-of-network billing rates increased by between *81 and 90 percentage points*." ¶57.

Second, defendants inflated EmCare's growth through "upcoding," an illegal practice whereby medical providers bill for services using a billing code that is more expensive than the billing code associated with the treatment the patient actually required or was provided. ¶¶59-63. When EmCare entered an ED, coding for the most expensive type of emergency care increased – without explanation – by an average of 42.7%. ¶63.

Third, EmCare inflated facility spending for its hospital partners (which in turn allowed EmCare to increase its own reported growth), by arbitrarily increasing – without regard to medical necessity – hospital admission rates and imaging rates and by using the same clandestine upcoding strategy Envision employed to increase its own revenue. ¶¶64-69.

Taking advantage of the stock price inflation caused by defendants' undisclosed improper practices, Envision's senior executives and CD&R (the private equity firm which controlled Envision) cashed out in an unprecedented fashion. CD&R offloaded its entire $4.4 billion equity stake in four stock offerings at artificially inflated prices between February 2014 and March 2015. ¶¶141-143. Defendants Williams, Sanger, Owen and Zimmerman also sold an additional *$138 million* of their own Envision shares before their misconduct came to light. ¶¶144-147.

Aware that their scheme could not continue forever, Envision began assessing whether it could be sold to another company, or consummate an acquisition large enough to conceal its misconduct. By August 2015, defendant Sanger was in discussions with AmSurg regarding a

1437037_1

merger.  ¶10.  These discussions were terminated in September 2015 when Envision recognized it would soon have to disclose adverse 3Q15 earnings.  ¶10.  On October 22, 2015, Envision issued drastically reduced earnings and guidance, primarily the result of a discrete set of contracts that had been performing below expectations for over a year – or, as defendant Owen said, since "day one." ¶¶130, 139-140.  Nevertheless, defendants consistently claimed prior to the miss that the contracts were performing as expected and boasted that Envision's detailed pre-contracting diligence provided management with great insight into expected revenues and profits *before* a contract was signed. ¶¶124-125, 127, 130-131.  While Envision's stock price declined over 30% on the 3Q15 miss, it continued to trade at artificially inflated levels throughout the remainder of the Class Period as defendants mischaracterized the miss as an isolated incident, assuring investors that Envision's "new contract pipeline [wa]s still robust."  ¶¶11, 71, 79.  Defendants affirmatively concealed that internally Envision was seeing "dramatic" changes in out-of-network reimbursements, as rates had been "declining significantly" and "precipitously," but had been "masked" by "tons" of revenue derived from acquisitions.  ¶¶93, 191.

Defendants' discussions with AmSurg continued, however, and on June 15, 2016, the companies announced a merger agreement between Envision and AmSurg.  ¶148.  On August 5, 2016, defendants disseminated to shareholders the Joint Proxy Registration Statement which emphasized the Merger's "synergies," estimating double-digit revenue and earnings growth for the combined Company, including FY17 EBITDA of approximately $1.5 billion.  Notably, the Joint Proxy Registration Statement did not disclose the illicit billing scheme that had driven Envision's revenue and adjusted earnings growth since its IPO.  ¶¶89, 91.  The Merger was completed on December 1, 2016.  The honeymoon, however, was short-lived.

In March 2017, defendants announced that Envision's $1 billion in out-of-network business – approximately 17% of Envision's post-Merger Physician Services revenues – would be moved in-

network over the next 18-24 months. In response to analysts' concerns about the adverse impact this change would have on Envision's revenue growth, defendants stressed that the transition would be "revenue-neutral" and would not adversely impact Envision's double-digit FY17 and FY18 EBITDA growth. Defendants further misled investors by characterizing the move to in-network as one of "great positive surprise" and a "pearl of the merger." In doing so, defendants concealed what they would later admit – that Envision's out-of-network rates had been precipitously declining and by the end of the Class Period were below the in-network rate offered by payors.

On July 25, 2017, the *New York Times* published a front page exposé detailing how Yale University researchers had exhaustively analyzed EmCare's pattern and practice of over-billing, and reporting how numerous patients were being "ambushed" by EmCare's business strategy into paying unexpected and outrageous charges. ¶16. The article was based largely on the NBER study, which exhaustively detailed Envision's misleading billing practices.

By the end of the day on July 25, Envision's stock had declined 6% from its closing price on July 23, 2017. ¶199. Yet, defendants continued to conceal the extent to which its historical and forecast growth was dependent on practices like those described above. ¶199. Investors were unable to discern this information on their own because it was not disclosed in Envision's financial statements or otherwise publicly available and, throughout the Class Period, defendants had refused to provide detailed or specific information about the extent to which it relied on out-of-network billings, even in response to specific questions from analysts. ¶¶164-170.

Internally, however, the response to the *New York Times* article and the NBER study was much different. On September 18, 2017, Envision announced a number of organizational changes, including the unexpected "resignation" of Envision's key Physician Services Division President, Bob Coward. ¶¶172, 200. In response to this news, Envision's stock declined an additional 10% on substantial volume of 11.2 million shares. ¶201. Two days later, on September 20, 2017, U.S.

Senator Claire McCaskill ("Senator McCaskill") sent a letter to Holden, demanding answers regarding EmCare's abusive practices, and recognizing that "EmCare staffing and management may have contributed to a decline in health care quality and access to patients." ¶¶18, 54.

It was not until October 31, 2017 (when Envision released its 3Q17 results) that defendants finally acknowledged the risks arising from its unfair business practices, slashing Envision's earnings and revenue outlook for FY17 and FY18. ¶¶202-203. Envision said the miss and guidance reduction were caused primarily by negative performance issues in its Physician Services Division business, the business unit responsible for managing in- and out-of-network medical services provided at EDs. ¶¶195, 203. Envision badly missed its 3Q17 estimates, was significantly reducing 4Q17 EBITDA guidance, and expected a 25%-30% reduction in FY18 EBITDA. ¶19. Defendants further surprised investors by admitting that Envision's out-of-network revenue was now below the in-network rate offered by payors. ¶¶202-203. Shocked by this dramatic change, analysts noted the adjusted guidance was about 50% below the $1.5 billion EBITDA defendants had, at the time of the Merger, led investors to expect for FY17. These disclosures caused Envision's stock price to collapse by over 41%, from over $42 per share to $28 per share. *Id.*

At the same time CD&R and other senior Envision insiders were able to unload *$4.5 billion* of their own Envision stock at prices near Envision's Class Period highs, plaintiffs and other class members investors who purchased Envision shares at inflated prices and/or obtained Envision shares in the Merger, suffered billions of dollars of harm as the truth about, and impact associated with, defendants' misconduct entered the market. This action seeks to recover those losses.

1437037_1



**Envision**

August 14, 2013 - Envision IPO

July 16, 2014 - CD&R sells more than 30 million shares for *$1 billion*, Sanger and Owen also sell shares for *$26 million*

March 9, 2015 - CD&R sells its remaining 51 million shares of common stock in the March 9, 2015 Offering for *$1.8 billion*

October 22, 2015 - Envision announces drastically reduced earnings and outlook as a result of failing contracts defendants had known of for a year. Stock declines 30%

July 24-25, 2017 - *New York Times* publishes article disclosing EmCare's misconduct and billing schemes. Stock declines 6%

September 18, 2017 - Envision unexpectedly announces "resignation" of key executives. Stock declines 10%

October 31, 2017 - Envision announces drastically reduced earnings and outlook as a result of revenue shortfall in Physician Services. Stock declines 42%

February 5, 2014 - CD&R sells more than 30 million (of the 31.6 million shares sold by selling stockholders) for almost *$1 billion*, Sanger and Owen also sell shares for almost *$15 million*

September 25, 2014 - CD&R sells more than 17 million (of the 17.5 million shares sold by selling stockholders) in the September 25, 2014 Offering for *$600 million*, Sanger and Owen also sell shares for *$12 million*

June 15, 2016 - Envision-AmSurg merger announced

December 1, 2016 - Envision-AmSurg merger completed

Class Period: February 3, 2014 - October 31, 2017

## B. Standard of Review

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts consider a complaint "in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382-83 (6th Cir. 2016). In general, a complaint "does not need detailed factual allegations," but only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 556.

1437037_1

## II.    Defendants Violated Section 10(b) of the 1934 Act

To state a prima facie claim of securities fraud under §10(b) of the 1934 Act, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 383-84 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)); *accord Norfolk Cty. Ret. Sys. v. Cmty. Health Sys.*, 877 F.3d 687, 694 (6th Cir. 2017) ("*Cmty. Health II*").

A securities fraud claim must satisfy Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 383.  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The PSLRA requires a plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter.  15 U.S.C. §78u-4(b)(1)-(2).  All other allegations are subject to *Twombly* and Rule 8(a).  *See id.*

Section 10(b) prohibits "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. §78j(b).  SEC Rule 10b-5 imposes liability for material misrepresentations or omissions, as well as for engaging in a scheme or wrongful course of business which operates as a fraud or deceit on investors ("scheme liability").  17 C.F.R. §240.10b-5.  Plaintiffs allege both statement-based and fraudulent scheme/omission-based theories.  ¶224.

### A.    Defendants' Scheme and Wrongful Course of Business

Rule 10b-5 makes it unlawful for any person to "employ any device scheme or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a

- 9 -

fraud or deceit upon any person[] in connection with the purchase or sale of any security." 17 C.F.R.

§240.10b-5(a), (c). Defendants' motions repeatedly refer to the alleged scheme, but they fail to

make any argument for dismissal of plaintiffs' scheme claims.

Courts have long recognized that the "securities laws reach misleading ***conduct*** as well as

misleading statements, so long as there is some mechanism by which that conduct misled investors."

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 WL 1335803, at *45

(M.D. Tenn. Mar. 31, 2011) (Haynes, J.) ("*Psychiatric Sols.*") (citing *Stoneridge Inv. Partners LLC

v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158-59 (2008)); *In re Am. Serv. Grp. Inc.*, No. 3:06-0323,

2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) (Haynes, J.). A plaintiff need only "'provide

examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *Grae v.

Corrs. Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at *12 (M.D. Tenn. Dec. 18, 2017)

(Trauger, J.) (quoting *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 444-45 (6th

Cir. 2008)).

Plaintiffs allege that Envision relied on a disproportionate and unsustainable use out-of-

network billing, as well as unlawful upcoding, to achieve revenue and earnings growth. ¶¶4-7, 48-

69. These undisclosed business practices misled investors, causing them to wrongly conclude that

Envision's historic and forecast growth was reflective of solid execution of its business plans and

strong demand for its services. *See* ¶¶7, 178-193. In truth, Envision's reported and forecast growth

was unsustainable, and was the focus of increasing objections from patients, regulators, legislators

and third-party payors. *Id*; ¶¶15-16, 53-54.

Asserting that plaintiffs' allegations are "unsupported" or conclusory, defendants in reality

take umbrage with the facts plaintiffs have alleged. *See* Mem. Br. at 5, 11-13.[4] Defendants' factual

---

[4] Memorandum in Support of Defendant Envision Healthcare Corporation and the Individual Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Mem. Br.") (ECF No. 126).

1437037_1

disputes, however, provide no support for dismissal at this juncture.  *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 894, 897-98 (M.D. Tenn. 2005) (Campbell, Todd).  This "stage of the litigation is not the time to compare the parties' respective collections of supporting facts and inferences."  *Id.*  So long as allegations are based on information derived from competent sources – and here there can be no dispute they are – the truth or falsity of that information is a question left for discovery.  *E.g.*, *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130 (6th Cir. 1995) (issues of credibility are not properly determined on the pleadings); *Am. Serv. Grp.*, 2009 WL 1348163, at *16, *47, *62 (crediting allegations of fraud based on *New York Times* article, corroborated by later negative financial report resulting from conditions and events described in the article); *Psychiatric Sols.*, 2011 WL 1335803, at *8-*11 (crediting allegations of understaffing and patient mistreatment based on *Chicago Tribune* article).  The Complaint's particularized allegations plead the existence of defendants' alleged scheme, notwithstanding defendants' objections.  ¶¶48-69; *supra*.

Ignoring *Am. Serv. Grp.* and similar authorities, defendants instead contend that the *New York Times* article, and the NBER study on which it was based, are not accurate.  *See* Mem. Br. at 1, 11-12.  But defendants' factual attacks on the NBER study and the *New York Times* article fall far short of establishing that the facts alleged are not competent to plead the existence of the alleged scheme.  Defendants attempt, for example, to characterize the NBER study as a "narrow statistical sample" (Mem. Br. at 12) but ignore that the NBER study pulled from a final data set of more than 8.9 million episodes at emergency departments in 3,345 hospitals over the course of four years, covering roughly $28 billion in economic activity.  Ex. 38[5] "NBER study") at 12-13.  While the before-and-after analysis of EmCare's billing practices was based on the 16 hospitals where NBER researchers could find public records of EmCare's entrance between 2011 and 2015, those results are

---

[5]  All "Ex. __" references are to the Declaration of Joseph B. Crace, Jr. in Support of Defendant Envision Healthcare Corporation and the Individual Defendants' Motion to Dismiss the Consolidated Amended Complaint (ECF No. 127).

1437037_1

also corroborated by the larger sample of 194 EmCare-affiliated hospitals analyzed in the study. *Id.* at 12. At the 16 hospitals, NBER found that: (a) out-of-network billing rose quickly and precipitously in all eight hospitals where the pre-entry rate was below 10.1%; and (b) out-of-network billing rates did not change for the remaining eight hospitals where the pre-entry rate was already above 97%. *Id.* at 12, 22-25. Across all 194 EmCare hospitals analyzed in the study, NBER found EmCare's average out-of-network billing rate to be 62% – far higher than the national average. *Id.* at 3, 13, 24. As with their other fact-based challenges, defendants' contention that the number of hospitals studied is too small to matter provides no ground for dismissal. *See, e.g.*, *Matrixx*, 563 U.S. at 27-28; *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976).

That neither the NBER study nor the *New York Times* article opine on the legality of defendants' billing practices does not undercut the validity of the study's empirical findings, or demonstrate that Envision's practices were not illicit.[6] Nor does it undermine the NBER study's conclusion that the dramatic billing changes observed when EmCare takes over an ED likely evidences a "deliberate strategy to increase physician compensation." NBER study at 8.[7] Contrary to defendants' claim that there are "no corroborating factual allegations" to support the claim of upcoding (Mem. Br. at 12-13), the NBER study refutes any argument that "changes in the case mix of patients that hospitals treat" after EmCare's entry explained the noted increases in "the rate patients are admitted from the ED to the hospital, imaging rates, facility spending or coding severity." ¶¶63-68; *see also* NBER study at 29-31. This stands in contrast to the findings regarding

---

[6] There is no dispute that the practice of "upcoding" is illegal, as "it is difficult to imagine a more obvious way to commit healthcare fraud than billing for services not actually rendered." *United States v. Semrau*, 693 F.3d 510, 530 (6th Cir. 2012).

[7] As defendants are well aware, the chart included in ¶57 is taken directly from the *New York Times* article and is sourced from the NBER study authors.

one of EmCare's top competitors – TeamHealth – which had virtually no change in hospital admissions, testing or coding upon taking over an ED.  NBER study at 4.

Defendants' contention that they had no duty to disclose their wrongful business practices is both incorrect and misses the point.  *See* Mem. Br. at 10-13.  Envision's wrongful course of business was misleading precisely because it was undisclosed.  17 C.F.R. §240.10b-5(a) and (c) prohibit deceptive acts separate and apart from any liability defendants may have for making false and misleading statements and omissions.  *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 391-93 (8th Cir. 2016).

Defendants also ignore that Item 303 of SEC Regulation S-K requires disclosure of material trends, events and uncertainties that are known or reasonably expected to have a material impact on revenues or income.  *Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 888 (M.D. Tenn. 2013); *Kyrstek v. Ruby Tuesday, Inc.*, No. 3:14-cv-01119, 2016 U.S. Dist. LEXIS 43523, at *24-*25 (M.D. Tenn. Mar. 31, 2016) ("*Ruby Tuesday*"); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).

The Complaint alleges that EmCare's negative out-of-network reimbursement "trend," which was then adversely impacting and was reasonably expected to continue to have a material adverse impact on future revenues and EBITDA fits squarely within the SEC disclosure rules that defendants violated.  ¶¶186, 191.  Defendants contend that there is no "actual authority" that requires disclosure of "recovery rates" or "out of network" billing.  Mem. Br. at 22.  But SEC disclosure rules were written to apply to *all* industries, and have never been interpreted to require disclosure only when a specific industry metric is mentioned in the rules.  17 C.F.R. 229.303(a)(3)(ii).

Defendants' reliance (Mem. Br. at 8-10) on *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394 (6th Cir. 1997), is similarly misplaced.  There, "the information claimed as adverse to the company had already been disclosed and was publicly available to permit an independent assessment by

- 13 -

investors and analysts." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560 (6th Cir. 2001). *In re Almost Family, Inc. Sec. Litig.*, No. 3:10-CV-00520-H, 2012 WL 443461, at *2, *13 (W.D. Ky. Feb. 10, 2012) was also dismissed on similar grounds. Here, by contrast, neither the NBER study or the data on which it was based had been publicly disclosed before the *New York Times* article was published. *See, e.g.*, *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys.*, No. 3:11-00433, 2016 WL 4098584, at *11-*12 (M.D. Tenn. June 16, 2016) ("*Cmty. Health I*") (distinguishing *Sofamar* and *Almost Family* as "inapposite" and "markedly different" from the complaint that alleged the defendants "hid core facts about the basis for the excessive ED admissions" and "aggressive growth strategies"), *rev'd on other grounds by* 877 F.3d 687; *see also Morse v. McWhorter*, 200 F. Supp. 2d 853, 860-61 (M.D. Tenn. 2000).

Throughout the Class Period, defendants' business practices misled investors about EmCare's business model, which depended on its ability to inflate revenue for both itself and its hospital partners in order to win new hospital contracts and sustain its reported growth rates. ¶¶178-193. Defendants knew, but failed to disclose, that this illicit billing scheme was coming under increasing scrutiny, and as a result was unsustainable. *Id*. These allegations sufficiently plead a violation of Rule 10b5-1(a) and (c), and provide an independent basis for upholding the Complaint. *See Am. Serv. Grp.*, 2009 WL 1348163, at *44-*47.

### B.    Defendants Made Materially False and Misleading Statements and Omissions Concerning Envision's Business

The 1934 Act prohibits "the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting 17 C.F.R. §240.10b-5(b)). Corporate actors must therefore "'provide complete and non-misleading information with respect to the subjects on which [they] undertake[] to speak.'" *Helwig*, 251 F.3d at 561. "[A] company may

choose silence or speech elaborated by the factual basis as then known – but it may not choose half-truths." *Id.*

The Complaint alleges that defendants made materially false and misleading statements and omissions concerning: (a) the critical drivers of EmCare's revenue and EBITDA growth rates; (b) the financial ramifications of EmCare transitioning EDs from out-of-network to in-network status; (c) the quality of care given to EmCare patients; and (d) the due diligence conducted by Envision in bidding on new contracts. *See* Complaint, §V.

### 1. Defendants Falsely Claimed that EmCare's Revenue and EBITDA Increases Were the Result of Organic Growth Factors, Rather than Its Unsustainable Billing Scheme

Defendants repeatedly asserted that EmCare's "significant organic growth" was the product of its "integrated service offerings," "data-driven processes," "scalable technology" and "sophisticated risk management programs" and claimed that the Company was "well-positioned" to continue its growth numbers based on these factors. *See, e.g.*, ¶¶71, 73, 77-79, 82, 91.[8] These statements were materially false and misleading because they concealed from investors that EmCare's reported and projected growth was largely dependent on its ability to (i) continue billing out-of-network charges at rates in excess of industry norms; (ii) continue increasing revenue through improper upcoding; and (iii) increase hospital profits through these same improper practices, thereby allowing Envision to win new hospital contracts that were critical to Envision's reporting revenue and EBITDA growth. ¶¶50, 55, 59. None of defendants' arguments for dismissal have merit.

**Statements Regarding Basis of Financial Performance**. Defendants contend that claims related to historical financial statements that are not alleged to be incorrect must be dismissed.

---

[8] These statements were made by: (a) Envision in its February 2014 prospectus; (b) Envision in its annual financial report on Form 10-K for the fiscal years of 2013, 2014, 2015 and 2016; (c) Zimmerman and Owen at the December 2014 Oppenheimer Healthcare Conference; (d) Sanger at the January 2015 JP Morgan Healthcare Conference; and (e) Owen at the May 2015 Bank of America Merrill Lynch Health Care Conference.

Mem. Br. at 14-15. The alleged statements and omissions are nearly identical to those found actionable in *Cmty. Health I*, 2016 WL 4098584. There, plaintiffs alleged that expert reports that "compare[d] Community's patient data to that of other hospitals" revealed that the company's "profits depended largely on Medicare fraud." *Cmty. Health II*, 877 F.3d at 689-91. The Community Health defendants stated that "synergies" and "efficiencies" in its hospitals were "key factors in the growth of its business," but failed "to disclose mandated, non-compliant, and unsustainable companywide practices that drove that success." *Cmty. Health I*, 2016 WL 4098584, at *10. Also like defendants here, Community Health's implementation of improper policies were accompanied by stark changes in admissions and billing rates upon taking over a hospital, with one major hospital seeing "sharp increases in inpatients and sharp declines in outpatients" immediately after acquisition. *Cmty. Health II*, 877 F.3d at 691. The court found the concealed practices were "certainly" material, as it is "an all but foregone conclusion that the aggressive growth strategies would tank when use of [those practices] was subjected to scrutiny." *See Cmty. Health I*, 2016 WL 4098584, at *11.

It is not only defendants' nondisclosure of Envision's illicit over-billing scheme that amounts to an actionable omission – it is the **combination** of the reported financial results and metrics together with defendants' explanations of the bases for those purportedly extraordinary results that gives rise to plaintiffs' claims. As Judge Sharp recognized in *Cmty. Health I*, "once [defendants] 'put the topic of the cause of [their] financial success at issue,' they were 'obligated to disclose information concerning the source of the success.'" 2016 WL 4098584, at *12; *accord In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018) ("'[W]here a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal

- 16 -

business practices.'") (quoting *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008)).  Many courts have found similar claims actionable, including where defendants:

- omitted to disclose that the company's ability to produce revenue growth of 7% - 9% was predicated upon an undisclosed practice of cutting expenses below the levels necessary to prevent physical and sexual assaults on patients (*Psychiatric Sols.*, 2011 WL 1335803, at *30-*31);

- engaged in "widespread and systemic" practices designed to deny inmates access to covered medical services to inflate profits, which "constituted material omissions about [defendant]'s actual practices, costs and gross margins during the class period" (*Am. Serv. Grp.*, 2009 WL 1348163, at *47); and

- attributed improved performance to factors other than the manipulation of claims reserves, which was alleged to be the true source of the performance gains (*In re UNUMProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 887 (E.D. Tenn. 2005)).

In contrast to this on-point authority, defendants rely on two cases where claims were dismissed due to the absence of allegations that the true source of, and risks to, the company's success was concealed from investors.  *See Perez v. Higher One Holdings, Inc.*, No. 3:14-cv-755(AWT), 2016 WL 6997160, at *15 (D. Conn. Sept. 13, 2016) (dismissing claim that defendants "had a duty to disclose the existence of improper business practices ***prior to any indication that those practices were under scrutiny***"); *Almost Family*, 2012 WL 443461, at *7-*9 (dismissing "soft statements" regarding the company's belief that it was in compliance with Medicare regulations where statements from confidential witnesses fell short of implicating a company-wide fraudulent scheme).

**Non-actionable opinions**.  Defendants contend that their statements are inactionable statements of opinion.  Mem. Br. at 15-16.  But prefacing statements with "we believe" does not render them non-actionable.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318, 1331 (2015) ("*Omnicare III*").  Such a rule "would nullify that statutory requirement for all sentences starting with the phrases 'we believe' or 'we think.'"  *Id.*

- 17 -

Here, the statements at issue are plainly of fact, not opinion, as they purport to explain the specific factors that led to Envision's past, and were expected to lead to its future, success. *See, e.g.*, ¶¶73, 91 (annual report statements that Envision's "significant new contract revenue growth has been driven by [its] differentiated service offerings and ability to deliver efficient, high-quality care"; that "Organic growth has historically been supported by consistent underlying market volume trends, stable pricing and a diversified payor mix"; and that Envision "successfully executed on new contract growth by providing a set of differentiated services and delivering integrated, efficient, high-quality care"); *see also Omnicare III*, 135 S. Ct. at 1325 ("A fact is 'a thing done or existing' or '[a]n actual happening'" where "[a]n opinion is 'a belief[,] a view,' or a 'sentiment which the mind forms of persons or things.'").

Were they pure statements of opinion, that alone would not render the statements "non-actionable." Rather, as defendants concede, statements of opinion are actionable where they omit material facts about the basis or reliability of the opinion. *Id.* at 1326, 1329. The Complaint adequately alleges that defendants' "belief" about the reasons for Envision's growth was misleading because they omitted to disclose the extent to which out-of-network billing, upcoding, and inflated hospital admission rates were the source of such growth. *Supra*, §II.A; *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, slip op. at 9 (ECF No. 144) (M. D. Tenn. Apr. 19, 2018) (Crenshaw, J.) ("An opinion statement may be actionable if it is paired with a sufficiently material omission."). Whether characterized as an "opinion" or not, the statements are actionable. *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 726-29 (S.D.N.Y. 2015) (holding that the statement that "the Company believes it is in substantial compliance with all laws, rules and regulations that

- 18 -

affects its business and operations," was actionable where defendants received notice of government investigation).[9]

**Safe Harbor**. Defendants contend that "[m]any of the statements of opinion" are forward looking statements protected by the statutory safe harbor or the bespeaks caution doctrine.[10] Mem. Br. at 17-18. Most, if not all, of the statements alleged to be misleading under the 1934 Act are not forward-looking, as they are alleged to be misleading due to their description of the current and historic factors that had led to Envision's success. Based on this historic performance, defendants consistently claimed that EmCare was "well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs." ¶73; *see also* ¶82 ("What's been driving the growth and what we believe will continue to drive that growth is really from a hospital standpoint, reimbursement continues to move to differentiation based on outcomes and metrics. . . . So hospitals are looking for more sophistication, more ability to impact broader metrics, and so that's driven our growth."). The failure to disclose the true source of Envision's historic success misled investors about the current state of Envision's business, regardless of whether that information was communicated with respect to the Company's historic results, its current financial condition, or its prospects for continued success. *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 442 (S.D.N.Y. 2009) (holding that the "bespeaks caution" doctrine does not

---

[9]   Defendants' reliance on *Almost Family* is misplaced, as the statements attributing the company's success to several factors were found to be "soft statements," and were limited to comments made at a single conference presentation. 2012 WL 443461, at *6-*7. Here, the majority of the statements identifying Envision's growth factors are contained in SEC filings, and "[i]nvestors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life." *Omnicare III*, 135 S. Ct. at 1330.

[10]   Defendants only specifically identify a few statements that they claim are inactionable on this basis, most of which are contained in the Joint Proxy Registration Statement.

apply where "the failure to disclose the present and past state of affairs is an alleged omission of present and historical fact").

Moreover, even those statements that could be construed as forward looking do not fall under the protection of the PSLRA's safe harbor, as: (i) the Complaint adequately alleges that each of the defendants knew that the abnormal amount of billing for out-of-network charges and upcoding was the true source of EmCare's rapid growth , and (ii) none of the statements were accompanied by meaningful cautionary language. *See* 15 U.S.C. §78u-5(c)(1); *see also* 15 U.S.C. §77z-2(c)(1) (1933 Act Safe Harbor).

There can be no reasonable dispute that defendants were aware of Envision's historic reliance on upcoding and out-of-network charges to foster revenue and earnings growth, or could have discovered those facts had they conducted a reasonable investigation and performed proper due diligence before issuing their statements. ¶260; *see also supra*, §I.A. (detailing the scope of Envision's schemes and the vast differences compared to emergency rooms not run by Envision).

And defendants failed to provide meaningful cautionary language that would trigger the safe harbor. For almost two decades courts in this Circuit have recognized that to be "'meaningful,'" "'cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge.'" *Helwig*, 251 F.3d at 559; *see also In re Phycor Corp. Sec. Litig.*, No. 3:98-0834, slip op. at 6 (ECF No. 90) (M.D. Tenn. Feb. 17, 2000) (safe harbor[s] "raise questions of fact which cannot be decided on a motion to dismiss"); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 596 (N.D. Ohio 2004) ("[G]eneral" cautionary language which "fails to disclose the 'actual risks' known by the Company" insufficient.); *Compare Miller v. Champion Enters., Inc.*, 346 F.3d 660 (6th Cir. 2003) (exact risk disclosed), *with In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 685-86 (E.D. Mich. 2004) (cautionary language not "meaningful" where it implied development of competing software as "a possibility as opposed to an

actuality").  Risk disclosures are "meaningless" where they "portend[] the future, but d[o] not alert investors about the conditions that then exist[]."  *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 U.S. Dist. LEXIS 45559, at *47 (M.D. Tenn. Apr. 26, 2011).

Defendants' cautionary language was not "meaningful."  The only substantive risk factor applicable to these statements are the boilerplate warnings that Envision is "subject to decreases in [its] revenue and profit margin under our fee-for-service contracts, where [it] bear[s] the risk of changes in volume, payor mix and third party reimbursement rates" and that Envision's revenues and profit margin could fluctuate under its fee-for-service contracts.  Mem. Br. at 18.  But these statements do not inform investors of:  (a) the extent of Envision's reliance on out-of-network charges and upcoding to drive revenues and growth, (b) the potential negative impact of "balance billing" legislation; or (c) the unsustainability of Envision's historic billing practices.

Defendants point to no warnings in Envision's SEC filings that disclosed the risks to its earnings if out-of-network payments or upcoding charges declined from historic rates.  Nor do defendants explain why the generalized warnings were sufficiently meaningful.  Generalized and non-specific warnings, where the important facts giving rise to the risks have not been disclosed, are insufficient to invoke safe harbor (or bespeaks caution) protection.  *See, e.g.*, *Helwig*, 251 F.3d at 560 ("blanket statements" that "offered investors no guidance about the consequences of health care reform upon the company's business . . . were not meaningful and were hardly even cautionary"); *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 690 (M.D. Tenn. 2000) (explaining that the bespeaks caution doctrine requires that forward-looking statements be accompanied by "'meaningful warnings and cautionary language'" (quoting *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1404 (7th Cir. 1995)).

Even if defendants had attempted to explain why the warnings were meaningful under the circumstances pled in the Complaint, their arguments would raise issues of fact not properly

- 21 -

determined at this stage. *See Prison Realty*, 117 F. Supp. 2d at 690 (whether cautionary language was "sufficiently meaningful" under the bespeaks caution doctrine "presents questions of fact that are inappropriate for determination on this Motion to Dismiss").

Defendants are only able to cite cases where, unlike here, the cautionary language detailed the specific risks at issue. *See, e.g.*, *Miller*, 346 F.3d at 677-78 (finding meaningful cautionary language where defendants "disclosed the exact risk that occurred in this situation: excess retailer inventory that could lead to negative economic effects on [defendant company]"); *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 654 (S.D. Tex. 2016) (holding that company's overly optimistic projections of its ability to issue consistent monthly cash distributions despite looming debt problems "were accompanied by *specific* cautionary language . . . *[i]n addition to* . . . generalized warnings" where the company identified *specific* potential negative impacts to its value as well as risks, including contractual debt, that could affect the company's "'ability to generate sufficient cash flows for making distributions'"); *Albert Fadem Tr. v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1019-22 (S.D. Ohio 2004) (applying safe harbor and bespeaks caution protection where defendants warned of the precise risks – the volatility and risky nature of the energy trading and wholesale business – of which the plaintiffs claimed to have been unaware). Envision, by contrast, issued vague, boilerplate warnings regarding revenue projections, but it never provided specific cautionary statements regarding out-of-network billing or upcoding practices. The safe harbor rule (and the bespeaks caution doctrine) therefore provides no protection from liability.

**Puffery**. Defendants contend their statements describing the bases for Envision's growth were "puffery." Mem. Br. at 15-14, 19-20. But "puffery" is just another attack on materiality, which raises fact-based contentions not susceptible to resolution on the pleadings. *Grae*, 2017 WL 6442145, at *14 (rejecting defendants' puffery contentions and finding materiality to be a question for the jury); *see, e.g.*, *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th

Cir. 2005) ("*Bridgestone*") (even "opinion or puffery . . . in particular contexts when it is both **factual and material** . . . **may** be actionable") (emphasis in original); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013) ("[I]nformation relating to Gentiva's purported push to provide medically unnecessary services to secure extra reimbursement from Medicare, even if only accounting for a small percentage of Gentiva's actual profits, was not 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'").

Moreover, defendants' statements about the source of Envision's growth and profitability are not mere puffery, *i.e.*, "loosely optimistic statements insufficiently specific for a reasonable investor to 'find them important to the total mix of information available.'" *Bridgestone*, 399 F.3d at 671. Indeed, the statements referenced in ¶¶71-92 concern the factors to which defendants attributed Envision's and EmCare's historical growth, which were the very same factors that served as the basis for defendants' assertions that Envision remained "well-positioned to continue to generate significant organic growth." Thus, the statements at issue here offer "facts about the current state of Defendant's affairs and go beyond vaguely optimistic statements about the future." *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 943 (M.D. Tenn. 1999); *see also Ruby Tuesday*, 2016 U.S. Dist. LEXIS 43523, at *23 (statements regarding defendants' "excitement" over "growth potential" of restaurant division were puffery, but finding them actionable due to omissions of restaurant's financial performance).

## 2. Defendants Concealed EmCare's Reliance on Out-of-Network Charges to Drive Growth, Then Claimed that the Transition to In-Network Status Would Not Impact Revenues

As their out-of-network billing scheme began to unravel, defendants falsely assured investors that a change to in-network status would not negatively affect EmCare's revenue growth. In response to initiatives to prohibit physicians from billing patients for out-of-network charges (*i.e.*, "balance billing"), defendants falsely maintained that new balance billing legislation – and the newly

- 23 -

announced plan to transition a majority of Envision's out-of-network business to in-network status – would actually be a "***positive***" for the Company. ¶¶94, 99, 107. But the truth was that payors were pushing back and declining to pay Envision's inflated out-of-network rates. ¶¶13, 94, 183. As a result, EmCare's net recovery rates on its out-of-network bills, which had served to inflate EmCare's revenues, began to plummet. ¶¶178, 181, 186. Even after the *New York Times* article was published, defendants doubled down on their false reassurances, claiming the move to in-network was "one of the pearls of the merger." ¶108.

On February 27, 2017, defendant Holden announced Envision's "strategic priority" to "mov[e] a majority of [its] relationships to in-network status," but claimed that the move would be "a net positive shift in policy, with significant strategic benefits" and that it could "be achieved in a budget neutral or positive way" without being "dilutive." ¶¶99-100. Again in March 2017, Holden and Mr. Bob Kneeley (on behalf of Envision) emphasized that "moving in network is revenue-neutral to the organizations." ¶¶101-102. Defendants continued issuing similar statements throughout the year, commenting on the "revenue-neutral" impact the transition would have. ¶¶103-108. Holden claimed the transition to in-network status was "really a revenue-neutral decision" during the September 7, 2017 conference call on which he admitted that the industry-wide "out-of-network rate has dropped precipitously" at least "over the last several years" ¶¶108, 187. It was not until Envision announced its 3Q17 earnings miss and lowered its 4Q17 guidance on October 31, 2017 that defendants finally admitted that Envision's own "out-of-network recovery rates had declined so precipitously" that "Envision's revenue from out-of-network services was lower than the in-network rate offered by payors." ¶110(g).

Relying primarily on impermissible factual arguments, defendants attempt to recharacterize or contradict the allegations in the Complaint. But facts in a complaint are to be construed in favor of the plaintiff, and dismissal may not be premised on arguments like those defendants prematurely

seek to raise here. *Helwig*, 251 F.3d at 553 ("Our willingness to draw inferences in favor of the plaintiff remains unchanged by the PSLRA."); *Zwick Partners*, *supra*, at 13 ("The Court cannot consider Defendants' defenses or asserted counter-facts . . . at this time").

For instance, defendants make a pseudo truth-on-the-market argument that Holden's "revenue neutral" statements disclosed that EmCare's out-of-network rates had been declining for several years. Mem. Br. at 21-23. Yet a truth-on-the-market argument is a "fact intensive inquiry" that is inappropriate to resolve on a motion to dismiss. *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 79 (D.D.C. 2008). Moreover, the "revenue neutral" statements omitted how declines in EmCare's out-of-network rates were negatively impacting Envision's financial results and its inability to achieve future EBITDA guidance. Defendants did not adjust their inflated guidance as their billing schemes unraveled, but to the contrary, assured investors the out-of-network transition would be neutral or a positive to earnings. It was not until the end of the Class Period that the truth was revealed when defendants admitted their out-of-network recovery rates were actually below the in-network rate and announced a 3Q17 earnings miss and 4Q17 guidance reduction.

Defendants also contend plaintiffs' allegations are "premature" because they purportedly only claimed that their objective "was for the transition to be ***revenue neutral 'within the next 12-18 months*** from August 2017.'" Mem. Br. at 20. Not so. Defendants stated that their "objective [wa]s to ***move the majority of our out-of-network revenue to in-network status within the next 12 to 18 months*** with a revenue neutral impact." ¶104. Investors reasonably understood defendants' statements to be explaining the time it would take to complete the transition, ***not*** to warn (as defendants' surmise) that the impact would be revenue neutral only after that entire time period had elapsed. Defendants' related contention that there is no basis to plead that the transition was ***not*** revenue neutral simply ignores their own description of the reasons for the 3Q17 earnings miss and

guidance reduction, which on its own provides a competent basis to plead that the transition was not revenue neutral. *See* ¶¶202-204.

Defendants further contend that their statements in February, March and May 2017 regarding Envision's plans to increase the number of in-network relationships "demonstrate that [they] had been candidly and consistently discussing" the transition and its revenue-neutral impact. Mem. Br. at 22-23. But defendants ignore that these statements were ***at best*** half-truths. Defendants' general admission in February 2017 that a material portion of its business derived from out-of-network payments did not touch on the true scope or systematic nature of defendants' overbilling scheme – as was ultimately revealed by the NBER study in July 2017. ¶¶55-68. By concealing and misrepresenting the risks associated with changing payment trends, defendants misled investors that there was no reason to be concerned with the transition.

Defendants again claim that their statements were merely opinions (Mem. Br. at 21), ignoring that corporations and their insiders cannot project "financial well-being . . . while knowingly omitting material facts that would have tempered their optimism." *Helwig*, 251 F.3d at 544. To allow otherwise would allow "a patchwork of honesty and omission." *Id.* at 560. That is a proposition which "is untenable[] both as a matter of policy and precedent." *Id.* at 560-61. Defendants were aware that their out-of-network recovery rates were dramatically declining, and this negative trend in reimbursement rates materially contributed to Envision's dramatic 3Q17 earnings miss and lowered 4Q17 and FY18 EBITDA guidance. ¶¶110-111. Hence, defendants had no reasonable basis to believe that the change to in-network would be "revenue neutral," and any assurances to the contrary were merely an effort to conceal the undisclosed decline in out-of-network recovery rates for which the Company still had significant exposure – and do so long enough to allow defendants to dispose of $4.5 billion of their own Envision holdings.

1437037_1

Nor are defendants' statements regarding the transition of its business to in-network status protected by the PSLRA's safe harbor. *See* Mem. Br. at 21. While defendants attempt to construe their statements as relating to future revenue performance, their statements misled investors about the rationale and basis for defendants' statements regarding the move to in-network status. Viewed in context, these are statements of present or historical fact, and thus are not protected by the PSLRA.[11] *See, e.g.*, ¶95 ("[W]e believe this **current approach** ensures that we will have an adequate revenue stream to satisfy contractual commitments to deliver high quality patient care, and maintain margins."); ¶96 ("While there are recent questions raised on the [balance billing] matter, **it's been a part of our business for a long time** and it's primarily related to our ED services."); ¶97 ("And the conversation you have about going in network or out of network is a conversation that the customer leads. We don't. **So, I just have been used to it for so long I don't think it's a great risk**.").

### 3. Defendants Falsely Claimed that EmCare's Quality of Care Drove Envision's Revenue and EBITDA Growth

Defendants claimed Envision's "significant new contract growth" had been driven by its ability to deliver "efficient, high-quality care," and that Envision and EmCare were able to "lower costs and improve quality." ¶¶112-113, 116, 119, 121.[12] Envision claimed in its Forms 10-K for

---

[11] Even if those statements could be construed as forward-looking, the safe harbor does not apply because defendants knew about the risks posed by the Company's excessive reliance on out-of-network charges, upcoding and other overbilling schemes, and Envision's purported risk disclosures were not meaningful. *See infra*, §III.C. Defendants do not even attempt to identify the particular cautionary statements that would apply to the "transition" statements (*see* Mem. Br. at 21 n.23), and none of the purported warnings referenced in Ex. 1 are germane to the statements concerning the transition to in-network services.

[12] These statements were made by: (a) Envision in its February 2014 prospectus in connection with a secondary offering of securities; (b) Envision in its annual financial report on Form 10-K for the fiscal years of 2013, 2014, 2015 and 2016; (c) Sanger at the June 2015 William Blair Growth Stock Conference; (d) defendants in a June 2016 presentation promoting the Merger; and (e) the Envision Director Defendants in the 2016 Joint Proxy Registration Statement.

FY13-FY15 that all "decisions regarding patient care [we]re made exclusively by the physicians," and defendant Sanger reiterated in January and February 2016 that Envision maintained a "patient-centric model." ¶¶114, 117-118. This was not true. The NBER study confirmed that upon entry into a hospital with low out-of-network rates, (a) EmCare would "raise out-of-network rates by over 81 percentage points and increases average physician payments by 117%," (b) the rate at which emergency room physicians billed the highest severity code increased by more than 40%, and (c) there was a 23% increase in the rate at which patients were admitted to the hospital from the emergency room. ¶¶57-58, 63, 67. These changes were immediate, "like a light switch was being flipped on" (¶15), evidencing that EmCare's decisions regarding patient care were not being made "exclusively by the physicians" as part of a "patient-centric model" – but instead were directed by EmCare's corporate strategy of maximizing out-of-network rates and the use of expensive and unnecessary tests and procedures. ¶¶114, 118, 122(e). U.S. Senator Claire McCaskill even recognized that "EmCare staffing and management may have contributed to a decline in health care quality and access for patients." ¶54.

Defendants characterize their statements about "high-quality care" as "lofty, aspirational statements of opinion." *See* Mem. Br. at 23-24. But "even superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism." *Grae*, 2017 WL 6442145, at *14. Unlike statements generally proclaiming commitment to quality in *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004), statements about quality and cost of patient care are specific, objectively verifiable statements of fact that stand in stark contrast to the practices revealed by the NBER study. *See Bridgestone*, 399 F.3d at 671-72. While the "question of what constitutes an adequate level of quality for clients in any particular field is difficult to resolve without evidence from knowledgeable experts," what plaintiffs

have alleged here is "as much as any plaintiff could be expected to plead to establish an allegation of quality deficiencies at the complaint stage." *Grae*, 2017 WL 6442145, at *14.

4. **Defendants Concealed Negatively-Performing Contracts While Boasting About the Purported Reliability of Their Pre-Contract Due Diligence Procedures**

In its 2013 and 2014 reports on Form 10-K, Envision assured investors that, before entering into a new contract, management "typically have visibility into payor mix," "ensures that the proposal is consistent with certain financial parameters" and "evaluates all aspects of each proposal, including financial projections, staffing model, resource requirements and competition, to determine how to best achieve [EmCare's] business objectives and the customer goals." ¶¶125, 132. Defendant Sanger assured investors in June 2014 that "when [Envision] enter[s] a contract [it is] not entering into these contracts blind," but rather has a "a very good understanding of the payer mix" and "a great understanding of reimbursement" such that it is "almost 99% right in terms of what [it] believe[s] [it's] going to see from that" contract. ¶124. In February 2015, in response to a question regarding the margin profile of EmCare's most recent contracts, defendant Owen told investors that, "if you looked at those [contracts] on an aggregate basis," the margins for those contracts would be "pretty similar to our overall EmCare margins." ¶127. Similarly, on a June 2015 conference call, defendant Owen continued to assure investors that they "expect[ed] to see margin improvement from recent [contract] starts." ¶130.

These statements were revealed to be false in October 2015, when Envision announced 3Q15 financial results that had fallen far short of expectations due to what defendant Sanger explained were a "certain group of contracts that had significantly performed below . . . expectations." ¶¶133-134. Defendant Sanger acknowledged that "approximately 30 contracts, about 21 of those that were – that came on in the last few quarters that frankly, were underperforming substantially based on the changes and [payor] mix that we saw, volume we saw, and we kind of misread what the cash per

- 29 -

visit was. . . . We ran into a set of frankly, poor execution, poor decision about taking those contracts." ¶135. That is, defendants admitted that the losses from the underperforming contracts were a result of inadequate diligence and that Envision "was missing a lot of information [and] had to make assumptions that were incorrect," such that defendants "misread for the ability to recruit . . . how many providers [it] would have *day one*." ¶¶135-139; ¶140 (admitting later in December 2015 that "with this group of about 20 contracts, it was an issue that [Envision] faced *immediately*").

Defendants' attempt to portray these allegations as "fraud-by-hindsight" (Mem. Br. at 24-25) is mistaken. Defendants ignore that at the time they assured investors that they expected this particular group of contracts to perform "pretty similar to [its] overall EmCare margins," they were *already* aware that the Company was missing the necessary information to conduct adequate diligence. *See* ¶¶135-140 (reflecting defendants were "immediately" aware, from "day one," that assumptions were incorrect). Plaintiffs' claims here are not based on a "generalized assertion concerning 'extensive' diligence," as in the principal case relied upon by defendants. *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, No. 09 MD 2058(PKC), 2012 WL 1353523, at *6 (S.D.N.Y. Apr. 12, 2012). Rather, they are based on defendants' own admissions in October and December 2015 about what they knew *at the time* the alleged misrepresentations were made. ¶¶133-140. This is not "fraud by hindsight." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (post-class period "admissions . . . directly and cogently tend to prove [defendants] state-of-mind at the time of their misleading statements and omissions") (*cited with approval in Winslow*, 2011 U.S. Dist. LEXIS 45559, at *39).

Nor were defendants' assertions "puffery," they were specific representations contained in annual reports, reaffirmed by fact-based assertions regarding the performance of contracts on which diligence had supposedly been performed. Objectively verifiable statements are not puffery. *Psychiatric Sols.*, 2011 WL 1335803, at *47-*49; *see also In re Bank of Am. Corp. Sec., Derivative,*

& *ERISA Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010).  Defendants' reliance on out-of-circuit

authority in *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, is misplaced, as that case involved

"general portraits of [the defendant's] due diligence" untethered to the type of factual misstatements

regarding performance that are present here.  957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013).

Finally, defendants' contention that "Plaintiffs asserted Section 10(b) claims based on these

statements for the first time in the CAC filed on January 26, 2018," is wrong.  Mem. Br. at 24-25.

Central Laborers' Pension Fund filed a complaint on Monday, October 23, 2017 (within two years

from defendants' October 22, 2015, disclosures about Envision's purported due diligence and its

adjusted guidance), containing allegations regarding this exact claim.  *See Central Laborers'*

*Pension Fund v. Envision Healthcare Corp.*, No. 3:17-cv-01397 (M.D. Tenn. Oct. 23, 2017) (ECF

No. 1, ¶¶72-75).

### C.    The Complaint Pleads a Strong Inference of Scienter in Support of Lead Plaintiffs' Fraud-Based 1934 Act Claims

Plaintiffs have pled a strong inference that defendants acted with scienter in concealing the

Company's unsustainable and systematic billing schemes and making each of the misrepresentations

and omissions described above.  Scienter may take the form of "'[1] knowing and deliberate intent to

manipulate, deceive, or defraud, and [2] recklessness.'"  *Frank v. Dana Corp.*, 646 F.3d 954, 958-59

(6th Cir. 2011) ("*Dana*") (quoting *Konkol v. Diebold, Inc.*, 590 F.3d 390, 396 (6th Cir. 2009)).

Recklessness is "'highly unreasonable conduct which is an extreme departure from the standards of

ordinary care.  While the danger need not be known, it must at least be so obvious that any

reasonable man would have known of it.'"  *Id.* (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d

671, 681 (6th Cir. 2004)).  The allegations against the Envision Individual Defendants can also be

imputed to Envision: "'knowledge of a corporate officer or agent acting within the scope of [his]

authority is attributable to the corporation.'"  *Bridgestone*, 399 F.3d at 688.

- 31 -

In considering scienter, courts must consider the totality of circumstances. *Tellabs*, 551 U.S. at 321-22; *accord PR Diamonds*, 364 F.3d at 428. A complaint will survive "if a reasonable person would deem the inference of scienter cogent and ***at least as*** compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 310. "This necessarily involves a sifting of allegations in the complaint. . . . [R]ecklessness in securities fraud is an untidy, case-by-case concept." *Helwig*, 251 F.3d at 551. The Court cannot, as defendants attempt here, treat each paragraph of the Complaint in isolation. *Tellabs*, 551 U.S. at 323.

The Sixth Circuit has identified nine non-exhaustive factors ("the *Helwig* factors") that courts have considered in determining whether a strong inference of scienter has been pled:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Dana*, 646 F.3d at 958 n.2 (citing *Helwig*, 251 F.3d at 552). Not all factors need to be met. *Bridgestone*, 399 F.3d at 685 (finding a strong inference of scienter despite four of the nine factors not being applicable). No case supports defendants' wild assertion that "the ***absence*** of any Helwig factors strongly suggests that Plaintiffs have failed to plead facts giving rise to a strong inference of scienter." Mem. Br. at 32. The *Helwig* court itself emphasized that this list was not exhaustive, and was only meant to "point to fixed constellations of facts that courts have found probative of securities fraud." *Helwig*, 251 F.3d at 552; s*ee also In re Cardinal Health Sec. Litig.*, 426 F. Supp. 2d 688, 718 n.43 (S.D. Ohio 2006) (noting that a plaintiff "should draw upon these factors where applicable"). And contrary to defendants' suggestion, *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F.

Supp. 3d 837, 856-61 (S.D. Ohio 2016), *aff'd sub nom. IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017), and *In re Diebold Sec. Litig.*, No. 5:05CV2873, 2008 U.S. Dist. LEXIS 64641, at *16-*35 (N.D. Ohio Aug. 22, 2008), merely found that the plaintiff had failed to plead scienter after a holistic review. Here, the totality of the factors supports a strong inference – *i.e.*, one that is as plausible as any competing innocent inferences – that the defendants acted knowingly or at least recklessly. *See Dana*, 646 F.3d at 958.

## 1. Defendants' Extraordinary Insider Trading Supports a Finding of Scienter

Three of the nine *Helwig* factors – insider trading, bribery, and withholding information from disinterested directors – "all go to the same question: conflict of interest." *Bridgestone*, 399 F.3d at 685. "[I]nsider trading at a suspicious time or in an unusual amount" supports an inference of scienter. *Helwig*, 251 F.3d at 552.

Envision's top executives all engaged in highly suspicious stock sales before disclosure of EmCare's billing practices. From February 11, 2014 to December 2016, Sanger sold **91%** of his Envision stock available for sale for proceeds of approximately $80 million; Owen sold **80%** of his sellable stock for proceeds of over $36 million; Zimmerman and Williams sold shares for total proceeds of nearly $18 million and over $4.3 million, respectively. ¶¶144-147.

The "remarkable timing of defendants' stock sales" supports an inference that defendants knowingly or recklessly misled the market. *See Cmty. Health II*, 877 F.3d at 695. And setting aside the timing, the sheer size of the sales is enough to make them "suspicious." *Helwig*, 251 F.3d at 573 (sale of stock can be suspicious if it is "unusual in scope *or* timing"). "Courts have classified stock sales as unusual or suspicious based on a variety of factors, which include 'the amount of profit from sales,' 'the portion of stockholdings sold,' 'the change in volume of insider sales,' 'and the number of insiders selling.'" *Cardinal Health*, 426 F. Supp. 2d at 728. Here, the sums involved are highly unusual both in absolute amount – nearly $140 million sold by a few individuals – and in the portion

- 33 -

of available shares sold – 91% by Sanger, and 80% by Owen.  ¶¶144-147.  This supports an inference of scienter.  *E.g.*, *In re SmarTalk Teleservs., Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000) (finding sales of 40%, 27%, 11%, and 37% of holdings to support a strong inference of scienter); *see also Psychiatric Sols.*, 2011 WL 1335803, at *58 (sales of 55% and 47% supported inference of scienter).

Defendants' contention that their insider trading does not support an inference of scienter because they successfully concealed the truth for a relatively long time after they sold out (Mem. Br. at 34-35), does not make sense.  It is precisely the rapidity with which defendants Sanger and Owen dumped their shares that suggests they knew material negative information that the market did not. Moreover, it is the proximity in time of the sales to the false statements, not the subsequent revelations over which defendants had no control, that makes those sales so suspicious.  *SmarTalk*, 124 F. Supp. 2d at 541 (insider sales support a strong inference of scienter where they were made close in time to the alleged misrepresentations, even though they were made "long before the end of the class period").

While defendants make much of the fact that some of the Envision Director Defendants did not sell shares and increased their holdings (Mem. Br. at 33, 36 n.45), those defendants are not §10(b) defendants, making their scienter or lack thereof irrelevant.  *See* ¶¶220-230; *In re Century Bus. Servs. Sec. Litig.*, No. 1:99-cv-2200, 2002 U.S. Dist. LEXIS 26964, at *26 n.18 (N.D. Ohio June 27, 2002) (trading by non-defendants is "not . . . probative of the defendants' scienter").  The §10(b) individual defendants sold substantial numbers of shares, and the two most central to the fraud sold nearly all the shares they were allowed to sell under applicable equity ownership guidelines.  ¶¶144-145.  For that reason, defendants' cases are inapt.  *See Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (cited in Mem. Br. at 36) ("Three of the four individual defendants increased their net holdings of GSK stock during the class period, and

1437037_1

the fourth individual defendant did not sell any shares at all."); *In re Cybershop.com Sec. Litig.*, 189

F. Supp. 2d 214, 234 (D.N.J. 2002) (cited in Mem. Br. at 36) (of three individual defendants, one not

alleged to have sold any shares; other two sold shares "but those sales affected minimally their

overall holdings" and one of those "remained the company's single largest shareholder"). In any

event, defendants concede that the other defendants' increases in net holdings were almost entirely

the result of "stock grants," not actual purchases of shares (Mem. Br. at 36 n.45), and they ignore the

fact that the Company had in place "equity ownership guidelines" that required directors and officers

to maintain a minimum level of equity holdings, such that continuing to hold zero shares was not an

option. *See* ¶¶144-146.

Defendants themselves concede that even those defendants who made some trades under a

10b-5(1) trading plan did ***not*** exclusively trade under such a plan (Mem. Br. at 35) – many of their

largest sales were made in connection with the secondary public offerings of Envision stock – and a

review of the Form 4s shows that all of the trading plans on which defendants rely were adopted

***after*** defendants began making false and misleading statements. *See* Exs. 18-19, 25. The fact that

these defendants, knowing of the Company's material false statements and omissions, opted to sell

their shares under a trading plan rather than in immediate sales "does not preclude the strong

inference of scienter, given the[] other circumstances" present here. *Psychiatric Sols.*, 2011 WL

1335803, at *58. In any event, "[a]ssuming an ambiguity about the justifications for [these

defendants'] stock sales, Defendants' contentions on this issue cannot be resolved on a motion to

dismiss." *Id.* (citing *Helwig*, 251 F.3d at 558).

### 2. Defendants' Intentional Concealment of Meaningful Metrics Supports a Finding of Scienter

The "disclosure of accounting information in such a way that its negative implications could

only be understood by someone with a high degree of sophistication" also supports an inference of

scienter. *Helwig*, 251 F.3d at 552. Envision's financial disclosures relating to its improper out-of-

network billing practices were so opaque that even someone with a high degree of sophistication could not have understood the relevant information until after the Class Period. Although Envision's quarterly and annual reports contained a chart purporting to show its "payor mix," that chart did not disclose the portion of EmCare's revenue generated by out-of-network billing. ¶164.

When defendants did begin providing information about the portion of EmCare's business attributable to out-of-network billing, they presented the information in a way that made it impossible to understand. First, in May 2016, the Envision Officer Defendants claimed that EmCare's business was roughly 20% out-of-network. ¶166. By March 2017, they put this number much higher, with VP Bob Kneeley telling a healthcare conference that the rate was "perhaps 30% to 35%," or about $700 to $800 million. ¶167. In August 2017, Holden told investors (after reassuring them that "[t]here's no gamesmanship here") that out-of-network billing was "about $1 billion." ¶169. This, at a time when EmCare was ostensibly shifting business in-network. ¶¶98-100.

Defendants' ever-changing statements on out-of-network billing strongly supports the inference that defendants were attempting to conceal Envision's actual billing practices in an effort to obscure the Company's true condition.

### 3. The Importance of EmCare's Physician Services Revenue to the Company Supports a Finding of Scienter

"Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations and omissions pertain to 'central, day-to-day operational matters,'" and especially where they are "'[f]acts critical to a business's core management.'" *Psychiatric Sols.*, 2011 WL 1335803, at *57; *accord PR Diamonds*, 364 F.3d at 688. In *Grae*, this Court found that the health of a relationship "which provided between 11% and 13% of the company's annual revenue, was central to [the company's] operations by any meaningful definition of the term." 2017 WL 6442145, at *21. The centrality of that relationship to the business supported a strong inference of scienter. *Id.*

- 36 -

It is implausible that the Envision Officer Defendants – all of whom held high-level positions at Envision, ¶¶30-34, 37-40, and three of whom had come up through the ranks of EmCare's senior management, ¶¶30, 32-33 – were not aware of EmCare's out-of-network and upcoding practices, given their participation in financial matters and the pervasiveness and magnitude of the billing schemes. EmCare accounted for the vast majority of Envision's business – between 63% and 67% of Envision's total net revenues during the Class Period. ¶171. The Envision Officer Defendants have placed out-of-network billing revenues specifically at anywhere from 20% to 35% of that number, and anywhere from $700 million to $1 billion in annual revenue. *See* ¶¶164-170.

The Envision Officer Defendants cannot plausibly claim that they did not realize the importance of out-of-network billing, given the enormous impact of switching to out-of-network billing: on average, in-network physicians charge 266% of what the Medicare program would pay, while out-of-network physician charge an average of 637%. ¶52. The disparity in balance-billing practices between EmCare hospitals and the rest of the industry was even more stark: the mean out-of-network billing rate for hospitals managed by EmCare was more than 1,000% greater than the rate at most other hospitals, and EmCare immediately increased out-of-network billing by 81% to 90% at newly acquired hospitals. ¶256. EmCare likewise significantly boosted the rates of admissions (23%) and of billing for the most expensive service codes (42.7%) upon taking over a new hospital ER. ¶¶63, 67. These are not minor changes that could have slipped under the radar of executive officers. Instead, the only plausible inference is that EmCare's upcoding and out-of-network billing schemes were a key part of its business model, of which Envision's officers and directors were aware and cultivated.

Despite this awareness, the Envision Officer Defendants never disclosed the central importance of EmCare's billing practices; nor did the defendants indicate that such practices were unsustainable in light of growing insurer and legislative pressures to shift in-network. Instead,

defendants played down the Company's over-reliance on these practices and the accompanying risks. *See, e.g.*, ¶97 (defendant Holden, the new CEO, stating that out-of-network billing was a stable practice – having been around for "30-something years" – and not a "great risk"); ¶95 (defendant Sanger claiming that Florida's out-of-network billing law "ensures that [Envision] will have an adequate revenue stream to satisfy contractual commitments to deliver high quality patient care, and maintain margins"). After the Merger, defendant Holden claimed that the move to in-network was "really a revenue neutral decision" and in fact the opportunity was "one of the pearls of the merger." ¶108. Only later would Envision executives admit that "over the last several years . . . the out-of-network rate ha[d] dropped precipitously" and that this worrisome trend had been "masked" from investors during the Class Period through a series of acquisitions. ¶¶93, 187.

Moreover, defendants never disclosed EmCare's reliance on out-of-network billing or upcoding, despite signing certifications that each of the filings during the Class Period contained material and accurate information. ¶92; *see, e.g.*, *Psychiatric Sols.*, 2011 WL 1335803, at *56 ("The Sarbanes-Oxley certifications signed by Jacobs and Polson establishes their awareness of PSI's rising malpractice expenses and declining staffing levels and budgets as well as the increasing costs of the regulatory investigations at Riveredge.").

Defendants' omissions are particularly glaring in light of their extensive and specific efforts to explain EmCare's seemingly strong performance. Defendants touted a slew of other factors, including "differentiated service offerings"; "efficient, high-quality care"; "brand recognition"; "competitive advantages in clinician recruitment"; and "lower costs." *See* ¶¶71-91, 112-113, 116, 125. These claims suggest that defendants had intimate knowledge of issues relating to billing and patient care. Defendants "cannot, in one breath, claim that [they] placed a high priority on [patient care] and then, in the next breath, plausibly suggest that perhaps its most important decision makers

- 38 -

were simply unaware of the mountain of evidence made available to them on that very topic." *Grae*, 2017 WL 6442145, at *21.

### 4. Defendants' False and Misleading Statements Were Made Close in Time to the Ultimate Revelations

Further supporting a strong inference of scienter is the temporal proximity between defendants' fraudulent statements and the disclosure of the truth. *See Helwig*, 251 F.3d at 552. Although there is no bright line for when timing contributes to an inference of scienter, courts have held that a matter of weeks or even months apart may support the inference. *See, e.g.*, *Winslow*, 2011 U.S. Dist. LEXIS 45559, at *66 (noting the "speed with which defendants" changed their story, from reaffirming financial results on February 2 and 10, 2010, to admitting those results to be questionable on February 25 and restating the results on March 15, 2010); *In re Grand Casinos, Inc. Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997) ("[G]iven the short time frame from [a] December offering, through the opening of [defendants' project] in late April 1996, to the revelations of mammoth problems beginning on July 22, 1996, it is reasonable to infer that management was on notice of these problems during the class period."). This analysis is always case-specific.

That the court in *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 484 (6th Cir. 2014) ("*Omnicare II*") found a "large time lapse . . . suggesting a lack of scienter," where the relevant statement had first been made in identical form in a Form 10-K more than three years before the ultimate revelation, *id.* at 463-64, therefore, has no bearing on this case. Here, defendants gave false assurances four months before the *New York Times* exposé (¶¶91, 99, 176) and described their visibility into new contracts seven months before revealing their lack of due diligence on new contracts (¶177). Even after the *New York Times* article came out, Envision continued to assure investors that the move to in-network would have "revenue-neutral impact" and was not a "high-risk-to-execute strategy." ¶¶99, 101, 104, 106, 108. These false assurances came less than two

months before Envision admitted that it had drastically missed its 3Q17 guidance and that it was forced to reduce guidance going forward. ¶176. These facts are starkly different from *Omnicare II. See also Grand Casinos*, 988 F. Supp. at 1283 (finding approximately seven-month period between offering and revelations to be "short time frame" and supportive of scienter). In short, it is implausible, given the timing, that defendants were not aware that their statements or omissions were false and misleading.

**5.    The Divergence Between Envision's Internal Information and Its External Statements Is Further Indicia of Defendants' Scienter**

The Complaint alleges Envision made public statements that contradicted its internal reporting. Envision publicly misrepresented that it extensively vetted new contracts when, in fact, the Company entered into contracts where it was forced to make assumptions to compensate for missing information. In 2014, defendant Sanger assured investors that when Envision enters into new contracts it is not "entering into these contracts blind," meaning the company adequately reviewed and vetted data from contracting parties. ¶124. And Envision's 2013 and 2014 Forms 10-K specifically represented that Envision had "visibility into payor mix prior to entering into new contracts." ¶125. Yet by October 2015, defendant Sanger had to acknowledge that the Company had not received sufficient information before entering at least twenty contracts and instead "had to make assumptions" that later proved incorrect. ¶138. Envision VP Bob Kneeley conceded that Envision had entered into these contracts without "hav[ing] access to the data [that the Company] normally would," and that that failure created an "immediate" issue." ¶140. Contrary to the 2014 statement that Envision did not enter into contracts blind, these admissions indicate that this was exactly what the Company had done. ¶137.

Defendants also had access to contemporaneous information about Envision's out-of-network billing scheme, and the declining out-of-network recovery rates. ¶¶155-156. As discussed above,

the sheer scope of EmCare's billing schemes is such that it is highly improbable that defendants did not receive internal reports indicating that, contrary to defendants' public statements, EmCare's financial well-being was heavily reliant on out-of-network billing and upcoding. During the Class Period all defendants other than Herr, Cigarran, and Popp were privy to relevant internal reports.

¶157. According to the 2014 and 2015 Form 10-Ks, "[s]enior management evaluates all aspects of each [contract] proposal, including financial projections, staffing model, resource requirements and competition." ¶154. And board members, "informed by reports from [Envision's] management team," "ha[d] primary responsibility for evaluating strategic and operational risk management." ¶155. Defendants cannot plausibly argue that officers who evaluated all aspects of every contract proposal, and board members who were tasked with oversight and informed by internal reporting from those officers, were not aware of major, system-wide billing practices that generated significant portions of Envision's overall revenue. *See, e.g.*, *Grae*, 2017 WL 6442145, at *20 (company's "own public statements about its quality assurance practices go a long way" toward showing that defendants knew of information that would have been reported as part of claimed robust quality assurance system); *Psychiatric Sols.*, 2011 WL 1335803, at *52 (allegation that management "actively tracked" data supported inference of scienter). Yet, as discussed above, none of the defendants ever publicly disclosed the scope of EmCare's schemes.

Defendants' reliance on *Diebold*, 2008 U.S. Dist. LEXIS 64641, at *21-*24, is misplaced. In that case, "[n]either the Complaint nor the opposition . . . explain[ed] other than in a conclusory, generalized fashion how [the internal] reports or meetings provided the defendants with specific information revealing 'the fraudulent revenue recognition scheme.'" *Id.* at *21. *Albert Fadem Tr.*, 334 F. Supp. 2d 985 is even further afield: there, plaintiffs made no allegation whatsoever that there was any internal procedure in place during the relevant period to notify management about the misconduct at issue, or that there was any internal reporting about that conduct during the relevant

- 41 -

period.  *Id.* at 994.  To the contrary, the plaintiffs specifically alleged that the Company "lacked internal controls" with respect to the conduct at issue.  *Id.* at 1006.  Here, the Form 10-Ks specifically confirmed that senior management (which included the Envision Officer Defendants) "evaluate[d] ***all aspects*** of each proposal," which more than inferably includes aspects relating to the in- or out-of-network status of billing.  ¶154.

### 6.    Envision's Quick Capitulation to the Related False Claims Act Case also Supports a Finding of Scienter

The "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit" supports a strong inference of scienter.  *Helwig*, 251 F.3d at 552.  "[A] company engaging in [quickly settling fraud suits] is, all things being equal, more likely than not aware of the improper nature of the practice being alleged [in those suits], or at least of the perception of the given problem, which puts it on notice and, is fair to say, generates a duty to inquire."  *Bridgestone*, 399 F.3d at 685.

In December 2013 and January 2014, whistleblower cases against EmCare and several other companies, alleging that EmCare (a) submitted claims to government payors that were medically unnecessary and (b) requested and received "kickbacks" in exchange for increasing ED admissions, without regard to medical need, were unsealed.  ¶¶161-162.

By any definition, EmCare's subsequent settlement with the Department of Justice ("DOJ") was "quick."  In October 2015, Envision reserved $30 million for a settlement with the government, announcing that "the Company and [the relevant] government representatives ha[d] made significant progress toward resolution of these matters."  ¶161.  Incredibly, at the time of settlement, the DOJ had yet to even intervene in the case against EmCare.  ¶160.  EmCare's settlement with the DOJ, ***before the DOJ has even asserted claims against it***, supports an inference of scienter.

Defendants' reliance on *Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004), is misplaced.  In *Fidel*, the plaintiffs sought to buttress allegations that outside audit firm Ernst & Young knowingly

- 42 -

engaged in fraudulent conduct while auditing a specific company by referring to settlements relating to Ernst & Young's audits of completely *different* companies. *Id.* at 233. Here, researchers have uncovered, and plaintiffs have alleged, a scheme of upcoding that took place at Envision's hospitals around the country. The settlement of claims that EmCare provided medically unnecessary services and received kickbacks for increasing admissions at one network of hospitals (*i.e.*, a subset of the hospitals implicated in this case) is anything but "unrelated" to the nationwide practices at issue here. *Cf.* Mem. Br. at 38.

### 7. Defendants' Self-Interested Motivation in Saving Their Jobs Supports Finding Defendants' Scienter

Another *Helwig* factor evidencing a conflict of interest – "the self-interested motivation of defendants in the form of saving their salaries or jobs" – is also present. *See Helwig*, 251 F.3d at 552. The Envision Individual Defendants were paid salaries in the millions – salaries they sought to protect by obscuring Envision's true circumstances. ¶173. That a string of defendants "resigned" soon after disclosure of EmCare's improper billing schemes also supports a strong inference that defendants indeed needed to conceal the billing schemes to preserve their jobs. ¶172. Defendant Sanger had a particularly strong motive: beyond his salary, he received an extra $3 million in equity compensation as a result of the Merger, ¶173, which would not have been consummated on the same terms, if at all, had investors known the extent of Envision's unsustainable billing practices. *See Cardinal Health*, 426 F. Supp. 2d at 738 ("[T]he Court may consider [defendants'] motivation to keep [the company's] stock price high in order to profit from their executive compensation packages in analyzing scienter."). That fact distinguishes this case from *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032 (6th Cir. 2016) and *EveryWare*, 175 F. Supp. 3d 837. The plaintiffs in both of those cases failed to allege any facts showing that the defendants received compensation that was "actually affected" by the fraud. *Doshi*, 823 F.3d at 1044; *EveryWare*, 175 F. Supp. 3d at 859-60.

- 43 -

### 8. The Complaint Does Not Rely on "Group Pleading"

The Complaint does not rely on "group pleading." Mem. Br. at 29. Rather, plaintiffs have pled "specific allegations as to each defendant's alleged involvement in the securities violations." *Psychiatric Sols.*, 2011 WL 1335803, at *43; *Am. Serv. Grp.*, 2009 WL 1348163, at *43.

The Complaint's occasional use of shorthand references to "defendants," in summarizing the facts that collectively give rise a strong inference of scienter, are underpinned by detailed factual allegations that describe each defendant's participation in the alleged fraudulent scheme. *See* ¶¶29-47; *see also, e.g.*, ¶¶141-148 (listing defendants whose trading supported inference of scienter); ¶¶149-158 (listing specific individuals who acknowledged that "we" received certain information; noting that "'senior management,' including the Envision Officer Defendants, were directly informed of the pertinent facts relevant hereto"; and explaining that members of Envision's Board were "informed by reports from [Envision's] management team"); ¶¶164-170 (listing specific individuals who engaged in obfuscation); ¶¶173-174 (identifying specific individuals whose compensation supported inference of scienter). This is not group pleading. *See, e.g.*, *Bridgestone*, 399 F.3d at 689 (explaining that "group pleading" involves relying on presumption that members of group that published statements all committed fraud based solely on their positions as officers).

### 9. There Are No Competing Inferences

In analyzing scienter, a court should "take into account plausible opposing inferences." *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 771 (M.D. Tenn. 2013) (Haynes, J.) ("*Fushi*") (citing *Tellabs*, 551 U.S. at 322-38). If "two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Dana*, 547 F.3d at 571. Where a defendant fails to come forward with ***any*** plausible opposing

inferences, "the inference of scienter is cogent, indeed." *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1264 (M.D. Fla. 2007).

Defendants have failed to articulate a single plausible opposing inference that would detract from plaintiffs' scienter showing. Instead, defendants point to the purported "absence of any *Helwig* factors" when, in fact, the Complaint pleads almost every one. *See* Mem. Br. at 40. And, the *Helwig* factors are not a checklist; courts have often found scienter adequately alleged even where (unlike here) most of the factors are absent. *See, e.g.*, *Grae*, 2017 WL 6442145, at *20-*21 (finding scienter adequately alleged despite listing only two *Helwig* factors); *Cardinal Health*, 426 F. Supp. 2d at 740-41 (finding scienter based on three *Helwig* factors).

Defendants also content that they (i) "openly addressed" the truth of all relevant facts, *i.e.*, there were no material false statements or omissions, and (ii) the decreases in stock price were caused by other factors. *See* Mem. Br. at 40-41. These are, at best, arguments about whether Plaintiffs have adequately alleged falsity and loss causation, not scienter.

## III. The Complaint Meets the Notice Pleading Standards for Lead Plaintiffs' Non-Fraud Claims Under the 1933 Act

Section 11 of the 1933 Act allows purchasers of stock to sue for damages when a registration statement "either 'contain[s] an untrue statement of a material fact' or 'omit[s] to state a material fact . . . necessary to make the statements therein not misleading.'" *Omnicare III*, 135 S. Ct. at 1321 (quoting 15 U.S.C. §77k(a)). A plaintiff need not allege "any intent to deceive or defraud." *Id.* Liability is "virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). "[A] plaintiff need only purchase a security issued pursuant to a registration statement that made a material misrepresentation or omission." *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1131 (W.D. Mich. 1996).

Plaintiffs have alleged claims under §§11, 12(a)(2) and 15 of the 1933 Act based on materially false and misleading misrepresentations and omissions in the August 4, 2016 Joint Proxy

- 45 -

Registration Statement issued in connection with Envision's December 1, 2016 merger with AmSurg. ¶¶250-280. Plaintiffs contend that the Joint Proxy Registration Statement failed to disclose that: (i) Envision's past and anticipated future profits and growth were dependent upon revenues derived from upcoding and out-of-network charges; (ii) Envision's recovery rate for out-of-network charges had been declining since 2014 and was expected to continue to decline; and (iii) as a result of the foregoing, there were significant undisclosed risks to Envision's ability to meet the EBITDA growth projections included in the Joint Proxy Registration Statement. ¶257. Plaintiffs also contend that the Joint Proxy Registration Statement misled investors about the quality of care provided by Envision, including by touting the purported benefits to patients and the Company's ability to capitalize on consumer demand trends without disclosing the risks arising from out-of-network billing and upcoding. ¶¶254-256. These claims do not sound in fraud, but are based exclusively on the strict liability and negligence provisions of the 1933 Act. ¶¶253, 268, 278.

Though defendants largely confine their discussion of the 1933 Act claims to footnotes, they make two general arguments for dismissal: (i) that the claims should be dismissed for failure to meet a heightened pleading standard under Rule 9(b); and (ii) that the claims arising from statements of past or projected future financial performance are inactionable because they were either true or protected by the safe harbor. Mem. Br. at 9 n.6, 14, 18 n.18. Neither argument has merit.[13]

### A. Plaintiffs' Section 11 Claims Are Not Subject to a Heightened Pleading Standard

Defendants wrongly contend that plaintiffs' 1933 Act claims should be subject to Rule 9(b) pleading standards. Mem. Br. at 9 n.6. A §11 claim is only subject to Rule 9(b) if it "sounds in fraud." *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d at 935, 948 (6th Cir. 2009)

---

[13]  Defendants also seek dismissal of the 1933 Act claims based on contentions that the Complaint doesn't adequately plead loss causation, standing or statutory seller or solicitation liability. Mem. Br. at 46-48. Those arguments are also incorrect. *See infra*, §§IV.C, VI.B.

("*Omnicare I*"); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001) (holding that claims that do not sound in fraud "cannot be dismissed for failure to satisfy Rule 9(b)"); *see also In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997) ("Rule 9(b) does not apply . . . because proof of fraud or mistake is not a prerequisite to establishing liability under §11.").

Where §11 claims are premised on allegations independent of fraud, such as failure to make a reasonable investigation, the claims do not "sound in fraud." *See Sirrom Capital*, 84 F. Supp. 2d at 938 (holding the Rule 9(b) pleading standard inapplicable to claims in which "[p]laintiffs speak in terms of defendants' failure to make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true"); *accord Prison Realty*, 117 F. Supp. 2d at 688.

Plaintiffs' 1933 Act claims are grounded not in fraud, but in defendants' failure to make a reasonable investigation or have a reasonable basis to support their projections of continued EBITDA growth in light of the declining rate of out-of-network reimbursement and the risks to Envision's ability to continue relying on out-of-network billing and upcoding to drive its future growth. ¶¶254-256, 260. By incorporating only non-fraud-based allegations into their 1933 Act claims, *see* ¶¶250, 265, 275, plaintiffs have "carefully segregated" those claims from the fraud claims elsewhere in the Complaint. *EveryWare*, 175 F. Supp. 3d at 869-70 (by segregating claims, plaintiffs created "a clear conceptual separation in the complaint between claims sounding in negligence and those sounding in fraud").

Defendants recognize that plaintiffs' 1933 Act claims are "based on a limited subset of statements contained in the 2016 Joint Proxy Registration Statement" but make no effort to explain why those limited claims are based on fraud. Mem. Br. at 9 n.6. The conclusory argument that these claims are fraud-based should be rejected, as "one footnote does not a developed argument make."

- 47 -

*Bentley v. Highlands Hosp. Corp.*, No. CV 15-97-ART, 2016 WL 7234757, at *3 (E.D. Ky. Dec. 13, 2016); *see also Hensley v. Gassman*, 693 F.3d 681, 688 n.6 (6th Cir. 2012) (holding that issue raised in a footnote and lacking supportive authority was insufficiently developed and therefore waived).

In addition to carefully segregating the 1933 Act claims from fraud claims, the Complaint expressly disclaims allegations of fraud in connection with the 1933 Act claims. ¶¶253, 268, 278. Such disclaimers suffice to prevent the application of Rule 9(b)'s heightened pleading standards. *FirstEnergy*, 316 F. Supp. 2d at 602 n.19 (§11 claims not governed by Rule 9(b) where plaintiffs "ha[d] purposely not premised their claims on any allegations of fraud" by "explicitly exclud[ing] any allegation contained [in the Complaint] that could be construed to allege intentional or reckless conduct"); *Sirrom Capital*, 84 F. Supp. 2d at 938 (no heightened pleading standard where "Plaintiffs' Section 11 claims do not mention fraud, except to expressly exclude any allegations which might sound in fraud"); *accord Prison Realty*, 117 F. Supp. at 688.[14]

Defendants mistakenly rely on the *EveryWare* court's reference to a prior district court decision, which concluded that a disavowal of fraud is "insufficient" to avoid the heightened pleading standard. 175 F. Supp. 3d at 869 (citing *Local 295/Local 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 709 (S.D. Ohio 2010) ("*Fifth Third Bancorp*")); Mem. Br. at 9 n.6. But given the contrary holdings discussed above, the *EveryWare* language at most indicates an intra-circuit conflict as to whether disclaimers of fraud are sufficient *on their own* to avoid the heightened pleading standard. *Compare id.*, *with FirstEnergy*, 316 F. Supp. 2d at 602. Where, as here, there are no allegations of fraud that must be proven to sustain the 1933 Act claims, and where those claims have been carefully segregated from fraud-based

---

[14]  Plaintiffs' negligence-based claims under §14(a) of the 1934 Act are also subject only to the notice pleading standards of Rule 8. ¶¶281, 284; *see, e.g.*, *Prison Realty*, 117 F. Supp. 2d at 688-89 (express disavowal of fraud supported holding that Rule 9(b) did not apply to §§11 or 14(a) claims).

- 48 -

allegations, there is no basis to subject the claims to Rule 9(b), regardless of whether or not fraud had been expressly disavowed. *See Herman & MacLean*, 459 U.S. at 381-82.[15]

### B. Plaintiffs' Section 11 Claims Are Not Subject to the PSLRA Safe Harbor

Defendants' argument that the Joint Proxy Registration Statement's EBITDA projections are protected by the PSLRA's safe harbor for forward-looking statements is unavailing.[16] The PSLRA safe harbor does not apply to the new Envision shares that were created and issued in connection with the merger between Envision and AmSurg. To the contrary, the statute expressly excludes any statements "made in connection with an initial public offering," of securities from safe harbor protection. 15 U.S.C. §77z-2(b)(2)(D). Statements in a "registration statement and prospectus are 'made in connection with an initial public offering,' 15 U.S.C. § 77z-2(b)(2)(D), and the PSLRA safe harbor does not apply to them." *In re Musicmaker.com Sec. Litig.*, No. CV 00-2018 CAS (MANx), 2001 U.S. Dist. LEXIS 25118, at *44 n.7 (C.D. Cal. June 4, 2001). An "initial public offering," is simply "an issuer's first offering of equity securities pursuant to a registration statement." §3:31. Misleading statement – Rules and statute relating to misleading statements – Section 27A of the Securities Act, 5 Disclosure & Remedies Under the Sec. Laws §3:31. The new Envision shares issued in connection with the merger meet this definition.[17]

---

[15] Even if the §11 claims did sound in fraud, plaintiffs have also satisfied Rule 9(b) for the same reasons that plaintiffs' §§10(b) and 20(a) claims meet this standard. *See In re Gen. Motors ERISA Litig.*, No. 05-71085, 2007 WL 2463233, at *4 (E.D. Mich. Aug. 28, 2007) (concluding that resolution of the pleading standard question was not necessary because "a review of the applicable portions of the Complaint reveal[s] that Plaintiffs have stated their negligent misrepresentation allegations with sufficient particularity to meet Rule 9(b)'s heightened pleading standard").

[16] Other than a passing reference in a footnote, defendants make no cogent argument to support their purported "bespeaks caution" defense to the 1933 Act claims. *See* Mem. Br. at 17 n.16. And, as discussed above, their unexplained footnoted reliance on *Albert Fadem Tr.*, 334 F. Supp. 2d at 1021 is misplaced. *See infra*, §II.B.1.

[17] Defendants do not dispute that shareholders received newly issued shares of new-Envision in the Merger. ¶257.

Even absent the express statutory carve-out, defendants would not be entitled to safe harbor protection (or bespeaks caution protection) from the §11 claim for the same reasons that the §10(b) claims do not warrant protection. The statements were either not forward-looking, or were made with actual knowledge of their falsity and without proper cautionary language because defendants failed to disclose their illicit billing practices and precipitously declining out-of-network recovery rates. ¶¶256(a)-(m); *see also supra*, §§II.B.1 and III.

## IV. Loss Causation Is Plausibly Plead in Support of the 1934 Act Claims, and Is Presumed For the 1933 Act Claims

"'Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384. Alleging loss causation "is 'not meant to impose a great burden upon a plaintiff,' but to 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* at 376 (quoting *Dura*, 544 U.S. at 347). Loss causation is not subject to heightened pleading standards. *Id.* at 384. Plaintiffs need only plead a theory that is "plausible," and may do so by alleging "'that negative investor inferences,' drawn from a particular event or disclosure, 'caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.'" *Id.* at 384-85; *see also Winslow*, 2011 U.S. Dist. LEXIS 45559, at *27-*38 (collecting cases).

The Complaint adequately alleges loss causation by describing stock price declines that accompanied disclosures made in 2015 and 2017 of the conditions concealed by the alleged misrepresentations, or the materialization of the risks created by those conditions. *See Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 385. Defendants' motion appears to be largely based on the incorrect (and discredited) theory that a "fact-for-fact" disclosure is required to plead loss causation – that is, that a disclosure is not "corrective" unless it admits fraud or precisely mirrors the alleged misrepresentation. *See* Mem. Br. at 42. But this is incorrect. *Cardinal Health*, 426 F. Supp. 2d at

760-61.[18]  Loss causation can be established through stock price declines that accompany the manifestation of a risk concealed by fraud, as well as by the revelation of the conditions concealed by a fraud scheme.  *E.g.*, *UNUMProvident*, 396 F. Supp. 2d at 898 ("Where a significant stock price decline immediately follows an announcement revealing fraud or prior misinformation to the public, it can reasonably be inferred that decline is fairly attributable to the conduct or information disclosed.").  Here, the Complaint pleads both.  Nor are these the only methods by which loss causation can be established.  Fraud-caused inflation can leak out of the stock price in a variety of ways; all that is required of the plaintiff at this stage is to plead a plausible theory of how that happened and when.  *Dura*, 544 U.S. at 347.  As long as the theory alleged is plausible, disputes over its accuracy are reserved for discovery, summary judgment and trial.  *Id.*; *see also Fushi*, 929 F. Supp. 2d at 787 (quoting *Dura*, 544 U.S. at 347).

### A.    Missed 3Q15 Earnings Resulting from Poorly-Performing Contracts Revealed the Weaknesses in Envision's Due Diligence Practices

On October 22, 2015, Envision announced a 3Q15 earnings shortfall and reduced its FY15 EBITDA guidance.  ¶195.  Defendants admitted that these results were due in large part to the reduced volumes and underperforming contracts in its Physician Services segment of EmCare, which are the subject of the due diligence claims described above.  ¶¶133-139.  The Complaint alleges these disclosures materialized the risk concealed by defendants' misrepresentations and omissions regarding the due diligence conducted on these new 2014-2015 contracts, causing Envision's stock price to drop over 30%, on huge volume of over 20 million shares (more than eight times the average daily volume).  ¶196; *supra*, §II.B.IV.  That same day, UBS lowered its price target by a third, and explained that "the recent uptick in underperforming contracts suggests that the pace of new contract signings needs to be tempered."  ¶196.  KeyBanc Capital Markets also lowered its price target by a

---

[18]   *Accord*, *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 544 (N.D. Ill. 2007); *In re St. Jude Med. Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 910 (D. Minn. 2011).

third, and noted that "the mis-assessing of new contracts has shaken investor confidence to a degree, in our view, as that is core to the Company's growth strategy." *Id*. These allegations suffice to plead loss causation with respect to claims arising from the misrepresentations about Envision's due diligence procedures and the performance of the relevant contracts.

In seeking dismissal, defendants **ignore** the foregoing allegations and then simply assert that "Plaintiffs have failed to point to any disclosures that are corrective of and reveal any such misrepresentations or omissions." Mem. Br. at 43. This conclusory and incorrect argument provides no proper ground on which to dismiss the Complaint. Defendants' second argument, that the allegations only concern "an error in business judgment," is directed at falsity or scienter (and is incorrect for reasons previously described). *See id.*; *supra*, §§II.B.4., II.C.5.

### B. 2017 Stock Price Declines Accompanying News of Envision's Inflated Billing Practices Support Loss Causation

The Complaint pleads three corrective disclosures in 2017 that removed artificial inflation caused by the Company's illicit billing practices and declining out-of-network recovery rates. ¶¶198-205. These disclosures, and their accompanying stock price declines, were a direct result of the revelation of the conditions concealed by defendants' fraud, and the financial impact of those conditions as the risks concealed by defendants' fraud scheme manifested.[19]

---

[19] These same allegations are sufficient to plead loss causation with respect to plaintiffs' §14(a) claims, where loss causation similarly requires plaintiff to plead that "the misrepresentations or omissions caused the loss of which plaintiff complains." *In re Gas Nat., Inc.*, No. 1:13-CV-02805, 2015 WL 3557207, at *12 (N.D. Ohio Sep. 24, 2014) (citing *Smith v. Robbins & Myers*, 969 F. Supp. 2d 850, 868 (S.D. Ohio 2013)); *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 231 (S.D.N.Y. 2004) ("To state a claim under §§10(b)and 14(a) of the Exchange Act, a plaintiff must plead loss causation, that is, the plaintiff must demonstrate that 'the economic harm that it suffered occurred as a result of the alleged misrepresentations.'"). The same misrepresentations were included in the Joint Proxy Registration Statement, inducing shareholders to vote in favor of the merger, and causing losses when the relevant truth was revealed. ¶¶285-288.

## 1. The July 2017 Price Declines Caused by the *New York Times* Article and the NBER Study Are Properly Alleged

On July 24, 2017, the *New York Times* exposé and NBER study were published. Following the release of the *New York Times* exposé online on the morning of Monday, July 24, 2017, the market price of Envision common stock declined 3.79%, on volume of over three million shares. ¶198. By contrast, the market was flat for the day. *Id.* The price of Envision shares continued to decline 2.35% on July 25, 2017, as the article was published on the front page of the *New York Times* print edition, and as the market digested the lengthy NBER study which was protected by a pay-wall. ¶199. By contrast, the market was up .35% for the day. *Id.* Envision also issued a statement on July 24, 2017, attempting to rebut the NBER study, which served to stem the stock price declines, thereby maintaining the inflation in Envision's stock price. *Id.*

Defendants' contention that "nearly all of the items discussed in the *New York Times* Article (and the NBER study) had been a matter of public record long before the article was ever published" is factually incorrect. The new material information in the July 2017 *New York Times* article and NBER study about Envision's improper billing practices was never previously disclosed. In any case, a "truth on the market defense" provides no grounds for dismissal. *Wilkof v. Caraco Pharm. Labs., Ltd.*, No. 09-12830, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2011).[20] Even when a "truth-on-the-market" defense is considered in the context of a motion to dismiss, defendants "bear a heavy burden of proof" to show that the information that was withheld or misrepresented was "'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations.'" *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996). Where, as here, the purported disclosures failed to provide a full disclosure of Envision's illicit billing practices, the truth-on-the-market defense is

---

[20]   The Sixth Circuit has expressly reserved the question of whether such a defense may even be raised in the context of a motion to dismiss. *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008).

1437037_1

inapplicable. *See Cmty. Health II*, 877 F.3d at 697 ("[T]hat Community not only admitted more inpatients than other hospitals, but did so in a manner that was clinically improper – was beyond the ken of most investors, and thus revealed new information to them.").

Defendants' authority lends them no support, as there, the disclosures contained "already-public information" that revealed the prior representations to be false. *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014) (republishing facts from public records found to be insufficient to plead loss causation because the disclosures were not "new to the market"); *see also In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (affirming dismissal on summary judgment, finding that plaintiff failed to demonstrate any new information in an article regarding defendant's alleged fraud). *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013), is also distinguishable because it involved *no* other cognizable revelations or facts indicative of fraud, unlike the numerous facts alleged here; *see also Almost Family*, 2012 WL 443461, at *4 (finding allegations of complaint insufficient where news article that plaintiffs alleged constituted partial disclosure of defendant's misrepresentations focused on a different company, revealed no information about the alleged fraud, presented no new information to the market, and was followed by a stock price *increase*).

### 2. The September 18, 2017 Price Decline Following the Resignation of Executives Responsible for the Business Unit Where Fraud Occurred Support Loss Causation

After the market closed on September 18, 2017, Envision announced a number of organizational changes, including the departure of its long-time CFO, the appointment of a newly created COO position, and the resignation of Bob Coward, the President of the Physician Services Division. ¶200. An analyst at JPMorgan noted that the Coward resignation would be "surprising to investors" and "potentially more concerning." *Id.* On this news, Envision's share price fell 10.05% from a closing price of $47.67 per share on September 18, 2017 to close at $43.11 per share on

September 19, 2017 on unusually high trading volume of more than eleven million shares. ¶201. By contrast, the market was up .08% for the day. *Id.*

Stock price declines accompanying executive departures in the wake of the disclosure of fraudulent activities or the manifestation of fraud-concealed risks suffice to plead loss causation. *E.g.*, *Willis v. Big Lots, Inc.*, No. 2:12-CV-604, 2016 WL 8199124, at *36 (S.D. Ohio Jan. 21, 2016). Defendants nevertheless ask the Court to conclude, as a matter of law, that the stock drop following the September 18 announcement was not corrective of any risks or conditions related to the alleged fraud. Mem. Br. at 44. Defendants' single-sentence argument is wholly conclusory and provides no proper grounds for dismissal. Plaintiffs need only allege a "foreseeable materialization of the risk concealed by" defendants' fraud – which they have done here for the September 18 price drop. *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 385. The sudden departure of key executives overseeing the business unit where the fraud scheme was perpetrated was clearly such a risk. As reflected by the quoted analyst report, the executive departure was a further sign of the extent of the fraudulent activities and the risks facing the Company, particularly coming as it did in the wake of the NBER study and *New York Times* article. Because the Complaint explains why the executive departures further revealed the magnitude of the risks facing Envision as a result of defendants' illicit billing scheme, the accompanying stock drop is adequately alleged to be corrective of the alleged fraud.

3.  **The 42% Stock Drop Following the October 31, 2017 Announcement of an Earnings Miss and Guidance Reduction Resulting from the Impact of the Discontinuance of Defendants Illicit Billing Scheme**

On October 31, 2017, after the market closed, Envision announced that it missed its 3Q17 guidance, and was significantly reducing 4Q17 guidance and its expectations for 2018 results, shocking investors and analysts. ¶202. Envision's stock price declined from $42.60 per share to $28.03 per share, a decline of 42% on unprecedented volume of 50 million shares on a day the market and its peers' stock prices increased. *Id.*

- 55 -

Envision admitted that the poor results and reduced guidance results were due to issues in its Physician Services business, including lower volumes, anesthesia rates and increased costs. Envision also admitted that it had moved 40% of the $1 billion in out-of-network revenue to in-network and expected to move another 35% in-network in 2018 and that its revenue from out-of-network was lower than in-network. ¶¶110(g), 111, 203. The exposure of the illicit billing practices and their discontinuance contributed to a reduction in revenues and EBITDA for 2017 and 2018. *Id.* Two weeks later in a November 13, 2017 "Investor Update," Envision further admitted that a majority of its guidance reduction was due to a decrease in "reimbursement rates," including a decrease in "Emergency Department Rate Assumptions." *See* ¶111, Ex. 6 at 5. Cantor Fitzgerald also reported that the volumes would be "well below expectations of a year ago" at the time of the Merger, when defendants told the market Envision expected (a) $1.4-1.6 billion in EBITDA in 2017, versus $768 million now expected, and (b) growth in its Physician Services business which now would suffer a decline. *Id.* Stephens's November 1, 2017 report also noted the steep decline in margins in the Physicians Services to single digits, and the Company blaming ED volume. ¶204.

Defendants' claim that the "hurricanes" were the cause of the stock price decline fails since the analysts focused on the earnings miss and reduction in 4Q17 and 2018 EBITDA that was unrelated to the hurricane's one-time impact on 3Q17 results. *See* ¶202 (analysts commentary focused on "surprising drop in volumes" and "big guide down and path to higher run rate net met with skepticism"); *see also Local 703, I B of T. Grocery & Food Emples. Welfare Fund v. Regions Fin. Corp.*, No. CV: 10-2847-IPJ, 2011 U.S. Dist. LEXIS 60761, at *32 (N.D. Ala. June 7, 2011) ("plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury"). Defendants' other claim that the decline was due to "continued deceleration of health sector utilization" is without merit since the issues were Envision-specific and related to the discontinuance of the illicit billing scheme. Mem. Br. at 45. Envision's out-of-network loss of revenue was one of

many reasons, including the reductions in reimbursement rates and emergency medicine volumes, defendants point to that were related to the illicit billing scheme unraveling that caused the reduction in 4Q17 and 2018 EBITDA. ¶¶110(g), 111, 202-03. At best, these are factual issues that cannot be decided at the pleading stage.

Defendants again mistakenly presume that the only way to plead, or prove, loss causation is by an express admission of fraud or a disclosure that is the mirror-image of the earlier misrepresentation. *See* Mem. Br. at 44-45. First, defendants **did** make a number of factual admissions on the November 1, 2017 conference call, and in the November 13, 2017 "Investor Update," that connects the reduced EBITDA to plaintiffs' allegations. *See* ¶¶110(g), 111, 203. Second, virtually every court that has considered this argument has rejected it, recognizing that such a rule would provide fraudsters with an expedient way to avoid liability by simply lying – again – about the reasons behind a negative turn of events resulting from the conditions they had previously concealed. *E.g.*, *Cardinal Health*, 426 F. Supp. 2d at 760-61; *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 385. Rather, a corrective disclosure must simply reveal "part of the falsity of the alleged misrepresentation . . . and not to some other negative information about the company." *In re DVI, Inc. Sec. Litig.*, No. 2:03-CV-05336, 2010 U.S. Dist. LEXIS 92888, at *25-*26 (E.D. Pa. Sept. 3, 2010), *aff'd* 639 F.3d 623 (3d Cir. 2011). So long as the Complaint describes a plausible theory of how the two are linked – which it does – the allegations of loss causation are sufficient. *In re Gilead Scis. Sec. Litig*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Moreover, defendants' truth-on-the-market argument that "the Company extensively discussed its out-of-network billing practices [and transition] . . . nearly two months before Plaintiffs' purported 'corrective disclosure'" is not only a fact intensive assertion that is inappropriate to resolve at the motion to dismiss stage but also conflates the actual representations made to investors. Mem. Br. at 45-46. The statements in March, May and September 2017 that

defendants rely on expressly omitted how any declines in EmCare's out-of-network rates were negatively impacting Envision's financial results and its inability to achieve future EBITDA guidance. Defendants did not adjust their inflated guidance as their billing schemes unraveled, but to the contrary, assured investors the out-of-network transition would be neutral or a positive to earnings. It was not until the end of the Class Period that the truth was revealed when defendants admitted their out-of-network recovery rates were actually below the in-network rate and announced a 3Q17 earnings miss and 4Q17 and 2018 guidance reduction that was due to a number of issues in its Physician Services business related to its illicit billing scheme, including lower reimbursement rates and reduced ED volumes. ¶¶110(g), 111, 202-203.

Accordingly, the decline in the price of Envision stock after the corrective disclosures came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market and were a substantial cause of the decline.

### C.    Loss Causation Is Presumed Under the 1933 Act, and Not Negated by the Pleadings

Loss causation is presumed under the 1933 Act. 15 U.S.C. §77k(e). Under §11, plaintiffs do not have to plead loss causation; it is an affirmative defense of "negative causation." *In re Regions Morgan Keegan Sec., Derivative, & ERISA Litig.*, 743 F. Supp. 2d 744, 760 (W.D. Tenn. 2010) ("*Regions I*") (citing *Omnicare I*, 583 F.3d at 947; 15 U.S.C. §77l(b)). The burden is on the defendant to prove that the decline in value resulted from factors other than the alleged misrepresentations. 15 U.S.C. §77k(e). Any portion of the decline that defendants cannot show was caused by some other factor remains as recoverable damages. *E.g.*, *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995).

"Where a Rule 12(b)(6) motion is based on an affirmative defense, the complaint must show on its face that the claim is barred by the defense." *Gaynor v. Miller*, 273 F. Supp. 3d 848, 869 (E.D. Tenn. 2017). Thus it is insufficient, for the purposes of dismissal, for defendants to merely identify

"some information previously disclosed to the public" as a means of showing that the later disclosures did not cause plaintiffs' losses.  *See id.* at 870.

Here, defendants have not shown, and cannot show, that the entirety of the decline in value between the time plaintiffs acquired their merger shares and the date this suit was commenced were the result of factors other than the alleged misrepresentations in the Joint Proxy Registration Statement.  Accordingly, they have failed to meet their burden of proving their affirmative negative causation defense.

In *Azzolini v. Corts Tr. II for Provident Fin. Tr. I*, No. 103CV1003, 2005 WL 3448053, at *6 (E.D. Tenn. Dec. 14, 2005), the defendants' misstatements and omissions "were revealed two years before Plaintiffs claim they suffered any losses" and so it was "apparent on the face of the complaint [that] the decline in share value [was] not related to any material misstatement and/or omission." *Id.* at *5.  Here, by contrast, there was no pre-disclosure revelation regarding the level of defendants' out-of-network or upcoding billing schemes.  This case, therefore, is far more similar to *Gaynor*, where the fact that some pieces of information came out before the ultimate disclosures was insufficient for disproving loss causation.  *See In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 869-70 (W.D. Ky. 2014).  Thus, defendants have not met their burden of showing a lack of loss causation on the face of the Complaint.

## V.    Lead Plaintiffs' Section 20A Insider Trading Claims Are Adequately Stated

Plaintiffs have adequately pled that defendants Williams, Sanger, Owen, Zimmerman, and CD&R[21] violated §20A of the 1934 Act by engaging in insider trading.  *See* 15 U.S.C. §78t-1(a).  To

_____

[21]    Plaintiffs refer to all CD&R entities collectively as "CD&R." Defendants admit that four CD&R funds owned Envision and subsequently sold Envision stock, while contending that other CD&R entities did not.  Memorandum of Law in Support of the CD&R Defendants' Motion to Dismiss the Consolidated Amended Complaint (ECF No. 123) ("CD&R Mem.") at 2-3.  Defendants' motion to dismiss some entities on grounds that they did not trade Envision securities raises factual issues extrinsic to the Complaint and should be denied.  *Id.* at 6-7; *see Kasper v. AAC Holdings, Inc. et al.*, No. 3:15-0923, slip op. at 7 (ECF No. 59) (M.D. Tenn. Jul. 1, 2016) ("[T]he Court cannot evaluate

- 59 -

state a claim under §20A, plaintiffs must allege "[1] a requisite independent, predicate violation of the securities law and [2] contemporaneous purchase or sale of securities with the purchase or sale of securities by . . . 'insider' Defendants." *Beach v. Healthways, Inc.*, No. 3:08-0569, 2009 WL 650408, at *6 (M.D. Tenn. Mar. 9, 2009). The Complaint sufficiently pleads both elements of this claim.

**A.    Lead Plaintiffs Have Adequately Alleged a Predicate Violation of the 1934 Act as All the Named Defendants Traded on Material, Non-Public Information**

Corporate insiders have a duty to refrain from trading stock if they have not disclosed materially adverse, non-public facts. *Beach*, 2009 WL 650408, at *5 (citing *J & R Mktg. v. GMC*, 549 F.3d 384, 398 (6th Cir. 2008)). Failure to disclose such information constitutes a violation of §10(b) of the 1934 Act that can serve as a predicate for a §20A claim. *Id.* at *5-*6. Plaintiffs have adequately alleged predicate offenses as to both CD&R and the Individual Envision Defendants.

**1.    CD&R**

Plaintiffs have raised a strong inference that CD&R knew but did not disclose information regarding Envision's improper billing schemes, given that CD&R owned Envision privately from 2011 to 2013, ¶43, and that, even as CD&R was divesting its interest in the Company through a series of transactions from 2014 to 2015, it retained significant control over and access to Envision's business strategies via designated board members who were simultaneously employed by CD&R. ¶¶43-47. Plaintiffs have explicitly shown when, how, and from whom CD&R and its representatives serving on Envision's board obtained information about billing practices. ¶43 (detailing CD&R's control over Envision and its placement of directors on Envision's board); ¶154 ("[T]he 2015 and 2016 annual proxy statements . . . stated: Our board as a whole has responsibility for overseeing our

---

additional facts presented by Defendants, weigh the evidence, or determine the credibility of each side's allegations.").

- 60 -

risk management. The oversight responsibility of the board and its committees is informed by reports *from our management team and from our internal audit department* that are designed to provide visibility to the board about the identification and assessment of *key risks and our risk mitigation strategies*.").[22] It is implausible that CD&R, with this level of control and access, would not have been aware of Envision's fundamental business strategies, including upcoding and out-of-network billing.

The inference that CD&R and the Envision Individual Defendants knowingly or recklessly withheld and traded on material, nonpublic information is further supported by the unprecedented size of the stock sales. "[T]o assess whether Plaintiffs have adequately alleged scienter, [courts] must employ a 'totality of the circumstances' test that requires consideration of factors such as: (1) insider trading at a suspicious time or in an unusual amount . . . ." *Willis*, 2016 WL 8199124, at \*30-\*31 (citing *Gruhn v. Tween Brands, Inc.*, No. 2:07-CV-852, 2009 WL 1542795, at \*7 (S.D. Ohio June 2, 2009)). Here, CD&R liquidated its entire \$4.4 billion ownership interest in just over a year, and did so through carefully structured and timed offerings coordinated with Envision. ¶¶141-143. CD&R's stock dump – within roughly five years of creating Envision – is particularly suspicious given its normal focus on "long-term" investments, many for more than ten years. ¶143.

---

[22]  CD&R cites a number of cases in which claims devoid of any particularized facts were dismissed, but these cases only highlight the strength of plaintiffs' allegations here. In *In re Petco Animal Supplies Inc. Sec. Litig.*, for example, the Southern District of California dismissed §20A claims where plaintiffs relied on "job status alone" "as to individual defendants" and "[did] not identif[y] how [corporate defendants] would have had access to those internal communications" reflecting the undisclosed accounting area." No. 05-CV-0823-H(RBB), 2006 WL 6829623, at \*17, \*35 (S.D. Cal. Aug. 1, 2006). Likewise, in *Picard Chem.*, the complaint did "not allege when any of the main Hillman defendants obtained the information, how [the] information was obtained, or from whom [the] information was obtained." 940 F. Supp. at 1130. CD&R's reliance on *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 793-94 (11th Cir. 2010), is similarly unavailing. There, unlike here, plaintiffs' complaint alleged only "trades made by individual [defendants] during the class period," but "fail[ed] to make any particularized allegation that any individual [defendant] knew about the [undisclosed issues] at the time of trading." For the reasons discussed above, plaintiffs have easily alleged facts supporting an inference that CD&R knew of Envision's billing practices at the time it conducted its sell-off.

The most plausible inference is that CD&R saw the writing on the wall and got out as quickly as it could. Plaintiffs have therefore adequately pleaded all elements – including scienter – necessary to state a claim that CD&R committed a predicate violation of the 1934 Act.

Finally, CD&R's assertion that plaintiffs cannot rely on a §20(a) claim as a predicate violation of §20A is a red herring. Plaintiffs' §20A claim is predicated on CD&R's violation of its duty to disclose material, non-public information when conducting an insider sale. The fact that plaintiffs did not separately plead a §10(b) violation against CD&R does not preclude plaintiffs from relying on such a violation as the predicate for a §20A claim. *See, e.g.*, *Johnson v. Aljian*, 490 F.3d 778, 783 (9th Cir. 2007) ("[T]he predicate violation need not itself be actionable.").

## 2. The Envision Individual Defendants

Defendants Williams, Sanger, Owen, and Zimmerman likewise traded while in possession of material, non-public information. As discussed above in regard to plaintiffs' §10(b) claims, all of these individual defendants held positions in which they were not only entitled, but were in fact were required, to be aware of Envision's major business strategies. ¶¶144-147; ¶154 ("[Envision's] 2014 Form 10-K and 2015 Form 10-K each stated that "[s]enior management evaluates all aspects of each proposal, including financial projections, staffing model, resource requirements and competition.").[23] Having this insider knowledge, the defendants therefore acted with the requisite scienter in failing to abide by their duty to abstain from trading. And, as with CD&R, the Envision Individual Defendants' large stock sales, many of which coincided with CD&R's, further support the inference that they were aware of material, nonpublic adverse information. ¶¶144-145, 147.

---

[23] As discussed above, plaintiffs have also adequately alleged §10(b) violations by these individual defendants that can serve as the predicate to the §20A claims.

1437037_1

## B. Lead Plaintiffs Have Met Section 20A's "Contemporaneity" Requirement Under Any Definition

The Complaint satisfies the contemporaneous trading requirement of §20A. First, it specifically alleges contemporaneity. Such an allegation alone has been found sufficient. *Beach*, 2009 WL 650408, at *6 (noting disagreement among courts over strict time requirements for contemporaneous traders and concluding that "for purposes of this Motion to Dismiss, alleging 'contemporaneous' sales by the Defendants is sufficient"). Second, UFCW's purchases meet the contemporaneous trading standard under any definition of the term: "[C]ourts have found that contemporaneous means that the insider and the plaintiff must have traded anywhere from on the same day, to less than a week, to within a month, to the entire period while relevant and nonpublic information remained undisclosed." *Id.* Here, CD&R and the Envision Individual Defendants conducted four major registered offerings of Envision stock and, each time, plaintiff UFCW purchased shares within one day and directly through the offering.[24] Thus, the trades were contemporaneous.

The Envision Individual Defendants are either confused or disingenuous in their arguments against contemporaneity. Relying on no Sixth Circuit support and ignoring an opinion of this Court, defendants ask this Court to apply the strictest possible standard for contemporaneity – "within one or two days of the insider's sale." *See* Mem. Br. at 48 (citing *In re Fannie Mae Sec., Derivative & ERISA Litig.*, 503 F. Supp. 2d 25, 46 (D.D.C. 2007)). Defendants then claim that UFCW's

---

[24] Envision announced a secondary offering of stock by CD&R, Owen, Sanger, and Zimmerman in a prospectus that became effective on February 5, 2014, and UFCW purchased stock directly in the offering at the offering price on February 6, 2014. ¶¶71, 208. Envision priced another registered offering – with sales by CD&R, Own, Williams, and Zimmerman – on July 10, 2014, and UFCW purchased shares directly in the offering at the offering price on July 11, 2014. ¶209. Another offering was priced on September 23, 2014 – with sales by CD&R, Sanger, and Owen – with UFCW purchasing stock directly in the offering the following day at the offering price on September 24, 2014. ¶210. And then on March 5, 2015, CD&R sold off its remaining shares, with UFCW purchasing in the offering at the offering price on March 6, 2014. ¶211. UFCW's purchases are listed in Attachment 3 of the Complaint.

purchases "span[] a period of eight days to five months" after the insider sales. Mem. Br. at 48. But the defendants are patently incorrect about the timing: as discussed above, UFCW purchased Envision stock directly in the offerings at issue in this claim and within one day of defendants sales.

## VI.  The Remaining Claims Are All Adequately Pled

### A.  The Complaint Alleges the Required Elements of a Violation of Section 14(a) of the 1934 Act

Section 14(a) makes it unlawful for individuals to solicit proxies or consent in regard to any registered security in violation of any rule promulgated by the SEC. 15 U.S.C. §78n(e). A plaintiff adequately pleads a §14(a) claim by alleging that the proxy statement contained a material misrepresentation or omission, the misrepresentations or omissions caused plaintiffs' losses – with the proxy statement serving as an essential link in completion of the transaction – and the defendants were at least negligent. *See Gas Nat*, 2015 WL 3557207, at *12. The Complaint meets all of these elements.

First, plaintiffs have adequately alleged materiality. "[A] fact [is] material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991) (quoting *TSC Indus.*, 426 U.S. at 449). And "a statement of belief by corporate directors about a recommended course of action, or an explanation of their reasons for recommending it, can take on [material] importance." *Id.* at 1090-91; *see also Winslow*, 2011 U.S. Dist. LEXIS 45559, at *52 ("'[O]nce a company chooses to speak, it must "provide complete and nonmisleading information with respect to subjects on which it undertakes to speak."'").

Plaintiffs have identified and explained numerous materially false and misleading statements in the Joint Proxy Registration Statement, as described above. *See* ¶¶254-256; *supra*, §III; *see also Gas Nat.*, 2015 WL 3557207, at *12 (holding that a complaint adequately pleaded materiality where

- 64 -

plaintiffs "identifie[d] the specific statements in the proxy statements that support[ed] th[eir] claim, followed by an explanation of how the statements and omissions were misleading to investors").

Next plaintiffs have adequately alleged causation. "[A] shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if . . . he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970); *see also id.* at 382 n.5 (explaining that actual reliance need not be shown).

Courts within the Sixth Circuit have held that the causal link requires a showing of transaction causation, *i.e.*, "whether 'the misrepresentations induced plaintiffs to engage in the subject transaction," and loss causation, *i.e.*, the "cause of particular economic harm."[25] *See, e.g.*, *Smith*, 969 F. Supp. 2d at 868. For example, plaintiffs adequately established a causal link by alleging that "if Defendants had not omitted or misrepresented material information in the Proxy concerning the Company and its current and future financial prospects, . . . shareholders would likely not have voted to approve the sale of the Company and forego their right to share in the profits of a Company worth more value than reflected in the Merger price." *Id.* Outside the Sixth Circuit, the Southern District of New York has held that allegations similar to those at issue here – specifically that a "proxy/prospectus presented a false snapshot of [the defendant corporation's] financial position and 'justified the Exchange Ratio' that would govern the merger" – are "precisely the type of essential link and the type of transaction contemplated under a Section 14(a) claim." *Police &*

---

[25] Defendants never specifically address the Complaint's 14(a) loss causation allegations, which are in any event sufficient to state a claims. *In re Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317, 1331 (N.D. Ga. 2016) (Mem. at 41-42), is not instructive, as it was a derivative action concerning data breaches, alleging 14(a) claims based on defendants' mere election to board, and plaintiffs failed to allege "that the security breaches to the company would not have occurred but for the Defendants being reelected to the Board."

*Fire Ret. Sys. v. SafeNet*, Inc., 645 F. Supp. 2d 210, 239 (S.D.N.Y. 2009). As in *Smith* and *SafeNet*, plaintiffs here have alleged that Envision and AmSurg succeeded in soliciting shareholder approval of the Merger by making materially false or misleading statements in the Joint Proxy Registration Statement and the Merger Prospectus incorporated therein. ¶285. Plaintiffs have therefore adequately pleaded a causal link.

Lastly, plaintiffs have sufficiently alleged that defendants acted negligently, which is sufficient for pleading §14(a) liability. *See Fradkin v. Ernst*, 571 F. Supp. 829, 843 (N.D. Ohio 1983) ("Where the defendant is the corporate issuer, and the corporate officials are responsible for drafting the proxy statement, the . . . negligence standard applies, but not the [heightened] scienter requirement."); *see also Wilson v. Great Am. Indus.*, 855 F.2d 987, 995 (2d Cir. 1988) ("Under Rule 14a-9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive."); *Prison Realty*, 117 F. Supp. 2d at 689 (applying negligence standard to §14(a) claims). "As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the . . . negligence standard." *Fradkin*, 571 F. Supp. at 843. Plaintiffs have alleged that Envision and the individual Envision and AmSurg defendants prepared materially false and misleading proxy statements, ¶284, and plaintiffs have therefore sufficiently alleged negligence.[26]

Defendants incorrectly contend that any §14(a) claims not alleging scienter must be dismissed. But *Ind. State Dist. Council v. Omnicare, Inc.*, deals with §11 claims and only discusses §14(a) as a means of providing context as to why 1933 Act claims do not require knowledge of

---

[26] No heightened pleading standard applies to a negligence allegation because "negligence is not a state of mind." *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009). As discussed above in regard to plaintiffs' §§10(b) and 20(a) claims, even if the Court were to require a heightened pleading standard, plaintiffs have cleared this bar by alleging facts showing that defendants knew of, or were reckless in omitting mention of, EmCare's reliance on out-of-network billing and upcoding.

falsity. 719 F.3d 498, 505-07 (6th Cir. 2013) ("*Omnicare IV*"), *vacated and remanded sub nom.* *Omnicare III*, 135 S. Ct. 1318. And the *Omnicare IV* court's footnote paraphrased *Adams v.* *Standard Knitting Mills, Inc.*, a case focused on the narrow issue of whether §14(a) required scienter when applied to outside accountants and directors. *See* 623 F.2d 422, 430 (6th Cir. 1980). For this reason, *Omnicare IV* does not address whether §14(a) claims require scienter. *See S.E.C. v. Das*, 723 F.3d 943, 953 n.5 (8th Cir. 2013) (declining to require scienter as to §14(a) claims against corporate officers, and noting that *Omnicare IV* footnote was dicta and that "it is not clear whether the court was extending its holding from *Adams*, which was limited to outside accountants and directors").

The Court should also reject defendants' argument that the Envision Individual Defendants are not "participants" for the purposes of §14(a). Defendants fail to cite **any** authority in which a court held that corporate officers and directors who signed or solicited a proxy statement were not participants. *Bank of Am.*, merely held that §14(a) liability "attaches only to defendants who actually solicited proxies or permitted the use of their name to solicit proxies" and therefore dismissed claims as to corporate officers who were not mentioned in the proxy statement at issue. 757 F. Supp. 2d at 293. But liability could, the court said, attach to the board of directors, because the proxy statement contained express language that it was solicited on their behalf. *Id.* The court also denied dismissal as to §14(a) claims against two individual defendants – the respective CEOs and chairmen of the board of the two companies involved in the Merger – both of whom signed a cover letter contained in the proxy statement, which informed shareholders that the board recommended the proposed acquisition. *See id.* at 280, 288-89, 293. At most, then, *Bank of Am.* stands for the narrow proposition that officers have little to no connection to the proxy solicitation are not statutory participants.

Here, by contrast, plaintiffs specifically allege that the Envision Individual Defendants played substantial roles in soliciting the proxies. ¶¶36, 285, 289. The voting form and cover letter

both contained express language that the board of directors "recommends" the Merger and that the proxy was "Solicited on Behalf of the Board of Directors." Ex. 4 at 509. And defendant Sanger, like the CEOs in *Bank of Am.*, signed the proxy statement cover letter urging shareholders to vote and informing them of the board's recommendation. *See* Ex. 4 at 4; *Bank of Am.*, 757 F. Supp. 2d at 280. Defendant Owen signed the included "Project Meat Commitment Letter," which detailed and secured funding for the proposed merger. Ex. 4 at 471. Thus, *Bank of Am.*'s holding as to uninvolved defendants is inapposite.[27]

Because plaintiffs have adequately alleged that defendants solicited proxies through materially false or misleading statements, the Court should deny defendants' motion to dismiss.

### B. Defendants Are Statutory Sellers Subject to Liability Under Section 12(a)(2) of the 1933 Act

The Complaint alleges that Envision and the Envision Individual Defendants are liable under §12(a)(2) for soliciting the sale of securities using the Joint Proxy Registration Statement. ¶¶265-274. Defendants' sole contention for dismissal – that they are not "statutory sellers," – is wrong and should be rejected.

Section 12(a)(2) creates a cause of action against a person who "offers or sells a security" in a public offering based on "misleading statements, misstatements, or omissions in a . . . prospectus." *In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, No. 2:09-2009 SMH V, 2012 U.S. Dist. LEXIS 197352, at *39-*40 (W.D. Tenn. Mar. 30, 2012) ("*Regions II*"); *see also* 15 U.S.C. §77l(a)(2). As set forth above, plaintiffs have adequately plead that the Joint Proxy Registration Statement was materially false and misleading. *Supra*, §III.

---

[27] As discussed above in regard to plaintiffs' §10(b) claims, defendants' affirmative defenses – specifically, that the misrepresentations were opinion, puffery, or forward-looking – are inapplicable to the facts of this case. These defenses are equally unavailing as to defendants' §14(a) claims, which are governed by the same case law. *See Prison Realty*, 117 F. Supp. 2d at 689 (simultaneously rejecting defendants' safe-harbor and bespeaks-caution defenses as to both §10(b) and §14(a) claims).

Ignoring authority of this Court in favor of authority from a district court outside this Circuit, defendants contend that the Complaint fails to plead that they are "'statutory sellers' within the meaning of §12(a)(2) of the 1933 Act." Mem. Br. at 46-47. Not so. "A seller is one who 1) passes title, or other interest in the security, to the purchaser for value or 2) successfully solicits the purchase based at least in part on a desire to further his own financial interests or those of the securities' owner." *Regions II*, 2012 U.S. Dist. LEXIS 197352, at *41. Here, the Joint Proxy Registration Statement admits that the Envision Director Defendants "are soliciting proxies from their respective common shareholders and stockholders," for the Merger, and the Complaint alleges defendants "participated in the sale of Envision common stock to plaintiffs and other members of the Class by means of the Merger Prospectus . . . for their own personal gain." ¶¶36, 270; Ex 4 at 1. Courts in the Sixth Circuit require nothing more to state a claim. *Prison Realty*, 117 F. Supp. 2d at 691; *see also Regions II*, 2012 U.S. Dist. LEXIS 197352, at *41 ("whether someone 'solicits' a purchase is a fact-bound inquiry unsuited for a Rule 12(b)(6) motion").

### C. Lead Plaintiffs' Control Person Claims Meet the Notice Pleading Standards Under the 1933 and 1934 Acts

As with other non-fraud allegations, allegations of control are subject only to the notice pleading standards of Rule 8. "'Allegations of control are not averments of fraud and therefore need not be pleaded with particularity.'" *Fushi*, 929 F. Supp. 2d at 789. To survive a motion to dismiss, "a plaintiff need only allege the power to control and not an actual exercise of control." *In re Nat'l Century Fin. Enters., Inv. Litig*., 504 F. Supp. 2d 287, 304 (S.D. Ohio 2007). Whether a defendant is a control person under §20(a) is "normally a question of fact," that cannot be determined at the pleading stage. *Pullins v. Klimley*, No. 3:05-CV-082, 2008 WL 85871, at *28 (S.D. Ohio Jan. 7, 2008).

The Complaint alleges that the Envision Individual Defendants, as well as the AmSurg Defendants (other than Cigarran, Herr and Popp), are liable under §20(a) as control persons with

- 69 -

respect to predicate violations of §10(b). ¶¶231-239. The Complaint also alleges that CD&R, the

Envision Individual Defendants and the AmSurg Defendants, are liable under §20(a) as control

persons with respect to predicate violations of §14(a). ¶¶292-300. Finally, the Complaint alleges

that the Envision Individual Defendants are liable under §15 of the 1933 Act as control persons with

respect to predicate violations of §§11 and 12. ¶¶275-280. Contrary to defendants' contentions, the

Complaint adequately pleads both control and a predicate violation giving rise to control person

liability.[28]

### 1. To State a §20(a) Claim, Plaintiff Need Only Plausibly Allege Some "Indirect Means of Discipline or Influence"

Section 20(a) of the 1934 Act establishes liability for anyone who "directly or indirectly

controls any person liable" under the 1934 Act. 15 U.S.C. §78t(a). Control includes "the

possession, direct or indirect, of the power to direct or cause the direction of the management and

policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

*Bridgestone*, 399 F.3d at 667; *Pullins*, 2008 WL 85871, at *28 (control established if "defendant had

some indirect means of discipline or influence, even if short of actual directions, over the

corporation").

The defendants named in Count II all reviewed, approved and/or signed materially false and

misleading statements, including the FY15 Form 10-K, the FY16 Form 10-K, and the Joint Proxy

Statement/Prospectus.[29] This is "sufficient to establish that the Individual Defendants are liable as

---

[28] Defendants' arguments as to a predicate violation are wholly derivative of their arguments for dismissal of the claims under §§10(b) and 14(a) of the 1934 Act and §§11 and 12 of the 1933 Act. Because those arguments must be rejected for the reasons previously stated, defendants' "predicate violation" arguments provide no grounds for dismissal of any of the control person claims. *E.g.*, *Kyrstek*, 2016 U.S. Dist. LEXIS 43523, at *31; *Winslow*, 2011 U.S. Dist. LEXIS 45559, at *73.

[29] ¶¶33, 39, 91, 236-237, 296-298; Exs. 3 at 101, 4 at 1.

controlling persons." *Fifth Third Bancorp*, 731 F. Supp. 2d at 715.[30] Defendants Sanger, Owen, Wilson, Zimmerman, Holden, Gulmi and Eastridge were also senior executives and officers of Envision who influenced and controlled the decision making at Envision, and had direct and supervisory involvement in the day-to-day operations of the Company. ¶¶30-33, 37-39, 158, 236-237. Courts in this District and the Sixth Circuit consistently find these same allegations sufficient to allege control. *Fushi*, 929 F. Supp. 2d at 789-90; *Direct Gen.*, 398 F. Supp. 2d 888; *Wilkof*, 2010 WL 4184465, at *9.

The Envision Individual Defendants and the AmSurg Defendants also exercised control over Envision with respect to the §14(a) claim (Count VIII), and specifically with respect to the Merger and solicitation of the Joint Proxy Registration Statement, including by: (i) approving the Merger; (ii) ordering that the companies solicit shareholder approval for the Merger; (iii) recommending that shareholders vote to approve the Merger agreement; and (iv) reviewing and approving the Joint Proxy Registration Statement. ¶¶296-298, Ex. 4 at 1, 175.

These allegations go far beyond plausibly alleging indirect influence over the Merger, which would be sufficient to state a claim, and demonstrate that the Envision Individual Defendants and the AmSurg Defendants were essential to the completion of the Merger, as the Joint Proxy Registration Statement could not have been issued without their approval. *Smith*, 969 F. Supp. 2d at 875. The Envision Individual Defendants and the AmSurg Defendants cite no authority and provide no argument to the contrary.

The Complaint also plausibly alleges that CD&R exercised control over Envision. CD&R owned over 97% of Envision prior to its August 14, 2013, IPO, and continued to own large amounts of Envision stock and have contractual rights to designate board members after the IPO. ¶8. As the

---

[30] *Fifth Third Bancorp* was addressing §15 claims. 731 F. Supp. 2d at 714-15. "Courts analyze control-person-liability claims brought under [§]15 [and] [§]20(a) using the same legal standards." *Pullins*, 2008 WL 85871, at *34.

owner of Envision prior to the IPO, it hand-picked Sanger, Owen, Wilson and Zimmerman to serve as senior executives and leaders of Envision, all of whom served in such roles at the time of the IPO, continued in such roles at the time of the Merger, and who owe substantial fortunes (through insider trading) in large part to their employment by CD&R. ¶¶13, 30-33, 47. And at the time of the Merger, Schnall and Williams, both longtime CD&R insiders, still served on Envision's Board of Directors and themselves approved the false and misleading Joint Proxy Registration Statement. ¶¶35, 43, 295. Far beyond an "indirect means of . . . influence," the Complaint plausibly alleges the inextricable influence and control available to CD&R at the time of the Merger. These allegations are more than sufficient at the pleading stage.

CD&R incorrectly cites *PR Diamonds*, 364 F.3d 671, for the proposition that plaintiffs must plead "actual control." CD&R Mem. at 12-13. A review of *PR Diamonds* will confirm that the court never even mentions "actual control," instead declining to address "whether the Individual Defendants possessed an adequate degree of control to support a Section 20(a) claim." 364 F.3d at 698. *Demoss v. Kretz*, No. 3:07-0405, 2009 U.S. Dist. LEXIS 853, at *40 (M.D. Tenn. Jan. 7, 2009), articulated a standard of proof at summary judgment, not a pleading standard. While plaintiffs in *Demoss* invited the district court to rely on *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474 (6th Cir. 1992), as *Nat'l Century Fin.* explains, *Sanders* did not hold that a plaintiff must plead "actual control." *Nat'l Century Fin*, 504 F. Supp. 2d at 303-05. Nevertheless, while unnecessary, the Complaint does plead actual control as to each defendant. ¶¶236, 295-299.

Neither *In re Glob. Crossing, Ltd., Sec. Litig*., No. 02 Civ. 910 (GEL), 2005 U.S. Dist. LEXIS 16232 (S.D.N.Y. Aug. 8, 2005), *In re Kosmos Energy Ltd. Sec. Litig*., 955 F. Supp. 2d 658 (N.D. Tex. 2013), nor *LLDVF L.P. v. Dinicola*, No. 09-1280 (JLL), 2010 WL 3210613 (D.N.J. Aug. 12, 2010), support defendants' contentions. *See* CD&R Mem. at 14-15. *Kosmos* relied almost exclusively on *Glob. Crossing*, yet defendants fail to advise the Court that courts in the Second

Circuit require an "actual control," and "culpable participation," pleading standard; courts in the Sixth Circuit have expressly rejected these standards.[31] *Compare Glob. Crossing*, 2005 U.S. Dist. LEXIS 16232, *with Halford v. AtriCure, Inc.*, No. 1:08cv867, 2010 U.S. Dist. LEXIS 144377, at *61 (S.D. Ohio Mar. 29, 2010). Moreover, CD&R fails to inform this Court that the *Glob. Crossing* court itself ***subsequently disclaimed its prior analysis***, finding almost identical allegations sufficient to plead control. *In re Glob. Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 352 (S.D.N.Y. 2006) ("[I]n the CIBC Ruling, the Court retreated from these holdings. . . . The Court held, on similar allegations made by plaintiffs against the CIBC defendants . . . that the allegations of control were sufficient.").

Finally, the fact that CD&R sold their Envision stock prior to the Merger is irrelevant. *See* CD&R Mem. at 14. CD&R's own authority recognizes that control is not limited to "'ownership of voting securities.'" *Id.* at 13 n.7 (quoting *Bridgestone*, 399 F.3d at 667). "Other means include 'other business relationships, interlocking directors, family relationships and a myriad of other factors.'" *City of Painesville v. First Montauk Fin. Corp.*, 178 F.R.D. 180, 192 (N.D. Ohio 1998).

Defendants' motion to dismiss the §20(a) claims and should be denied.

## 2. Lead Plaintiffs' Section 15 Claims Are Adequately Pled

Section 15 places liability "jointly and severally" on any person who "controls any person liable under §§11 or 12." 15 U.S.C. §77o(a). "Courts analyze control-person-liability claims brought under Section 15 of the Securities Act of 1933 and control-person-liability claims brought under Section 20(a) of the Securities Exchange Act of 1934 using the same legal standards." *Pullins*, 2008 WL 85871, at *27.

---

[31] The fact that some courts have held that "a party that has always held only a minority share of the company does not, by virtue of that fact alone, possess 'control' over that company" does not suggest that plaintiffs' allegations here, which are far more substantial, are inadequate to state a claim. *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1049 (N.D. Cal. 2016) (distinguishing *Kosmos*, 955 F. Supp. 2d 658).

At set forth above, the Complaint adequately pleads the predicate §§11 and 12 claims. *Supra*, §III, VI.B. And contrary to defendants' conclusory contention, the Complaint pleads the Envision Individual Defendants' control. *Supra*, §VI.C.1. Defendants' motion to dismiss the §15 claims should therefore be denied.

## VII. If the Court Grants Defendants' Motion in Any Respect, Lead Plaintiffs Should Be Granted Leave to Amend

While plaintiffs are confident the Complaint more than satisfies the applicable pleading requirements, should the Court conclude that any of the allegations in the Complaint are not sufficient to support a claim, plaintiffs request leave to amend the Complaint to cure any defect identified by the Court.[32] The Sixth Circuit has held that "leave to amend is 'freely given when justice so requires.'" *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002); *accord Anderson v. Young Touchstone Co.*, 735 F. Supp. 2d 831, 833 (W.D. Tenn. 2010) (finding that "Rule 15 encourages federal courts to look favorably on requests to amend"). This is because cases "should be tried on their merits rather than the technicalities of pleadings." *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982). "Thus, where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 644 (6th Cir. 2003). Moreover, "[i]n the securities litigation context, leave to amend is particularly appropriate where the complaint does not allege fraud with particularity." *Morse*, 290 F.3d at 800.

---

[32] For example, plaintiffs can amend to add more detail regarding United Healthcare's termination of its insurance coverage contract with Envision, as a result of Envision's "egregious billing practices," "improper game of hide-the-ball . . . to wrongly increase [its] profits," and "highly questionable billing practices and lack of candor." *Envision Heathcare Corp. v. United Healthcare Ins. Co.*, No. 18-cv-60530 (S.D. Fla. Apr. 6, 2018), ECF No. 24 at 2-4. Plaintiffs can also add more detail regarding their control person claims against Clayton Dubilier & Rice, LLC and CD&R Associates VIII, Ltd.

# VIII. Conclusion

Defendants' motions to dismiss should be denied in their entirety.

DATED: June 11, 2018                    Respectfully submitted,

                                        ROBBINS GELLER RUDMAN & DOWD LLP
                                        CHRISTOPHER M. WOOD, #032977
                                        CHRISTOPHER H. LYONS, #034853


                                                s/ Christopher M. Wood
                                        ———————————————————————
                                              CHRISTOPHER M. WOOD

                                        414 Union Street, Suite 900
                                        Nashville, TN  37219
                                        Telephone:  615/244-2203
                                        615/252-3798 (fax)

                                        ROBBINS GELLER RUDMAN & DOWD LLP
                                        DARREN J. ROBBINS
                                        SPENCER A. BURKHOLZ
                                        ERIC I. NIEHAUS
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        ROBBINS GELLER RUDMAN & DOWD LLP
                                        DENNIS J. HERMAN
                                        Post Montgomery Center
                                        One Montgomery Street, Suite 1800
                                        San Francisco, CA  94104
                                        Telephone:  415/288-4545
                                        415/288-4534 (fax)

                                        Lead Counsel for Plaintiff

1437037_1

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2202
615/252-3798 (fax)

Local Counsel

1437037_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 11, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 11, 2018.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
        & DOWD LLP
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)

E-mail:  CWood@rgrdlaw.com

# Mailing Information for a Case 3:17-cv-01112 Bettis v. Envision Healthcare Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jonathan L. Bobbitt**
  jbobbitt@gilbertfirm.com,sweaver@gilbertfirm.com,cstegall@gilbertfirm.com,gilbertrussellmcwherterplc@yahoo.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com

- **Kenneth S. Byrd**
  kbyrd@lchb.com,korsland@lchb.com,aalmand@lchb.com

- **Mark P. Chalos**
  mchalos@lchb.com,korsland@lchb.com,aalmand@lchb.com

- **Gregory F. Coleman**
  greg@gregcolemanlaw.com,GCLPC@ecf.courtdrive.com,dawn@gregcolemanlaw.com

- **Joseph B. Crace , Jr**
  jcrace@bassberry.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Philip N. Elbert**
  pelbert@nealharwell.com,rparrish@nealharwell.com,jbrawner@nealharwell.com,jzager@nealharwell.com,mwilson@nealharwell.com

- **Elliot Greenfield**
  egreenfield@debevoise.com

- **John S. Hicks**
  jhicks@bakerdonelson.com,lkroll@bakerdonelson.com,mbarrass@bakerdonelson.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Britt K. Latham**
  blatham@bassberry.com,allison.acker@bassberry.com,nicholas.deuschle@bassberry.com,lbilbrey@bassberry.com,bmccaskill@bassberry.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **John T. Long**
  johnlong@cavanagh-ohara.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,smcclenahan@barrettjohnston.com,nchanin@barrettjohnston.com

- **Eric I. Niehaus**
  ericn@rgrdlaw.com

- **W. Brantley Phillips , Jr**
  bphillips@bassberry.com,kreecer@bassberry.com,lbilbrey@bassberry.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Shannon Rose Selden**
  srselden@debevoise.com,ambartlett@debevoise.com,mao-ecf@debevoise.com

- **Rachel A. Shanies**
  rashanies@debevoise.com

- **James Gerard Stranch , IV**
  gerards@bsjfirm.com,ecf-processor@bsjfirm.com,jennifers@bsjfirm.com

- **Lisa A. White**
  lisa@gregcolemanlaw.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,ldeem@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`