UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| In re ENVISION HEALTHCARE CORPORATION SECURITIES LITIGATION ) | Civil Action No. 3:17-cv-01112 **(Consolidated with Case Nos. 3:17-cv-01323 and 3:17-cv-01397)** |
| This Document Relates To: ) | CLASS ACTION |
| ALL ACTIONS. ) | Honorable William L. Campbell, Jr.<br>Magistrate Judge Jeffery S. Frensley |
| | DEMAND FOR A JURY TRIAL |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................1

II. JURISDICTION AND VENUE ....................8

III. PARTIES ....................9

A. Plaintiffs ....................9

B. Defendants ....................11

1. Envision Defendants ....................11

2. AmSurg Defendants ....................13

IV. DEFENDANTS' IMPROPER PRACTICES AND WRONGFUL COURSE OF BUSINESS ....................15

A. Envision's Revenues Were Dependent on Its Undisclosed Strategy to Manipulate Out-of-Network Emergency Department Physician Payments ....................16

B. Envision Obtained New Hospital Contracts and Inflated Its Reported Revenue Through Upcoding and Other Medically Unnecessary Procedures ....................19

V. DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ....................23

A. False and Misleading Statements Regarding EmCare's Revenue and EBITDA Growth ....................23

B. False and Misleading Statements Regarding EmCare's Quality of Care ....................32

C. False and Misleading Statements Regarding the Performance of Envision's New 2014-2015 Contracts ....................37

D. Additional False and Misleading Statements ....................43

1. False and Misleading Statements Regarding Envision's Out-of-Network Exposure ....................44

2. False and Misleading Statements Regarding Envision's Balance Billing Practices ....................53

VI. ADDITIONAL SCIENTER ALLEGATIONS ....................57

A. CD&R and Defendants' $4.5 Billion in Insider Trading ....................57

Page


B. Contemporaneous Information Known to Defendants Directly Contradicted Their Public Statements ....60

C. Defendants Paid over $30 Million to Resolve a False Claims Act Lawsuit Containing Allegations Substantially Similar to Those at Issue in This Case ....64

D. Defendants Intentionally Concealed Meaningful Metrics Regarding Envision's Out-of-Network Revenues ....66

E. EmCare's Improper Billing Practices Were Central to Envision's Operations ....69

F. Envision's Key Executives Abruptly Departed at the End of the Class Period ....69

G. Defendants' Substantial Executive Compensation ....70

H. Defendants' False Statements Were Made Close in Time to Envision's Disclosures ....70

VII. DEFENDANTS' SEC DISCLOSURE VIOLATIONS ....71

A. The Impact of the Out-of-Network Scheme on Envision's Reported Revenues ....73

B. The Material Adverse Trend in Out-of-Network Recovery Rates as the Scheme Unraveled ....74

C. The Impact of the Unsustainable Out-of-Network Scheme on Envision's Future Results ....75

VIII. LOSS CAUSATION/ECONOMIC LOSS ....77

A. The 2015 Disclosures ....77

B. The 2017 Disclosures ....78

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ....82

X. INSIDER TRADING ....83

XI. CLASS ACTION ALLEGATIONS ....85

**Page**


XII. CAUSES OF ACTION ..... 86

COUNT I ..... 86

Violations of §10(b) of the 1934 Act and SEC Rule 10b-5 Against Envision, Sanger, Owen, Holden and Gulmi ..... 86

COUNT II ..... 88

Violations of §20(a) of the 1934 Act Against the Envision Individual Defendants and the AmSurg Defendants Other Than Cigarran, Herr and Popp ..... 88

COUNT III ..... 90

Violations of §20A of the 1934 Act Against Williams, Sanger, Owen and Zimmerman ..... 90

COUNT IV ..... 91

Violations of §11 of the 1933 Act Against Envision and the Envision Individual Defendants ..... 91

COUNT V ..... 96

Violations of §12(a)(2) of the 1933 Act Against Envision and the Envision Individual Defendants ..... 96

COUNT VI ..... 98

Violations of §15 of the 1933 Act Against the Envision Individual Defendants ..... 98

COUNT VII ..... 98

Violations of §14(a) of the 1934 Act and SEC Rule 14a-9 Against Envision, the Envision Individual Defendants and the AmSurg Defendants ..... 98

COUNT VIII ..... 100

Violations of §20(a) of the 1934 Act Against the Envision Individual Defendants and the AmSurg Defendants ..... 100

PRAYER FOR RELIEF ..... 102

JURY DEMAND ..... 102

Plaintiffs, by and through their undersigned counsel, bring this federal class action against defendants upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of counsel, which included, without limitation, the review and analysis of: (a) public filings made by Envision and other related non-parties with the United States Securities and Exchange Commission ("SEC"); (b) releases and other publications disseminated by defendants; and (c) securities analyst reports, news articles, websites, and other publicly available information concerning defendants and other related non-parties.[1] Plaintiffs believe that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a securities class action brought on behalf of all persons who purchased or otherwise acquired the common stock of Envision Healthcare Corporation and Envision Healthcare Holdings, Inc. ("Envision" or the "Company") between February 3, 2014 and October 31, 2017, inclusive (the "Class Period"), against Envision, certain of its senior insiders, and its former controlling shareholder for violations of the federal securities laws.

2. Defendant Envision provides healthcare-related services to consumers, hospitals, healthcare systems, health plans and governmental entities. During the Class Period, Envision's business operations included AMR, a medical transportation provider; Evolution Health, a post-acute and home-based health care services provider; and EmCare, an integrated facility-based

---

[1] Pursuant to the Court's December 2, 2021 Order (ECF No. 368) granting Plaintiffs' Motion for Leave to Amend the Consolidated Class Action Complaint for Violation of Federal Securities Laws (ECF No. 333), this Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws omits previously dismissed claims and parties. Plaintiffs expressly reserve their right to appeal any and all parties and claims dismissed by the Court's November 19, 2019 Order (ECF No. 152).

physician services which generated approximately 60% of Envision's net revenue and adjusted earnings ("adjusted EBITDA" or "EBITDA").

3. During the Class Period, defendants oversaw an illicit billing scheme at EmCare which drove Envision's reported revenue and EBITDA growth, while publicly maintaining that Envision's strong results were the product of a "patient-centric model" that "uniquely positioned" Envision to "improve service and quality" and "lower costs." According to defendants, Envision's growth was the product of "integrated service offerings, . . . data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs." It was these strengths, defendants told the market, that drove EmCare's revenue from $2.3 billion in FY13 to approximately $4.2 billion in FY16 and allowed it to report double-digit compounded annual growth rates for EBITDA during this same period.

4. The truth, however, was that EmCare was reporting strong revenue and EBITDA growth by manipulating its out-of-network billing, engaging in unlawful upcoding and improperly increasing hospital admissions and procedures to garner new hospital contracts.

5. One of the prime drivers of Envision's strong Class Period performance was EmCare's practice of staffing almost all of its emergency departments ("EDs") with out-of-network physicians, which enabled EmCare to bill both health insurers and patients at vastly higher rates than its industry peers. This practice has been derided as "unfair and deceptive" by U.S. Senator Bill Nelson, and characterized as the "healthcare equivalent of a carjacking," by Yale University researchers who uncovered EmCare's improper practices in a July 2017 National Bureau of Economic Research ("NBER") study entitled: *Surprise! Out-of-Network Billing for Emergency Care in the United States*. The NBER study revealed that the mean out-of-network billing rate for hospitals managed by EmCare was 62%, compared to less than 5% for most other

hospitals. The NBER study further confirmed that once EmCare entered a hospital, "out-of-network billing rates increased by between ***81 and 90 percentage points***."

6. Defendants also inflated Envision's reported revenue using a fraudulent practice commonly referred to as "upcoding," whereby medical providers bill for services under a code that is more expensive than what a patient actually required or was provided. Specifically, the NBER study concluded that once EmCare entered an ED, coding for the most expensive type of emergency care increased – without explanation – by 42.7%.

7. EmCare inflated facility spending for its hospital partners (which in turn allowed EmCare to increase its own reported growth), by arbitrarily increasing, without regard to medical necessity, hospital admission rates and imaging rates and using the same clandestine upcoding strategy Envision employed to increase its own revenue.

8. Envision was controlled during the Class Period by Clayton, Dubilier & Rice, LLC ("CD&R"),[2] a private equity firm. Prior to the Company's August 14, 2013 Initial Public Offering ("IPO"), CD&R owned over 97% of Envision. Following the IPO, CD&R continued to control Envision's operations, holding over 70% of Envision's outstanding equity as well as the contractual right to designate the majority of the members of Envision's Board of Directors (the "Board"), including the Chairman.

9. The wrongful course of business alleged herein was designed to allow CD&R and Envision's senior insiders to sell the vast majority of their Envision shares at artificially inflated prices before the truth about Envision's illicit practices was revealed. CD&R unloaded its entire equity stake in Envision at artificially inflated prices for proceeds of almost ***$4.4 billion*** in four

---

2 The term "CD&R" collectively refers to Clayton, Dubilier & Rice, LLC and its affiliates CD&R Associates VIII Ltd., Clayton, Dubilier & Rice Fund VIII, L.P., CD&R EMS Co-Investor, L.P., CD&R Advisor Fund VIII Co-Investor, L.P. and CD&R Friends and Family Fund VIII, L.P.

rapid-fire stock offerings in February 2014, July 2014, September 2014 and March 2015, before Envision's improper practices became public. In these same offerings, as well as other Class Period sales, several of the individual defendants – Envision's Chairman (and CD&R's operating advisor and co-investor) Ronald A. Williams ("Williams"); Chief Executive Officer ("CEO") William A. Sanger ("Sanger"); Chief Financial Officer ("CFO") Randel G. Owen ("Owen"); and President and CEO of EmCare Todd G. Zimmerman ("Zimmerman"), sold an additional ***$138 million*** of their own Envision stock, so they too could cash in before their misconduct became known.

10. As defendants were completing their insider trading, Envision's Board was pushing Sanger to assess whether Envision could either be sold to another company, or consummate an acquisition large enough to enable Envision to continue to conceal EmCare's out-of-network billing scheme. By August 2015, Sanger was in discussions with Envision competitor AmSurg regarding a possible merger. Those discussions were terminated in September 2015 in light of Envision's recognition that it would soon have to disclose adverse 3Q15 earnings.[3]

11. On October 22, 2015, Envision issued its 3Q15 results, reporting drastically reduced earnings and guidance as a result of weaknesses in dozens of EmCare contracts, which defendants had been aware of for a year but had concealed from the market. While Envision's stock price declined over 30% on this news, it continued to trade at artificially inflated levels throughout the remainder of the Class Period, as defendants assured investors that "the new contract pipeline is still robust," and "we're doing very well." What defendants did not tell

---

[3] Envision's fiscal quarters and fiscal years are abbreviated throughout. Thus, "3Q15" for example, represents the third quarter of fiscal year 2015. "FY15" represents the fiscal year of 2015. Envision's fiscal year follows the calendar year, beginning on January 1 and ending on December 31.

investors was that internally Envision was seeing "dramatic" changes in out-of-network reimbursements, as rates had been "declining significantly" and "precipitously."

12. In early March 2016, the State of Florida enacted legislation prohibiting physicians from billing patients for any out-of-network charges not paid by their insurers – referred to in the healthcare industry as "Balance Billing." Envision's stock price dropped 13%, as analysts began to scrutinize Envision's out-of-network business. Since Envision declined to separately disclose its out-of-network business in its reported financial results, analysts questioned defendants about the impact of the Florida legislation and similar legislation being considered by other states. Rather than admitting the truth about the unsustainability of its improper billing practices, defendants falsely maintained that the new legislation was actually a "positive" for Envision.

13. At the same time, defendants, CD&R and the executives it selected to run Envision, had re-engaged in merger discussions with AmSurg. Envision and AmSurg reached an agreement, and on June 15, 2016, the Boards of both companies issued a release announcing the merger between Envision and AmSurg (the "Merger"). On August 4, 2016, Envision filed a registration statement on Form S-4 with the SEC in connection with the Merger (the "Joint Proxy Registration Statement"). On October 21, 2016, Envision and AmSurg disseminated to shareholders the Joint Proxy Registration Statement which emphasized the "synergies" to be delivered from the Merger while failing to disclose the illicit billing scheme that had driven Envision's revenue and adjusted earnings growth since its IPO. And, despite the fact that Envision's reported growth was unsustainable, the Joint Proxy Registration Statement continued to estimate double-digit growth, including FY17 EBITDA of approximately $1.5 billion for the combined Company.

14. In March 2017, just months after the AmSurg Merger was completed, defendants announced that Envision's $1 billion in out-of-network business – approximately 17% of

Envision's post-Merger Physician Services revenues – would be moved in-network over the next 18 months to two years. However, in response to analysts' significant concerns about the adverse impact this change would have on Envision's revenue growth, defendants assured analysts and investors that the transition would be "revenue-neutral" and would not impact Envision's double-digit FY17 and FY18 EBITDA growth. In doing so, defendants concealed what they would later admit – that Envision's out-of-network rates had been falling and no longer could be "masked" by its acquisition-driven model.

15. On July 24, 2017, the *New York Times* ("*NY Times*") published an article about the NBER study, which detailed for the first time, EmCare's over-billing scheme at hospitals across the Country, stating:

> [R]esearchers at Yale found that the rate of out-of-network doctor's bills for customers of one large insurer jumped when EmCare entered a hospital. The rates of tests ordered and patients admitted from the E.R. into a hospital also rose, though not as much. The use of the highest billing code increased.
>
> "It almost looked like a light switch was being flipped on," said Zack Cooper, a health economist at Yale who is one of the study's authors.

16. The *NY Times* exposé, which was published on the front page of the July 25, 2017 print edition, detailed how Yale University researchers had exhaustively analyzed EmCare's pattern and practice of over-billing, noting how patients were being "ambushed" by EmCare's "strategy." By the end of the day on July 25, Envision's stock had declined 6% from its closing price on July 23, 2017.

17. On September 18, 2017, less than two months after the *NY Times* article was published in print, Envision announced a number of organizational changes, including the sudden and unexpected "resignation" of Envision's key Physician Services Division President, Bob Coward ("Coward"). "[S]urprised" by Coward's resignation, analysts noted the obvious –

"executives rarely depart when results are strong." In response to this news, Envision's stock declined an additional 10% on dramatic volume of 11.2 million shares.

18. Two days later, on September 20, 2017, U.S. Senator Claire McCaskill ("Senator McCaskill") sent a letter to Envision CEO, defendant Christopher A. Holden ("Holden"), demanding answers regarding EmCare's abusive practices, and recognizing that "EmCare staffing and management may have contributed to a decline in health care quality and access to patients."

19. Finally, on October 31, 2017, after the market closed, Envision announced that, due in large part to issues in its Physician Services Division business, it had badly missed its 3Q17 estimates, was significantly reducing 4Q17 EBITDA guidance, and expected a 25%-30% reduction in FY18 EBITDA. Defendants further surprised investors by admitting that Envision's out-of-network revenue was below the in-network rate and the effect of that on future revenues as part of the reduced revenues and EBITDA for FY17 and FY18. Shocked by this dramatic change, analysts noted the adjusted guidance was about 50% below the $1.5 billion EBITDA defendants had, at the time of the Merger, led investors to expect for FY17. These disclosures caused Envision's stock price to collapse by over 41%, from $42.60 per share to $28 per share.

20. While CD&R and other senior Envision insiders were able to unload ***$4.5 billion*** of their own Envision stock at prices near Envision's Class Period highs, plaintiffs and other class members investors who purchased Envision shares at inflated prices and/or obtained Envision shares in the Merger have suffered billions of dollars of harm as the truth about, and impact associated with, defendants' misconduct entered the market.



4

## II. JURISDICTION AND VENUE

21. The claims asserted herein arise under §§10(b), 14(a), 20(a) and 20A of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b), 78n(a), 78t(a) and 78t-1, and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and §§11, 12(a)(2) and 15 of the Securities Exchange Act of 1933 ("1933 Act"), 15 U.S.C. §§77k, 77l and 77o.

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act and §27 of the 1934 Act.

23. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because many of the acts and practices complained of herein occurred in substantial part in this District. Envision's

---

4 Prices have been adjusted to reflect the 3:1 conversion ratio of the December 1, 2016 Envision Merger with AmSurg.

corporate headquarters are located in this District. AmSurg's pre-Merger headquarters were located in this District and its shareholders approved the Merger based on the false and misleading Joint Proxy Registration Statement at AmSurg's executive offices in this District on or about November 28, 2016. Envision conducts substantial business in Tennessee sufficient to provide for general jurisdiction over it in this District.

24. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

25. Lead Plaintiff Laborers Pension Trust Fund for Northern California is an institutional investor which was established in 1963 and provides retirement income benefits to more than 30,000 laborers and their dependents. Laborers Pension Trust Fund for Northern California purchased or otherwise acquired Envision common stock during the Class Period and AmSurg common stock that was exchanged in the Merger (as set forth in its previously filed certification (ECF No. 88-1)), and was damaged thereby.

26. Lead Plaintiff LIUNA National (Industrial) Fund ("LNIPF") was founded in 1967 by the Laborers' International Union of North America ("LIUNA") and employers of LIUNA members for the purpose of providing retirement income benefits. Established for non-construction workers, LNIPF covers workers in a broad range of employment, including professional, dental, manufacturing and service contracts. Federal government, public sector and others in various job classifications are also covered by the Fund. There are more than 24,000 active participants covered by the Fund and more than 13,000 retirees receiving benefits. The

LIUNA Staff & Affiliates Pension Fund provides retirement benefits for full-time officers and employees of the International Union, Local Unions and District Councils affiliated with LIUNA. The LIUNA Staff and Affiliates Pension Fund has over 3,000 active participants and provides benefits for over 4,000 retirees. Lead Plaintiffs LNIPF and LIUNA Staff and Affiliates Pension Fund purchased or otherwise acquired Envision common stock during the Class Period and AmSurg common stock that was exchanged in the Merger (as set forth in its previously filed certification (ECF No. 48-2)), and were damaged thereby.

27. Named plaintiff Central Laborers' Pension Fund ("Central Laborers") is an institutional investor which was established in 1965 and provides retirement income benefits to more than 7,500 participants. The Fund provides benefits to active and retired laborers and their beneficiaries throughout most of Illinois and has approximately $1 billion in assets under management. Central Laborers purchased or otherwise acquired Envision common stock during the Class Period and AmSurg common stock that was exchanged in the Merger (as set forth in its previously filed certification (ECF No. 88-2)), and was damaged thereby.

28. Named plaintiff United Food and Commercial Workers Union Local 655 Food Employers Joint Pension Fund ("UFCW Pension Fund") is an institutional investor which was established in 1965 and provides retirement benefits to more than 20,000 participants. The UFCW Pension Fund purchased or otherwise acquired Envision common stock during the Class Period, including shares purchased directly and/or contemporaneously from defendants Williams, Sanger, Owen and Zimmerman (as set forth in its previously filed certification (ECF No. 88-3)), and was damaged thereby.

## B. Defendants

### 1. Envision Defendants

29. Defendant Envision provides physician-led outsourced medical services in the United States. The Company's stock is listed and trades on the New York Stock Exchange ("NYSE") under the symbol "EVHC." As of January 2018, the Company had more than 119 million shares of common stock issued and outstanding. Prior to the Merger, Envision Healthcare Holdings, Inc. common stock traded on the NYSE under the symbol "EVHC."

30. Defendant Sanger served as Chairman of the Envision Board from November 2014 through the Merger, as Executive Chairman of the Board from the Merger through December 1, 2017, and currently serves as non-Executive Chairman of the Board. Sanger was a director and the President and CEO of Envision from May 2011 through the Merger. Sanger was also a director, chairman, and CEO of Envision's predecessor beginning in February 2005 and its President beginning in 2008. Before that, Sanger was President of EmCare beginning in 2001 and CEO of EmCare and AMR beginning in 2002. As part of the Merger, Sanger received $3 million in equity compensation. During the Class Period, Sanger also sold at least 2.2 million of his own Envision shares at artificially-inflated prices for proceeds of approximately $80 million while in possession of material, non-public information, including shares Sanger sold contemporaneously with purchases by the UFCW Pension Fund and other class members in the 2014 offerings. Defendant Sanger signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") accompanying each of the Form 10-Ks and Form 10-Qs issued by Envision before the Merger, participated in the preparation of the false and misleading Joint Proxy Registration Statement, and made numerous false and misleading statements during the Class Period.

31. Defendant Owen is, and has been since the Merger, the Executive Vice President and President of Envision's Ambulatory Services Group. Before the Merger, defendant Owen had

served as the CFO and as an Executive Vice President of Envision between May 2011 and November 2016, and as its Chief Operating Officer ("COO") from September 2012 through November 2016. During the Class Period, Owen also sold at least 1 million of his personally-held shares of Envision stock at artificially inflated prices for proceeds of approximately $36 million while in possession of material, non-public information, including shares sold contemporaneously with the UFCW Pension Fund and other class members in the 2014 offerings. Defendant Owen signed certifications pursuant to SOX accompanying each of the Form 10-Ks and Form 10-Qs issued by Envision before the Merger, participated in the preparation of the false and misleading Joint Proxy Registration Statement, and made numerous false and misleading statements during the Class Period.

32. Defendant Craig A. Wilson ("Wilson") is, and has been since May 2001, the Senior Vice President, General Counsel and Secretary of Envision. He also served as General Counsel of Envision's predecessor beginning in April 2010, and as Corporate Counsel from February 2005 through March 2010. Defendant Wilson was Corporate Counsel of EmCare from March 2000 through February 2005. Wilson participated in the preparation of the false and misleading Joint Proxy Registration Statement.

33. Defendant Zimmerman served as President of EmCare from April 2010 to April 2015, and served as CEO of EmCare from February 2013 until June 2017. Defendant Zimmerman was an Executive Vice President of Envision from May 2011 until the Merger. Defendant Zimmerman sold almost half a million of his own Envision shares at artificially-inflated prices for proceeds of almost $18 million while in possession of material, non-public information, including shares Zimmerman sold contemporaneously with purchases by the UFCW Pension Fund and other class members in the February 2014 and July 2014 offerings. Defendant Zimmerman also made

or approved false statements during the Class Period, and participated in the preparation of the false and misleading Joint Proxy Registration Statement.

34. Defendants Sanger, Owen, Wilson and Zimmerman are sometimes referred to herein as the "Envision Officer Defendants."

35. Defendants Carol J. Burt ("Burt"), Mark V. Mactas ("Mactas"), Leonard M. Riggs, Jr. ("Riggs"), Richard J. Schnall ("Schnall"), James D. Shelton ("Shelton"), Michael L. Smith ("Smith") and Williams each served as an Envision Board member prior to the Merger (collectively, with Sanger, the "Envision Director Defendants," and collectively with the Envision Officer Defendants, the "Envision Individual Defendants"). Defendant Williams, who was an operating advisor to CD&R, and had an investment in the CD&R Advisor Fund VIII Co-Investor, L.P. Fund, served as Chairman of the Board between May 2011 and November 2014, and sold almost 131,000 of his own Envision shares at artificially-inflated prices for proceeds of about $4.3 million while in possession of material, non-public information, contemporaneously with purchases by the UFCW Pension Fund and other class members in the July 2014 offering.

36. Each of the Envision Director Defendants prepared the Joint Proxy Registration Statement and participated in the solicitation of proxies in support of the Merger. Defendants Burt, Riggs, Schnall, Shelton, Smith and Williams each joined the Envision Board after the Merger, as did defendant Sanger.

**2. AmSurg Defendants**

37. Defendant Holden has, since the Merger, been the President and CEO of Envision and a member of Envision's Board of Directors. Prior to the Merger, defendant Holden served as the President, CEO and a director of AmSurg. Defendant Holden participated in the preparation of the false and misleading Joint Proxy Registration Statement and, following the Merger, signed certifications pursuant to SOX accompanying each of the Form 10-Ks and Form 10-Qs issued by

Envision during the Class Period. Defendant Holden also made false and misleading statements during the Class Period in connection with the Merger and in conference calls and releases.

38. Defendant Claire M. Gulmi ("Gulmi") was, from the time of the Merger until October 2, 2017, the Executive Vice President and CFO of Envision. Effective October 2, 2017, Gulmi became an advisor to Envision. Before the Merger, defendant Gulmi served as the CFO of AmSurg between September 1994 and November 2016, as an Executive Vice President of AmSurg between February 2006 and November 2016, and as a director of AmSurg from 2004 until the Merger. Defendant Gulmi participated in the preparation of the false and misleading Joint Proxy Registration Statement and, following the Merger until October 2, 2017, Gulmi signed certifications pursuant to SOX accompanying each of the Form 10-Ks and Form 10-Qs issued by Envision and made numerous false and misleading statements in conference calls and releases from the Merger through October 2, 2017.

39. Defendant Kevin D. Eastridge ("Eastridge") was, from the time of the Merger until October 2, 2017, the Senior Vice President, Finance and Chief Accounting Officer ("CAO") of Envision. Since October 2, 2017, defendant Eastridge has been Envision's CFO. Before the Merger, defendant Eastridge served as Senior Vice President, Finance and CAO of AmSurg. As described below, defendant Eastridge participated on behalf of Envision in multiple conference calls and conference presentations, where false and misleading statements were made, from the Merger through the end of the Class Period.

40. Defendants Holden, Gulmi and Eastridge are sometimes referred to herein as the "AmSurg Officer Defendants," and together with the Envision Officer Defendants, the "Officer Defendants."

41. Defendants Thomas G. Cigarran ("Cigarran"), James A. Deal ("Deal"), John T. Gawaluck ("Gawaluck"), Steven I. Geringer ("Geringer"), Henry D. Herr ("Herr"), Joey A. Jacobs ("Jacobs"), Kevin P. Lavender ("Lavender"), Cynthia S. Miller ("Miller") and John W. Popp, Jr. ("Popp") (collectively, with Holden and Gulmi, the "AmSurg Director Defendants," and collectively, with Holden, Gulmi and Eastridge, the "AmSurg Defendants"), each served as a member of the Board of AmSurg at the time of the Merger.

42. Each of the AmSurg Director Defendants participated in the preparation of the Joint Proxy Registration Statement and participated in the solicitation of proxies in support of the Merger Agreement. After the Merger, defendants Deal, Gawaluck, Geringer, Jacobs, Lavender and Miller joined the Envision Board, as did defendant Holden.

## IV. DEFENDANTS' IMPROPER PRACTICES AND WRONGFUL COURSE OF BUSINESS

43. Throughout the Class Period, defendants asserted that Envision's revenue and EBITDA growth, particularly with respect to its largest operating unit, EmCare, was being driven by factors, including "integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs" and a "patient-centric model" which was able to deliver "the best quality and cost." *Infra* §V.

44. To investors, it appeared that Envision's strategy was largely successful as both EmCare's net revenue and EBITDA showed double-digit compounded annual growth, with EmCare's net revenue increasing from $2.3 billion in FY13 to approximately $4.2 billion in FY16.

45. The truth, however, was that a majority of EmCare's reported revenue and EBITDA growth during the Class Period was derived from the undisclosed, improper and unsustainable practices detailed herein, including systemic out-of-network billing, upcoding, improper hospital admissions and medically unnecessary procedures. EmCare's ability to generate the new contract

growth it reported was based on defendants' wrongful course of business, which allowed Envision to appear to be legitimately increasing revenue for the hospital partners with which it contracted, and thereby win new hospital contracts.

### A. Envision's Revenues Were Dependent on Its Undisclosed Strategy to Manipulate Out-of-Network Emergency Department Physician Payments

46. The majority of hospitals outsource the management of emergency rooms to independent physician groups or companies such as EmCare, which provide physician staffing and billing as well as other related services. Because hospitals bill separately from emergency room physicians, when a given hospital is in-network with a specific insurer, the emergency room physicians in that hospital may not necessarily be in-network with that same insurer.

47. As a result, patients who go to an in-network hospital emergency room may later discover, often through the surprise arrival of a large bill, that the physician(s) from whom they received care were not in-network providers. While in-network physicians charge, on average, 266% of what the Medicare program would pay for the same services, out-of-network physician charges are far higher, charging, on average, ***637%*** of the corresponding Medicare rates. Because a patient's insurer may not fully pay inflated out-of-network bills, patients are often left liable for the balance – which is commonly referred to in the healthcare industry as "Balance Billing."

48. This practice, which generated revenue up to $1 billion a year for Envision during the Class Period, has been widely recognized as unethical and improper. U.S. Senator Bill Nelson has stated his concern that these practices were unlawful, "unfair and deceptive" as:

> [C]onsumers are often given no notice that a doctor or other service provider is not covered by their insurance, and they are later saddled with massive bills that can cause severe financial distress – and even bankruptcy.
>
> Section 5 of the Federal Trade Commission Act generally prohibits "unfair or deceptive acts or practices in or affecting commerce." I am concerned that these out-of-network surprise bills could be both unfair and deceptive.

49. Senator McCaskill has stated that "EmCare staffing and management may have contributed to a decline in health care quality and access for patients." Zack Cooper, an assistant professor of health policy and economics at Yale University, and a co-author of the NBER study, has stated: "To put it in very, very blunt terms: This is the health equivalent of a carjacking." Gerald Kominski, director of UCLA's Center for Health Policy Research, has stated that such practices are "an abuse of the implicit trust that you have with your doctor and with your healthcare providers."

50. Throughout the Class Period, Envision actively concealed its extraordinary out-of-network operating structure, and how much higher its rates and improper billing practices were compared to its peers, which adverse information was confirmed in the 2017 NBER study.

51. Specifically, the NBER study confirmed that at most hospitals, 5% or less of the bills from emergency room providers were out-of-network, while at EmCare facilities over 62% of bills were out-of-network, and at some EmCare facilities 100% of the bills were out-of-network:




52. The above chart shows that most ER visits at most hospitals do not result in out-of-network bills. Envision was quite the opposite. EmCare intentionally manipulated out-of-network billing to be a Company-wide strategy, allowing Envision to report revenue growth while masking underlying weaknesses in its business model. The NBER study confirmed that the "mean out-of-network billing rate for hospitals managed by EmCare is 62%," compared to less than 5% for most other hospitals. The NBER study further confirmed that following EmCare's entry into a hospital, those hospitals' out-of-network billing rates "increased by between 81 and 90 percentage points." As the following chart shows, for many hospitals that contracted with EmCare, immediately following EmCare's engagement, not a single emergency room physician remained in-network with a large insurer:




53. The results of these practices were profound. In FY15, over 50% of EmCare’s net revenue came from payments it received in connection with ED physician staffing. And, the NBER study found that when EmCare “takes over the management of emergency services at hospitals with low out-of-network rates, they raise out-of-network rates by ***over 81 percentage points*** and ***increases average physician payments by 117%***.”

### B. Envision Obtained New Hospital Contracts and Inflated Its Reported Revenue Through Upcoding and Other Medically Unnecessary Procedures

54. Envision inflated its reported revenue by using an unlawful practice known as upcoding, as well as inflating its own revenue and the revenue of its hospital partners by improperly increasing hospital admission rates and procedures, including imaging rates, without

regard to medical necessity. Increasing the revenue of its hospital partners was critical to Envision's effort to market itself to, and obtain contracts with, new hospitals in order to meet the revenue and EBITDA growth rate estimates Envision disseminated to the market.

55. Physicians bill for their services using Current Procedural Terminology ("CPT") – a medical code set used by health insurance companies and others to report medical, surgical and diagnostic procedures and services to payers. "Upcoding" is a form of fraud where providers bill for medical services designated under a code that is more expensive than that associated with medical services that a patient actually needed or was provided.

56. Emergency room physicians use CPT codes 99281, 99282, 99283, 99284 and 99285 for reporting care provided in the ED. CPT code 99281, representing the lowest severity, is appropriate where the symptoms the patient presents with are low urgency, requiring little to no immediate medical care. CPT code 99285, representing the highest severity, is appropriate when the symptoms the patient presents with pose an immediate and significant threat to life or physiologic function.

57. Upcoding can be used by ED physicians to vastly inflate their bills. For example, a May 2012 study by the Office of Inspector General found that the average 2010 Medicare payment rate for a CPT Code 99285 was 748% higher than the payment rate for CPT Code 99281, 185% higher than the payment rate for CPT Code 99283, and 49% higher than the payment rate for CPT Code 99284.

58. As the NBER study confirmed, when EmCare entered a hospital, the rate at which emergency room physicians coded with CPT 99285 (the highest severity code), increased by more than 40%. Specifically, after EmCare entered a hospital there was a "14.8 percentage point increase in the rate that there is a physician claim on each episode that is coded with the CPT codes

for the most intensive physician services. This represents an increase in the likelihood of having an episode coded using the most intensive physician emergency CPT code of 42.7%."

59. Defendants also engaged in misconduct designed to increase fees and payments to the hospitals with which EmCare contracted. A critical component of EmCare's reported growth was its ability to win new contracts with hospitals in which it could place its emergency room physicians. As set forth below, the Envision Officer Defendants emphasized Envision's new contract rates in its quarterly financial reporting, as well as during Envision's quarterly conference calls with investors, where these defendants were routinely asked about the pipeline for new contract growth. To win new contracts, EmCare desired to demonstrate that it could increase a hospital's revenues after the hospital contracted with EmCare.

60. Rather than providing hospitals with improved efficiency, quality or patient volume, EmCare was increasing hospital revenue through its improper upcoding strategy and by manipulating hospital admission rates and performing medically unnecessary procedures on patients, including MRI's and other forms of imaging. In total, the NBER study found, EmCare increased facility payments by 10.8% following its entry into each hospital.

61. First, much like a hotel, hospitals bill payors for the time a patient stays in the hospital, separate and apart from any physician charges. The higher the severity of the CPT code billed by the physician, the more a hospital can typically charge for a patient's stay. Therefore, Envision's abusive upcoding practices had the dual impact of driving short-term increases in revenue for both Envision and its hospital partners.

62. Second, as confirmed by the NBER study, when EmCare entered a hospital, there was a 23% increase in the rate at which patients were admitted to the hospital from the emergency room. Admission rates are critical to a hospital's profits. For example, the NBER study cites a

2014 study entitled, *Emergency Department Profits Are Likely to Continue as the Affordable Care Act Expands Coverage*,[5] which found that, with respect to Medicare patients, the profit margin on ED care for patients who were discharged from the ED, and not admitted to the hospital was ***negative*** 53.6% whereas the profit margin for patients who were admitted to the hospital from the ED was 18.4%. By increasing hospital admissions without regard to medical necessity, EmCare was able to dramatically increase its hospital partner's profits.

63. Critically, as the NBER study confirmed, the significant increases in "the rate patients are admitted from the ED to the hospital, imaging rates, facility spending or coding severity following the entry of EmCare into a hospital," could not be explained by "changes in the case mix of patients that hospitals treat" after EmCare's entry. In other words, while EmCare touted its ability to both decrease waiting times and improve treatment of complex cases (which, if true, could improve a hospital's reputation or attract more complex and profitable patients), the significant increase in admission rates, imaging rates, facility spending and coding severity was ***not*** a result of sicker patients being attracted to an ED after EmCare's entry.

64. The NBER study's findings are consistent with a *qui tam* lawsuit against EmCare, which the Company settled on December 17, 2017, for $29.8 million. As the Department of Justice's ("DOJ") release set forth:

> EmCare agreed to pay $29.8 million to resolve claims that, from 2008 to 2012, EmCare received remuneration from now-defunct Health Management Associates ("HMA") to increase Medicare admissions at HMA Hospitals by recommending admission for patients whose medical care should have been billed as outpatient or observation services. These recommendations allegedly caused the medically unnecessary admission of Medicare beneficiaries.
>
> On average Medicare pays at least three times as much for an inpatient admission as it does for care billed as observation or an ED visit. As part of the

[5] Michael Williams & David Cutler, "Emergency Department Profits are Likely to Continue as the Affordable Care Act Expands Coverage," *Health Affairs*, 33(5), 792-99 (2014).

alleged scheme, HMA made certain bonus payments to EmCare ED physicians and tied EmCare's retention of existing contracts and receipt of new contracts to increased ED admissions.

*  *  *

"Improper physician inducements not only compromise sound medical decision-making, but also cost American taxpayers millions in unnecessary medical costs," said U.S. Attorney for the Western District of North Carolina Andrew Murray. "Such kickback arrangements will not be tolerated."[6]

## V. DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

65. During the Class Period, defendants made false and misleading statements and omitted material facts necessary to make the statements made not false or misleading, including statements regarding: (i) the critical drivers of EmCare's revenue and EBITDA growth rates; (ii) the quality of care given to EmCare patients; and (iii) the performance of Envision's new 2014-2015 contracts.

### A. False and Misleading Statements Regarding EmCare's Revenue and EBITDA Growth

66. On February 3, 2014, Envision filed with the SEC a preliminary prospectus for the contemplated secondary offering of 31.625 million shares. The preliminary prospectus stated:

> **Strong and Consistent Revenue Growth from Diversified Sources**. We have a history of delivering strong revenue growth through a combination of new contracts, same- contract revenue growth and acquisitions. ***We believe that our significant new contract revenue growth has been driven by our differentiated service offerings and ability to deliver efficient, high-quality care.*** Further, ***new***

---

6 While EmCare denied that it has engaged in any misconduct, the terms of the settlement demonstrate that the DOJ felt differently, and that the DOJ's concerns regarding EmCare's misconduct were not limited to 2008-2012. The release confirmed that the DOJ had required EmCare enter into a five-year "Corporate Integrity Agreement ("CIA") with the Department of Health and Human Services Office of Inspector General" to refrain from further misconduct. As stated in a March 9, 2000, open letter from the Office of Inspector General, entitled, *An Open Letter to Health Care Providers*, CIA's are used when a provider has engaged in "serious misconduct," but as part of a settlement is being allowed to continue to participate in federal healthcare programs.

***contract growth has been accelerating since 2011 as a result of our integrated service offerings and the success of each of EmCare and AMR in cross- selling services to their respective customers***. Our new contract pipeline remains robust across each of our businesses.

* * *

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

**Capitalize on Organic Growth Opportunities**. Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives since 2011, provide us with competitive advantages to continue to grow our business. We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors. ***We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs***.

The prospectus, as amended, was declared effective on or about February 5, 2014, and repeated each of the statements quoted above, on February 7, 2014.

67. On March 5, 2014, Envision issued a release announcing its 4Q13 and FY13 financial results. For 4Q13, Envision reported EmCare revenue of $629.6 million, which resulted in revenue growth of 23.1%.[7] In addition, for 4Q13, Envision reported EmCare EBITDA of $75.3 million. Envision also disclosed that excluding the impact of two malpractice cases, EmCare EBITDA was $85 million. This resulted in 19% EBITDA growth and "was primarily driven by the net impact of revenue increases from net new contracts and same store revenue growth." For FY13, Envision reported EmCare revenue of $2.36 billion and EmCare EBITDA of $294 million.

---

[7] The quarterly growth rates Envision reported in its earnings releases were based on a comparison with the same quarter of the prior year. For example, 4Q13 revenues compared to 4Q12 revenues.

This resulted in annual revenue growth of 23.2% and annual EBITDA growth of 12.8%. Envision also reaffirmed its previously announced 2014 adjusted EBITDA guidance of $538-$545 million, which was approximately 21% higher than results for 2013.

68. On March 14, 2014, Envision filed with the SEC its annual financial report on Form 10-K for the fiscal year ended December 31, 2013 (the "2013 Form 10-K"). The 2013 Form 10-K repeated the same EmCare annual revenue and EBITDA results reported in the March 5, 2014 release. The 2013 Form 10-K also repeated substantially identical versions of the quoted statements from the February 2014 prospectus, including,

- "We believe that our significant new contract revenue growth has been driven by our differentiated service offerings and ability to deliver efficient, high-quality care."
- "[N]ew contract growth has been accelerating since 2011 as a result of our integrated service offerings and the success of each of EmCare and AMR in cross- selling services to their respective customers."
- "We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs."
- "We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers."[8]

69. On May 7, 2014, Envision issued a release announcing its 1Q14 financial results. Envision reported EmCare revenue of $644.6 million and EmCare EBITDA of $71.4 million for 1Q14. This represented revenue growth of 16.2% and EBITDA growth of 7.9%. Envision also reaffirmed its 2014 adjusted EBITDA guidance of $538-$545 million, which constituted an EBITDA growth rate of approximately 21%. On May 13, 2014, Envision filed with the SEC its

---

8 Substantially identical versions of the foregoing statements were repeated in the 2014 Form 10-K filed on March 2, 2015 and the 2015 Form 10-K filed on February 29, 2016.

Form 10-Q for the quarter ended March 31, 2014, which repeated the same EmCare revenue and EBITDA results reported in the May 7, 2014 release.

70. On August 6, 2014, Envision issued a release announcing its 2Q14 financial results. Envision reported EmCare revenue of $690 million and EmCare EBITDA of $87.1 million for 2Q14. This resulted in revenue growth of 21.2% and EBITDA growth of 23.4%. Envision reported that EmCare's EBITDA growth was "***primarily driven by revenue increases from net new contract wins and same store revenue growth***." Envision also increased its 2014 adjusted EBITDA guidance to $553-$558 million, which represented an EBITDA growth rate of approximately 25%. On August 14, 2014, Envision filed with the SEC its Form 10-Q for the quarter ended June 30, 2014, which repeated the same EmCare revenue and EBITDA results reported in the August 6, 2014 release.

71. On November 5, 2014, Envision issued a release announcing its 3Q14 financial results. Envision reported EmCare revenue of $748.1 million and EmCare EBITDA of $99.7 million for 3Q14. This resulted in revenue growth of 23.6% and EBITDA growth of 21.6%. On November 12, 2014, Envision filed with the SEC its Form 10-Q for the quarter ended September 30, 2014, which repeated the same EmCare revenue and EBITDA results reported in the November 5, 2014 release.

72. On February 26, 2015, Envision issued a release announcing its 4Q14 and FY14 financial results. For 4Q14, Envision reported EmCare revenue of $759.8 million and EmCare EBITDA of $102.5 million, representing quarterly revenue growth of 20.7% and quarterly EBITDA growth of 36.1%. For FY14, Envision reported EmCare revenue of $2.84 billion and EmCare EBITDA of $363.3 million, representing annual revenue growth of 20.5% and annual EBITDA growth of 23.6%. Envision also reaffirmed its 2015 adjusted EBITDA guidance of $653-

$665 million, which was approximately 17%-20% higher than results for 2014. On March 2, 2015, Envision filed with the SEC its 2014 Form 10-K, which repeated the same EmCare annual revenue and EBITDA results reported in the February 26, 2015 release.

73. On April 30, 2015, Envision issued a release announcing its 1Q15 financial results. Envision reported EmCare revenue of $825 million and EmCare EBITDA of $77.1 million for 1Q15. This resulted in revenue growth of 28% and EBITDA growth of 7.6%. Envision reported that excluding the impact of Medicaid parity, and a minority interest benefit the previous year, "adjusted EBITDA would have increased by 22.6% at EmCare." On May 8, 2015, Envision filed with the SEC its Form 10-Q for the quarter ended March 31, 2015, which repeated the same EmCare revenue and EBITDA results reported in the April 30, 2015 release.

74. On July 30, 2015, Envision issued a release announcing its 2Q15 financial results. Envision reported EmCare revenue of $929.1 million and EmCare EBITDA of $105.2 million for 2Q15. This represented revenue growth of 34.6% and EBITDA growth of 19.1%. On August 3, 2015, Envision filed with the SEC its Form 10-Q for the quarter ended June 30, 2015, which repeated the same EmCare revenue and EBITDA results reported in the July 30, 2015 release.

75. On October 22, 2015, Envision issued a release announcing its 3Q15 financial results. Envision reported EmCare revenue of $933.9 million. However, Envision reported disappointing 3Q15 EmCare EBITDA of $86.4 million, which was "short of our expectations." Envision also updated its adjusted EBITDA guidance to a range of $600 million to $605 million, down significantly from the previous estimates of $653 million to $665 million. On November 3, 2015, Envision filed with the SEC its Form 10-Q for the quarter ended September 30, 2015, which repeated the same EmCare revenue and EBITDA results reported in the October 22, 2015 release.

76. On January 11, 2016, Envision announced its "2016 Guidance," including adjusted EBITDA of $715 million to $740 million (approximately a 18%-23% increase over FY15) and adjusted EPS of $1.43 to 1.51.

77. On February 22, 2016, Envision issued a release announcing its 4Q15 and FY15 financial results. For 4Q15, Envision reported EmCare revenue of $960.3 million and EmCare EBITDA of $109 million, which represented revenue and EBITDA growth of 26.4% and 6.3%, respectively. Envision also reported that EmCare's 4Q15 EBITDA grew 26.2% over the disappointing 3Q15 EBITDA results. For FY15, Envision reported EmCare revenue of $3.65 billion and EBITDA of $377.7 million. This resulted in annual revenue growth of 28.4% and annual EBITDA growth of only 4% due to EmCare's disappointing 3Q15 results, yet Envision reaffirmed its FY16 EBITDA guidance of $715 million to $740 million, which was approximately 18% to 23% higher than FY15. On February 29, 2016, Envision filed with the SEC its 2015 Form 10-K, which repeated the same EmCare annual revenue and EBITDA results reported in the February 22, 2016 press release.

78. On May 5, 2016, Envision issued a release announcing its 1Q16 financial results. Envision reported 1Q16 EmCare revenue of $1.01 billion and EmCare EBITDA of $87.3 million, which represented revenue and EBITDA growth of 22.8% and 13.3%, respectively. On May 6, 2016, Envision filed with the SEC its Form 10-Q for the quarter ended March 31, 2016, which repeated the same EmCare revenue and EBITDA results reported in the May 5, 2016 release.

79. On August 3, 2016, Envision issued a release announcing its 2Q16 financial results. Envision reported 2Q16 EmCare revenue of $1.05 billion and EBITDA of $103.8 million. This represented revenue growth of 13.1%, but no tangible EBITDA growth due to a delay in the expected earnings contribution from Evolution Health's recently launched Florida health plan

contract. On the same day Envision reported its 2Q16 financial results, the Company filed with the SEC its Form 10-Q for the quarter ended June 30, 2016, which repeated the same EmCare revenue and EBITDA results reported in the August 3, 2016 release.

80. After agreeing to the Merger with AmSurg in June 2016, on August 4, 2016, Envision filed the final Merger Prospectus with the SEC on October 21, 2016, which formed part of the Joint Proxy Registration Statement. The Joint Proxy Registration Statement represented that Envision would post FY17 EBITDA growth of 14% (to $1.5 billion) and FY18 EBITDA growth of 13% (to $1.7 billion) and that the Merger was "expected to achieve approximately $100 million in annual synergies by the third year following their completion, in part from operational cost savings and in part from an acceleration in revenue opportunities through the cross-selling of a broader array of offerings and access to a broader client base."

81. On November 1, 2016, Envision issued a release announcing its 3Q16 financial results. Envision reported 3Q16 EmCare revenue of $1.06 billion and EBITDA of $113.9 million. This represented revenue growth of 13% and EBITDA growth of 32%. On November 3, 2016, Envision filed with the SEC its Form 10-Q for the quarter ended September 30, 2016, which repeated the same EmCare revenue and EBITDA results reported in the November 1, 2016 release.

82. On March 1, 2017, Envision filed with the SEC its annual financial report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K). Emphasizing the Company's "Competitive Strengths," the 2016 Form 10-K stated:

> We believe our scale and breadth of services in a fragmented marketplace ***allows us to be the most trusted and highest quality strategic partner for health systems, healthcare providers, payors, patients and communities in the common pursuit of the highest quality of care for the patients we serve***. Additionally, our portfolio of service offerings ***creates value by delivering integrated physician-centric care to systems, payors and patients***, and positions us favorably for growth and long-term leadership as the dynamic healthcare landscape continues to evolve.

* * *

We have a track record of delivering strong growth through a combination of organic growth, new contract additions and selective acquisitions. ***Organic growth has historically been supported by consistent underlying market volume trends, stable pricing and a diversified payor mix. Market volumes have been driven primarily by the non-discretionary nature of our services, aging demographics and primary care physician shortages that drive patients to emergency rooms.***

***We have successfully executed on new contract growth by providing a set of differentiated services and delivering integrated, efficient, high-quality care, which has helped us expand our relationships with our existing customers and compete effectively in the bidding process for new contracts***. We intend to continue to expand our existing customer relationships and capitalize on greenfield opportunities as we seek to increase our new contract growth, which represents the majority of the anticipated revenue synergies of the Merger. We anticipate additional growth through greenfield opportunities, as we believe that we currently provide physician services to approximately 40% of our target hospitals. Additionally, ***we believe we will have opportunities to expand our services in the hospitals we currently serve***. We also have a strong track record of executing on and integrating select acquisition opportunities. ***We expect that the fragmented nature of the segments in which we operate, in particular the physician services segment, in addition to the strength of our operating platform, will aid in increasing our near- and long-term acquisition pipelines***.

83. Each of the Form 10-Ks and Form 10-Qs issued during the Class Period prior to the Merger incorporated signed certifications by defendants Sanger and Owen, and by defendants Holden and Gulmi following the Merger. Those certifications were executed pursuant to SOX, certifying that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which statements were made, not misleading with respect to the period covered by this report."

84. The statements in ¶¶66-83 above were each false and misleading when made. The true facts which were then known to, or recklessly disregarded by, defendants Envision, Sanger and Owen (and AmSurg, Holden and Gulmi at the time of the 2016 Form 10-K) based upon their access and review of internal Company information include:

(a) that EmCare had been staffing the vast majority of emergency rooms with medical personnel with no coverage contracts with the major healthcare insurance carriers, forcing payors and unwitting patients to incur and pay expensive "out-of-network" costs;

(b) that the mean out-of-network billing rate for hospitals managed by EmCare was ***62%***, a rate more than 1,000% higher than the less than 5% out-of-network billing rate for most other hospitals;

(c) that upon taking over management of emergency rooms, EmCare hospitals' out-of-network billing rates increased by between ***81 to 90%***;

(d) that upon EmCare taking over management of emergency rooms, physician payments increased by ***117%*** and average physician charges increased by ***96%***;

(e) that, as defendants later admitted, Envision's net recovery rates for its out-of-network business had been declining since 2014, as payors (insurers) were balking at Envision's abusive practices;

(f) that a "significant" and "precipitous" decline in net recovery rates was being masked by the "tons," or hundreds of millions of dollars, of revenue derived from Envision acquisitions, as defendant Holden admitted in the fall of 2017;

(g) that Envision's reliance on the improper out-of-network billing practices inflated its reported revenue and profitability while concealing that its reported results were not sustainable if this improper business practice came to light;

(h) that EmCare's "significant organic growth" was the product of an ***unsustainable***, systemic out-of-network over-billing scheme rather than integrated service

offerings, data-driven processes to recruit and retain physicians, scalable technology or sophisticated risk management programs; and

(i) that, as a result of (a)-(h) above, Envision was not "well positioned" to continue to generate strong growth and defendants had no reasonable basis to expect and did not expect Envision's inflated revenue and EBITDA growth to continue unless Envision was able to continue the illicit practices detailed above.

## B. False and Misleading Statements Regarding EmCare's Quality of Care

85. On February 3, 2014, Envision filed with the SEC a preliminary prospectus for the contemplated secondary offering of 31.625 million shares. The preliminary prospectus stated:

> **Competitive Strengths**
>
> We believe the following competitive strengths position us to capitalize on the favorable healthcare services industry trends:
>
> Due to our scale and scope, we are able to offer our customers integrated services and national contracting capabilities, while ***demonstrating differentiated clinical outcomes across our businesses. We have developed strong brand recognition and competitive advantages in clinician recruitment as a result of our market position, clinical best practices and clinician leadership development programs***.
>
> **Strong and Consistent Revenue Growth from Diversified Sources**. We have a history of delivering strong revenue growth through a combination of new contracts, same-contract revenue growth and acquisitions. ***We believe that our significant new contract revenue growth has been driven by our differentiated service offerings and ability to deliver efficient, high-quality care***.

The prospectus was declared effective on February 5, 2014, and on February 7, 2014, Envision filed a final prospectus, which was dated February 5, 2014, and repeated each of the statements quoted above.

86. On March 14, 2014, Envision filed with the SEC its 2013 Form 10-K. The 2013 Form 10-K also emphasized the Company's "Competitive Strengths," repeating substantially identical versions of the statements quoted above, including:

- "We have developed strong brand recognition and competitive advantages in clinician recruitment as a result of our market position, clinical best practices and clinician leadership development programs."
- "[W]e believe that our track record of consistently meeting or exceeding our customers' service expectations allows us to continue to compete effectively in the bidding process for new contracts."
- "We have a history of delivering strong revenue growth through a combination of new contracts, same-contract revenue growth and acquisitions."
- "We believe that our significant new contract revenue growth has been driven by our differentiated service offerings and ability to deliver efficient, high-quality care."

These statements were repeated again in substantially identical form in Envision's 2014 Form 10-K and 2015 Form 10-K. Defendants made similar false statements concerning Envision's quality of care in the 2016 Form 10-K, *supra* ¶82.

87. The Form 10-K for each of the years 2013, 2014 and 2015 further represented that, under each of the corporate and contractual arrangements that EmCare (through subsidiaries and affiliates) used to provide emergency department management services, "decisions regarding patient care are made exclusively by the physicians."

88. On May 14, 2014, defendants Sanger and Owen gave a presentation on behalf of Envision at a Bank of America Merrill Lynch Health Care Conference. In response to a question about how Envision differentiated itself from the competition, defendant Sanger said:

> We think the unique value proposition is our ability to create an integrated model on hospital-based physician care. And certainly there are others out there that provide the same types of services that we do. However, we have been more effective at being able to demonstrate continuing across the patient's stay at the hospital, and also improve metrics as well as more appropriate utilization.

> And that has really I think been the single most important differentiator in the marketplace on the EmCare side of the business.

89. On June 11, 2015, defendant Sanger gave a presentation on behalf of Envision at a William Blair Growth Stock Conference. As part of his prepared remarks, defendant Sanger emphasized Envision/EmCare's ability to "lower costs and improve quality," stating, "***[t]he ability to lower costs and improve quality is something that can be done, and we're moving towards that in a very unique way*** and really focusing on key markets."

90. On January 14, 2016, defendants Sanger and Owen presented on behalf of Envision at a JPMorgan Healthcare Conference. At the conference, defendant Sanger stated:

> We talk about these evolving care models and evolving reimbursement. We believe we are well positioned for several reasons. Number one, we service the three constituencies that have a vested interest in overall healthcare. That includes the communities, the healthcare facilities, the payers; and, of course, ***the patient is at the center of that model***.

91. On February 22, 2016, Envision convened a conference call with investors and analysts to discuss the Company's 4Q15 and FY15 financial results. Defendants Sanger and Owen participated on behalf of Envision. Defendant Sanger stated:

> Simply put, the right care, delivered by the right provider, in the right setting will be fundamental to delivering the best quality and cost. Health plans realize that today. As important, hospitals and hospital systems are seeing the value of this patient-centric model, as they are increasingly taking on responsibility for the patient in a pre-and a post-hospital setting. In response, they're turning to Envision as a multi-faceted provider to partner with them across this care continuum.

92. In June 2016, in connection with the announcement of the Envision-AmSurg Merger, defendants released an investor presentation trumpeting the Merger. Among other things, the presentation proclaimed that Envision and AmSurg had a "shared vision: to be the most trusted strategic partner for providers, health systems, communities and payors in the common pursuit of delivering the highest quality of care for the patients we serve." (capitalization omitted). The presentation further stated that one way the Merger would "add[] value for key stakeholders" was

through "improved quality, outcomes and efficiency." (capitalization omitted). Similarly, during a conference call held on June 16, 2016, in which defendants Holden, Sanger, Wilson, Gulmi, and Owen each participated, defendant Holden told investors:

> [T]his is a transformative strategic combination for many reasons. Both companies share a vision to be the most trusted and highest quality strategic partner for providers, health systems, communities and payers. In order to achieve this we will focus on these three objectives – number one, to achieve greater scale and scope to provide an enhanced continuum of services across a national footprint; two, to support performance excellence across our marquee brands; and three, translate this into local relevance, remembering that healthcare is local and we need to deliver at the market level.

93. Also during the June 16, 2016 conference call, in response to an analyst's question about the "cultures" at Envision and AmSurg, defendant Sanger hailed the companies'

> shared vision of being a clinically driven Organization, our shared vision of innovation, our shared vision of our collective Boards, all the way down to our 60,000-some-odd employees of the customer comes first has been one that's permeated both these Organizations during their several-decade history.
>
> This was not a clash of cultures, by no stretch of the imagination. We are a clinically driven, customer-focused Organization, both of us. And that in itself will drive success.

94. According to the Joint Proxy Registration Statement, the Envision Director Defendants' stated reasons for recommending the Merger included:

- that "the combined company would benefit patients by providing an integrated care model (ambulance, emergency/inpatient, anesthesia, radiology, ambulatory surgery and post-acute care) that improves quality and lowers costs";
- that "the combined company would be better positioned to capitalize on key industry trends, including consumer demand for integrated health services and reform of traditional payment models"; and
- that "the greater scale, specialization and local presence of the combined company would allow the combined company to be a trusted strategic partner for physicians, health systems and payors."

95. The statements in ¶¶85-94 above were each false and misleading when made. The true facts which were then known to, or recklessly disregarded by, defendants Envision, Sanger, Owen and Holden, based upon their access and review of internal Company information were:

(a) that it was not the quality of Envision's care that was driving Envision's reported revenue growth, but rather that EmCare had been staffing the vast majority of emergency rooms with medical personnel whom had no coverage contracts with major healthcare insurance carriers, forcing unwitting payors and patients to incur and pay excessive "out-of-network" costs;

(b) that the mean out-of-network billing rate for hospitals managed by EmCare was ***62%***, a rate more than 1,000% greater than the less than 5% out-of-network billing rate for most other hospitals;

(c) that upon taking over management of emergency rooms, EmCare hospitals' out-of-network billing rates increased by between 81 to 90%;

(d) that Envision's history of revenue growth was not "driven by" the Company's differentiated service offerings or its efficient, high quality care, but rather by Envision's unsustainable practices of manipulating its out-of-network billing;

(e) that Envision's ability to compete in the bidding process for new contracts was not the product of consistently meeting or exceeding its customers' service expectations, but rather a direct product of its out-of-network billing scheme, as Envision inflated the revenue it generated for its hospital partners through the illicit and unsustainable practices of manipulating its out-of-network billing; and

(f) that as a result of (a)-(e) above, defendants' statements about Envision's quality of care driving Envision's revenue and EBITDA growth were materially false and misleading.

### C. False and Misleading Statements Regarding the Performance of Envision's New 2014-2015 Contracts

96. During 2014 and 2015, the Envision defendants presented the Company as generating rapid organic growth, *i.e.*, by obtaining new contracts with hospitals. As defendant Owen stated on June 11, 2014 at a Goldman Sachs Healthcare Conference, "[o]ur big driver of growth has been really net new contracts and the ability to get new contracts."

97. Envision's 2013 Form 10-K and its 2014 Form 10-K each represented that "[w]e believe that EmCare is well-positioned to continue to generate significant organic growth due to its . . . data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs," and that "EmCare is differentiated by . . . employing a data-driven process to more effectively recruit and retain physicians."

98. On February 26, 2015, Envision filed a report on Form 8-K, attaching as an exhibit a release that was issued that same day. The release reaffirmed the Company's FY15 guidance. Also, EmCare reported revenue growth of 15.5% for 4Q14, driven by an increase of 10.2% from net new contracts and 5.3% from same store contracts.

99. On February 26, 2015, Envision convened a conference call with investors and analysts to discuss the Company's 4Q14 and FY14 financial results. Defendants Sanger and Owen participated on behalf of Envision. In response to a question from a Credit Suisse analyst about the margin profile of EmCare's new contracts, defendant Owen stated that "if you looked at those [contracts] on an aggregate basis, ***I would think of those as pretty similar to our overall EmCare margins***. That's what I would tell you at this point."

100. On July 30, 2015, Envision filed with the SEC a current report on Form 8-K, attaching as an exhibit a release issued that same day with Envision's 2Q15 financial results. Under the heading "2015 Guidance," the release stated:

> Envision is maintaining its existing 2015 guidance of Adjusted EBITDA in a range of $653 million to $665 million and Adjusted EPS of $1.42 to $1.50. The Company anticipates that its third quarter of 2015 results will be approximately 26% to 26.5% of its full year guidance. At this time, 2015 guidance does not incorporate any impact from the pending Rural/Metro acquisition.

101. Also on July 30, 2015, Envision convened a conference call with investors and analysts to discuss the Company's 2Q15 financial results. Defendants Sanger and Owen, among others, participated on behalf of Envision. Defendant Owen stated that Envision was standing by its previously issued FY15 earnings guidance, said that Envision only anticipated changing the guidance depending on the timing of its acquisition of an ambulance company, and claimed that the timing of new business starts would contribute to improved margins in 4Q15:

> We are not adjusting our 2015 [annual] guidance at this time. Results to date are in line with our guidance range, and we don't anticipate modifying guidance until we have more details on when the Rural/Metro acquisition will close. We do anticipate Q3 adjusted EBITDA to be approximately 26% to 26.5% of our annual EBITDA guidance. We anticipate a higher growth rate in Q4, based on the timing of new business starts and expected margin improvement at EmCare.

102. In response to a question from a Barclays Capital analyst about this statement, questioning the Company's assertion that its 4Q15 results would improve, defendant Owen elaborated:

> We also expect to see margin improvement from recent starts. As we've talked about before, they typically start lower margin, and then we are able to improve that margin in a relatively short period of time, in many cases. We also anticipate a lowering impact of the anesthesia issue that we talked in the first quarter. It was lower this quarter, but we think we will get past that before we get to the fourth quarter. So there are a number of pieces.

103. In response to an analyst's question about contract terminations, the following colloquy took place:

> [Owen:] [L]ook, from time to time, you always have contracts, like we've talked before, that for some reason or other, may turn negative or have challenges. Whether it's recruiting, or something happens in the community, it's under stress. And so we obviously try to right-size those. And when we don't, then we are able to exit those contracts.

*        *        *

> [Sanger:] AJ, I feel very disciplined, when we see a contract that's [not] []performing at the expected levels, ***the first thing we're going to do*** is (inaudible) lead process to find out exactly why it's not performing. If it's an issue of finances, we'll look for a subsidy. If it's an issue of recruitment, we will change our strategy. But if those two don't work, then essentially, we will exit the contract. And it's a discipline that we think is the right approach you take for our business.

104. The statements in ¶¶96-103 above were each false and misleading when made. The true facts which were then known to, or recklessly disregarded by, defendants Envision, Sanger and Owen based upon their access and review of internal Company information include:

(a) that defendants had no reasonable basis to believe and did not, in fact, believe that Envision would meet its FY15 EBITDA guidance because EmCare ***had not*** conducted adequate due diligence with respect to a significant number of new contracts, such that defendants were aware they did not understand the business environment of the hospitals Envision was entering by executing contracts "blind," *i.e.*, without a reasonable basis to believe those contracts would be profitable to Envision;

(b) that, because of Envision's inadequate due diligence, approximately twenty of the EmCare hospital contracts defendants entered into during 2014-2015 were persistently unprofitable from "day one," causing Envision to experience slow "same-store" volume growth and overstaffing in its facilities;

(c) that Envision had recklessly disregarded the underperforming nature of these contracts from day one, because contrary to what defendant Sanger had said on June 11, 2014 at the William Blair & Company LLC Growth Stock Conference, Envision had entered into contracts "blind," and without any reasonable understanding, let alone "good understanding of the payer mix," or "a great understanding of reimbursement";

(d) that defendants recklessly disregarded the underperforming nature of these contracts from day one, because contrary to Envision's assurances in the 2013 Form 10-K and 2014 Form 10-K that "we typically have visibility into payor mix prior to entering into new contracts," in its haste to complete acquisitions, Envision entered these contracts even though it was "missing a lot of information" and "did not have access to the data." These defendants were aware of this given that, according to the 2013 and 2014 Form 10-Ks, "[p]rior to responding to an RFP [for a new contract], EmCare's senior management ensures that the proposal is consistent with certain financial parameters" and "evaluates all aspects of each proposal, including financial projections, staffing model, resource requirements and competition, to determine how to best achieve our business objectives and the customer goals," and given that, according to Kneeley, the problematic nature of the contracts was "an issue that [defendants] faced immediately"; and

(e) that as a result of (a)-(d) above, defendants had no reasonable basis to believe and did not believe the Company would meet its FY15 EBITDA guidance because EmCare ***had not*** conducted adequate due diligence on a number of EmCare hospital contracts defendants entered into during 2014-2015, and as a result these contracts had immediately underperformed, and defendants failed to address the problems causing that underperformance, instead allowing the problems to persist for ***12 months*** before finally renegotiating or terminating the contracts, which adversely impacted Envision's FY15 revenue and EBITDA.

105. On October 22, 2015, Envision released its 3Q15 results. The release revealed that performance at EmCare had fallen "short of our expectations," and that Envision was "adjusting its 2015 annual Adjusted EBITDA guidance to a range of $600 million to $605 million," down significantly from the previous estimated adjusted EBITDA of $653 million to $665 million.

106. That same day, Envision convened a conference call with investors and analysts to discuss its financial results. Defendants Sanger and Owen participated on behalf of Envision, with defendant Sanger explaining:

> During the quarter, EmCare's results were negatively impacted by decelerating same-store volume growth, which resulted in higher staffing ratios[,] and certain underperforming contracts. I will address each of these issues.
>
> First, volume. During the quarter, we experienced a lower rate of volume growth. . . .
>
> Early in the quarter, the ED volume appeared to be tracking to seasonally lower July levels. When those levels did not increase in August as anticipated, we responded by initiating staffing schedule changes across all service lines. While those adjustments will help to offset some of the impact of slower volume growth, EmCare's staffing schedules are generally set 45 to 60 days in advance. These schedules are based on anticipated volumes and hospital staffing level commitments. When volume trends shift, there's a lag in time before we're able to flex our staffing or to go back to the hospital so we can renegotiate these contracts to align with the changes in the volume.
>
> * * *
>
> ***Second challenge – underperforming contracts. There were a certain group of contracts that had significantly performed below our expectations. Adjusted EBITDA loss on these contracts were approximately $6.5 million, while we had expected a positive adjusted EBITDA of $3.5 million on these contracts, resulting in a negative $10 million variance. These contracts have either been renegotiated to bring us to acceptable levels, or are scheduled for termination in Q4***.

107. In response to a question from a Barclays Capital analyst about the underperforming new contracts, defendant Sanger explained:

> ***There were a small set of contracts, approximately 30 contracts, about 21 of those that were – that came on in the last few quarters that frankly, were underperforming substantially based on the changes and [payor] mix that we saw, volume we saw, and we kind of misread what the cash per visit was. . . . We ran into a set of frankly, poor execution, poor decision about taking those contracts***.

108. Responding to a question from a UBS analyst, defendant Owen elaborated:

> A couple of things. One, some of those contracts that Bill mentioned that where we had acute difference in the performance, there were probably a little over half of those were with a smaller system that we have been involved with. That's more of where, what we probably in terms of assessing what the expected volume, the demographics, the coverage requirements, the ability to recruit, with all this effort, we missed that.
>
> So that does cause you to make sure that – part of what we've done is make sure that as you're looking at that, we are really confident in the information that we get from facilities that, that is accurate and we can recruit and staff appropriately. And so as Bill said, there were some other contracts that were just in areas that were difficult to recruit. And I think we underestimated the challenges initially of the recruitment process and ended up paying a much higher rate for temporary staffing because of what we'd committed from a hospital standpoint than we had expected.

109. Asked by a Citigroup analyst about the reasons for the new contract problems, defendant Sanger revealed that the contracts had underperformed because the Company had failed to complete due diligence on the contracts sufficient to understand the business environment, despite the Company's previous assurances that Envision always did exactly that. Defendant Sanger stated:

> Let me begin with when we enter into a contract, we look at a certain number of data points. And it is important to get those data points correct. Number one, the market rate for the physicians in that area, the cash-per-visit we're expected, the payer-mix we're expected and we rely heavily upon the data that's provided by the hospital. ***At times that's incomplete and we have to make assumptions*** on those factors.
>
> With the group of contracts with a particular hospital system, ***we had data that was inconsistent*** that resulted in upside-down contracts. Of the 30 contracts that were underperforming that I had mentioned in my presentation, 21 of those were from that one system. We have since renegotiated or canceled those contracts. Now, ***into the future, we are going to be very cautious of the information that's provided for us versus validation through our system of actually going through every chart*** and looking at what the payer-mix, the payer-shift might be, looking at cash-per-visit, looking at rates for physicians, the ability to recruit that area.

110. Defendant Sanger later reiterated:

> This is a case where, I'll be frank with you, we misread on at least 20 of these 30 contracts. We misunderstood the data.

> This is not something that happens on a routine basis but for a fair book of these business, the information that we had derived from the system was inadequate and was ***missing a lot of information that we had to make assumptions that were incorrect***. Then our execution on those contracts were inconsistent, did not meet the expectations.

111. Defendant Owen also stated:

> Some of other these also were in smaller communities from rural areas and clearly, ***we misread for the ability to recruit and misread in some of those, how many providers we would have day one***. It was a much bigger challenge from a recruiting and had a much higher cost of staffing. So, that's part of what we would look at in terms of taking a careful look in those areas especially rural areas where it may be harder to recruit to make sure we have that identified properly.

112. A few weeks later, on December 2, 2015, Kneeley participated on behalf of Envision at the Piper Jaffray Healthcare Conference, and his comments showed that the Envision Individual Defendants had been aware of the problems well before they were revealed on October 22, 2015:

> The other issue that we faced was tranche of contracts, most of them had been started ***within the last 12 months*** and they were just under-performing. They were – 21 of them with a single health system. The way the revenue model was built, ***we did not have access to the data*** the way we normally would as we do a model. We went forward with that. That was a process that we have since reversed and stopped. We will now make certain – that we're doing our normal process. We add about 100 contracts per year. And this is not an issue that we face, but ***with this group of about 20 contracts, it was an issue that we faced immediately***.
>
> What happened after we were awarded the contracts, the volume and the service line mix was very different than what we had in our model. And it was based upon, again, the data that we had in building the model.

**D. Additional False and Misleading Statements**

113. Discovery in this action has shown that additional Class Period statements made by defendants Envision, Owen, Gulmi and Holden relating to Envision's out-of-network revenues and balance billing practices were false and misleading.

114. More specifically, discovery in this action has shown that in addition to omitting that the Company's unsustainable out-of-network business strategy was a key driver of the Company's EBITDA and revenue growth, when defendants did speak about Envision's out-of-network business, these statements were false and misleading, as defendants significantly underestimated the amount of Envision's out-of-network exposure – sometimes by hundreds of millions of dollars.

115. With respect to balance billing, discovery in this action has shown that defendants' statements that Envision did not "pursue a strategy of balance billing" and "for the most part, . . . [did] not balance bill" were patently false. Rather, discovery shows that throughout the Class Period EmCare balance billed patients at a significant number of the sites it staffed, used balance billing as a strategy to obtain higher reimbursements from insurers and received complaints from insurers, hospitals and patients about its balance billing practices.

### 1. False and Misleading Statements Regarding Envision's Out-of-Network Exposure

116. On May 5, 2016, Envision convened a conference call with investors and analysts to discuss Envision's 1Q16 financial results. Defendants Sanger, Owen and Wilson participated on behalf of Envision. During this conference call, in response to direct questioning from analysts, defendant Owen repeatedly stated that Envision's out-of-network exposure was limited to 20% of EmCare's emergency department ("ED") commercial collections, specifically stating:

> [Analyst:] But I do want to understand, what percentage of your business is actually out-of-network?
>
> * * *
>
> [Owen:] ***[I]f you look at really the kind of what you would really call out-of-network at any point time***, and again, that may fluctuate depending on what negotiations you are doing or whatever else, ***it's probably around 20% of our EmCare ED collections, our commercial collections***.

*     *     *

> I do want to make sure, just because Josh had asked the question earlier, I just want to take a moment to make sure that my response is clear. We talked about – he asked about that out-of-network percentage and so when you look at commercial – commercial is about somewhere between 50% and 60% of total collections. Okay?
>
> ***Of the commercial collections, the out-of-network is about 20% of the commercial collections. What we call in-network, which really includes contracts, directly with payers, and contracts with payers through intermediaries, that really is the bulk of the kind of commercial collections are those in-network***.
>
> So, I just want to make – it wasn't 20% of total ED collections. ***It's 20% of the commercial collections***. So, I just want to make sure that's clarified.

117. Relying on defendant Owen's statement that only 20% of EmCare's ED commercial collections were out-of-network, analysts estimated Envision's out-of-network exposure to be approximately $300 million. For example, May 6, 2016 research reports issued by analysts Barclays Capital, Stephens and RBC Capital Markets all estimated that Envision's out-of-network revenues were between $300 million and $318 million.

118. On May 6, 2016, Kneeley, Envision's Vice President of Investor Relations, sent each of these analyst reports, which contained incorrect estimates of approximately $300 million in out-of-network exposure based on defendants' May 5, 2016 false and misleading statements, to defendants Owen, Sanger, Wilson and Zimmerman.

119. Similarly, based on defendant Owen's statement that only 20% of EmCare's ED commercial collections were out-of-network, some investors incorrectly believed that Envision's out-of-network exposure was as low as $240 million. For example, Jefferies analyst, Brian Tanquilut ("Tanquilut"), sent Kneeley an email relaying a question Tanquilut received from a large investor who had estimated that Envision's out-of-network revenues were $240 million based on Owen's May 5, 2016 comments regarding Envision's out-of-network exposure.

120. The statements in ¶116 above were false and misleading when made. The true facts which were then known to, or recklessly disregarded by, defendants Envision and Owen based upon their access and review of internal Company information include:

(a) that the Company's true out-of-network revenues for 2015 were approximately 75% of EmCare's ED commercial collections (or $1.1 billion in out-of-network exposure), rather than only 20% of ED commercial collections (or $300 million in out-of-network exposure), as defendants publicly stated on May 5, 2016. In fact, an internal analysis that Envision prepared in response to a Congressional inquiry regarding the Company's out-of-network practices confirmed that EmCare had $1.1 billion in out-of-network exposure for 2015 and 2016. Importantly, Envision's Federal Rule of Civil Procedure 30(b)(6) deponents testified the analysis Envision prepared in response to the Congressional inquiry was the Company's best estimate and data for its out-of-network revenue exposure;

(b) that on May 4, 2016, the day before Envision's 1Q16 earnings conference call, defendant Owen received an internal analysis showing that Envision's out-of-network revenues from Reimbursement Technologies, Inc. ("RTI") (an EmCare subsidiary and its largest billing system) alone were nearly $831 million, rather than the 20% of ED commercial collections (or $300 million in exposure) that defendants publicly disclosed the very next day, on May 5, 2016;

(c) that on April 1, 2016, defendant Owen received an internal Envision analysis showing that out-of-network revenues from RTI alone for FY15 were approximately $863 million, rather than only 20% of ED commercial collections (or $300 million in exposure), as defendants publicly stated on May 5, 2016;

(d) that on March 14, 2016, defendant Owen asked EmCare's CFO, Jason Standifird ("Standifird"), and Kneeley what "par/non-par data we have," and Standifird responded that "RTI nonpar cash" (*i.e.*, EmCare's out-of-network revenue from RTI only) is "about $785M." This amount provided by Standifird was more than double the amount of non-par (out-of-network) revenue that defendant Owen publicly claimed on May 5, 2016;

(e) that on February 17, 2016, defendant Owen received an out-of-network analysis from EmCare's CFO, Standifird, showing that 30% of EmCare's ***total*** ED collections were out-of-network, which equaled approximately $800 million in out-of-network revenue – more than double the amount of out-of-network revenue that defendant Owen publicly claimed (approximately $300 million) through his 20% statement on May 5, 2016;

(f) that revenues earned from "contracts with payers through intermediaries" (a/k/a "wrap networks" such as PMCS or DataiSight) were "out-of-network" revenues, rather than "in network" revenues, as defendant Owen falsely described them on the May 5, 2016 earnings call. In fact, in November 2015, defendant Owen received an email from the President of RTI, Murray Fein, explaining that the revenue from wrap networks (such as "PMCS deals, etc.") were "in the commercial (non-par) bucket" rather than in the "Par/in-network" bucket. Similarly, in February 2016, defendant Owen received a "Q4 2015 Operations Update" from EmCare's CFO, Standifird, that described "[r]eimbursement often accessed through network intermediaries such as PMCS and Data iSight" (*i.e.*, wrap networks) as being "non-par" or "out-of-network." Also, contrary to defendant Owen's false representation that wrap networks like PMCS were in-network, PMCS on its own website advertises itself as "the out-of-network experts" (https://www.pmcsonline.com/); and

(g) that defendants intentionally omitted out-of-network revenue obtained through "contracts with payers through intermediaries" when providing estimates of out-of-network revenues to investors and analysts (to keep EmCare's out-of-network revenue exposure as low as possible), in spite of the fact that such revenues were categorized internally as out-of-network, were actually out-of-network as there was no contract for reimbursement between EmCare and the payor, and were subject to the same market pressures and risks as the other out-of-network revenues (20%) that defendants included in their public estimates. Indeed, one internal Envision email explains that Envision can "spin" wrap networks however it wants, but that they are actually "non-par" and subject to the same market pressures and risk of non-payment from insurers as other out-of-network bills. Another internal Envision email similarly explains: "[T]he underlying risk all relates to the rich ED Practice margin which is only attainable due to the aggressive fees/nonpar/PMCS strategy."

121. On December 6, 2016, just five days after the Merger between Envision and AmSurg was completed, Envision's new management team (new CEO Holden and new CFO Gulmi) spoke on behalf of Envision at the Citi Global Healthcare Conference. In response to questions from analysts at the conference, defendants Gulmi and Holden repeated defendant Owen's prior false and misleading statement that Envision's out-of-network exposure was limited to 20% of EmCare's ED commercial collections, stating:

> [Analyst:] And then maybe just remind us on a combined basis what the [out-of-network] exposure is, maybe.
>
> [Gulmi:] Sheridan is pretty much in network everywhere. ***It's really at EmCare, it's really through the Envision piece, and I think 20% of the EmCare business is out of network***.
>
> [Holden:] ***That's right***, and is not carrier specific.

122. In reliance on defendants Gulmi and Holden's misstatements that Envision's out-of-network exposure was only 20%, Barclays Capital issued a report on December 15, 2016 estimating Envision's out-of-network revenues to be $319 million. Defendants Holden and Gulmi received a copy of this analyst report, which incorrectly estimated Envision's out-of-network revenues based on defendants Holden and Gulmi's December 6, 2016 false and misleading statements.

123. The statements in ¶121 above were false and misleading when made. The true facts which were then known to, or recklessly disregarded by, defendants Envision, Gulmi and Holden based upon their access and review of internal Company information include:

(a) that the Company's true out-of-network revenues for 2015 and 2016 were approximately 75% of EmCare's ED commercial collections (or $1.1 billion in out-of-network exposure), rather than only 20% of ED commercial collections (or $300 million in out-of-network exposure), as defendants publicly stated on May 5, 2016 and reiterated on December 6, 2016. In fact, an internal analysis that Envision prepared in response to a Congressional inquiry regarding the Company's out-of-network practices confirmed that EmCare had $1.1 billion in out-of-network exposure for 2015 and 2016. Importantly, Envision's Federal Rule of Civil Procedure 30(b)(6) deponents testified the analysis Envision prepared in response to the Congressional inquiry was the Company's best estimate and data for its out-of-network revenue exposure;

(b) that on May 5, 2016, in connection with the due diligence process for the Merger, defendant Gulmi received an out-of-network analysis from Envision through one of its due diligence advisors, Barclays Capital, showing that Envision's out-of-network exposure was approximately $863 million, significantly higher than the 20% or $300 million in out-of-network exposure defendants publicly stated on December 6, 2016;

(c) that on May 24, 2016, in connection with the due diligence process for the Merger, defendants Holden and Gulmi received a report from one of Envision's due diligence advisors, Guggenheim, showing that EmCare had $856 million in out-of-network revenue; and

(d) that on June 4, 2016, defendant Gulmi received an email from Kneeley, which attached an analysis showing that Envision's out-of-network exposure was $857 million, significantly higher than the 20% or $300 million in out-of-network exposure defendants publicly stated on December 6, 2016.

124. On March 21, 2017, Kneeley spoke on behalf of the Company at the Oppenheimer Healthcare Conference. At this conference, Kneeley falsely told analysts and investors that Emcare's out-of-network ED revenues were $700-$800 million, stating:

> So for the benefit of the webcast the question is around the announcement we made with our earnings call to move in network with our physician services and this is really a legacy EmCare issue and it is an emergency department issue. ***It represents perhaps 30% to 35% of legacy EmCare revenue, somewhere in the $700 million to $800 million of revenue*** that would be converted from an out of network relationship to win in network and for the benefit of those, the numbers, the composition that does include both traditional out of network as well as what is referred to as wrap or multiplan type accounts where you don't have a direct contract with a payer.

125. Analysts and investors were surprised and confused by this drastic change in Envision's out-of-network exposure. For example, one analyst forwarded to Kneeley an email he had received from a large Envision investor asking why defendant Owen had said in May 2016 that the Company's out-of-network revenues were only $240 million, but now, less than a year later, the Company was saying its out-of-network exposure was three-times that amount – $700-$800 million according to Kneeley's statement.

126. The statements in ¶124 above were false and misleading when made. The true facts which were then known to, or recklessly disregarded by, defendant Envision based upon the Company's internal information include:

(a) that the Company's true out-of-network revenues for 2016 were approximately 75% of EmCare's ED commercial collections (or $1.1 billion in out-of-network exposure), rather the $700-$800 million disclosed by the Company on March 21, 2017. In fact, an internal analysis that Envision prepared in response to a Congressional inquiry regarding the Company's out-of-network practices confirmed that EmCare had $1.1 billion in out-of-network exposure for 2015 and 2016; and

(b) that a presentation made at Envision's February 24, 2017 Board meeting stated that the Company had $1.34 billion in out-of-network revenue exposure for 2016 – approximately 79% higher than the $700-$800 million in out-of-network exposure that the Company publicly claimed a month later at the Oppenheimer Healthcare Conference.

127. On June 7, 2017, Envision participated in the Jefferies Healthcare Conference, at which defendants Holden and Gulmi spoke on behalf of the Company. In response to questions from an analyst regarding the amount of Envision's business that was out-of-network, defendant Holden falsely responded that Envision had approximately $1 billion in out-of-network revenues, while at the same time reassuring the analyst that the Company had transitioned and was continuing to transition this business from out-of-network to in-network, and that the Company was "not the least bit worried" about this transition from a risk perspective, stating:

> [Tanquilut:] One of the things that you said when you closed the deal was that you want to shift your out-of-network businesses as much as possible to in-network, and that's been quantified anywhere from $700 million to $900 million. . . .
>
> . . . [Holden:] We're about, and I think you said $800 million, if you take the [wrap] networks and everything that – because we've tried to be all-inclusive. ***There's no gamesmanship here. It's about $1 billion worth of revenue***. We've moved about a little less than 20% of that in-network already just in the first few months of the combination. We feel like we can get 75% or more over the next 18 to 24 months. We know the order in which that's going to happen. It's not geography-dependent, it's not service line, it's not a horsetrading issue, it's a pretty straight line, linear process. . . . So for all those reasons, we're very excited about

the strategy. We're not the least bit worried about it from a risk perspective. We wouldn't have done it if it were dilutive.

128. Two months later, on August 8, 2017, Envision convened a conference call to discuss the Company's 2Q17 earnings results. Defendants Holden, Gulmi, Eastridge and Owen participated on behalf of Envision. During this conference call, Holden falsely repeated that the Company's out-of-network revenues were $1 billion:

> [Analyst:] I was wondering if you could maybe just provide a bit more color on the added network sizing. I know that you've talked about it from time-to-time at conferences and on the calls. But it would be great to just kind of maybe reset and see if you could give us some numbers about how much revenue maybe at the beginning of the year was kind of in that out-of-network bucket. . . .
>
> [Holden:] Sure, Kevin. I think I've said publicly that it was – and we've been, I think, ***the most comprehensive or inclusive in defining out-of-network. We've included [wrap] networks and everything else. We've said, including all of that, it's about $1 billion***.

129. The following month, on September 7, 2017, Envision participated in the Wells Fargo Healthcare Conference. Defendant Holden spoke on behalf of Envision at this conference, and again falsely repeated that Envision's out-of-network revenues were $1 billion:

> [Analyst:] To – I think on the last call, you said you migrated 20% so far. Can you talk about the path forward of getting the rest of it done?
>
> [Holden:] There's about $1 billion when we started, and we were very broad in what we defined as out of network. That included [wrap] networks and a whole other set of lingo many of you may not be familiar with. But suffice it to say, we didn't leave anything out of that number.

130. The statements in ¶¶127-129 above were false and misleading when made. The true facts which were then known to, or recklessly disregarded by, defendants Envision and Holden based upon their access and review of internal Company information were that Envision's out-of-network revenues were $1.1-$1.3 billion, as described below:

(a) that defendants Holden, Gulmi and Eastridge received a written presentation at the February 24, 2017 Board meeting stating that Envision's out-of-network

revenue exposure for 2016 was $1.34 billion – approximately 34% higher than defendant Holden's statements in June, August and September 2017;

(b) that the Company's true out-of-network revenues for 2016 were approximately $1.1 billion, as described in an internal analysis prepared by Envision in response to a Congressional inquiry regarding its out-of-network practices, which confirmed $1.1 billion in out-of-network exposure for 2016; and

(c) that defendants Holden and Gulmi received out-of-network analyses included in Envision's Board packages for 1Q17 and 2Q17 demonstrating that Envision's true out-of-network exposure was higher than $1 billion. For example, the 1Q17 CEO Report that defendant Holden provided to the Board showed that the Company's out-of-network revenue for 2016 to be $1.14 billion. Similarly, the 2Q17 Envision Board package, which both defendants Holden and Gulmi received, showed the Company's out-of-network revenue to be $1.2 billion for 2016.

### 2. False and Misleading Statements Regarding Envision's Balance Billing Practices

131. As discussed in ¶116 above, on May 5, 2016, Envision convened a conference call with investors and analysts to discuss Envision's 1Q16 financial results. Defendants Owen, Sanger and Wilson participated on behalf of Envision. On that call, defendant Owen described Envision's balance billing practices, stating:

> ***It's also important to note that we do not pursue a strategy of balance billing patients and for the most part, we do not balance bill our patients. Collections from balance billing of patients represents less than 1% of EmCare's collections***.

132. Analysts who participated in this conference call followed up on defendant Owen's statement regarding balance billing, stating: "it sounds like you don't balance bill if less than 1% of collections, so clearly that's not a major focus of yours." Analysts then repeated their incorrect

understandings of Envision's balance billing practices in the reports they published the next day, mentioning Envision's reassurances that the Company did not pursue a balance billing strategy "quell[ed]" their "concerns." For example, a May 6, 2016 Goldman Sachs analyst report stated: "On the call, we think EVHC effectively addressed the current focus areas in disclosing . . . it does not pursue a strategy of balance billing . . . ." And a Jeffries analyst report from May 5, 2016 contained a headline that the Envision conference call resulted in an "Elimination of Balance Bill Concerns."

133. On May 6, 2016, Kneeley, sent each of these analyst reports, which repeated defendant Owen's false and misleading statements regarding Envision's balance billing practices, to defendants Owen, Sanger, Wilson and Zimmerman.

134. The statements in ¶131 above were false and misleading when made. The true facts which were then known to, or recklessly disregarded by, defendants Envision and Owen based upon their access and review of internal Company information include:

(a) that defendant Owen received an email in March 2016 estimating that Envision balance bills "30% of [its] commercial business";

(b) that an August 2015 internal balance billing report sent to defendant Zimmerman showed that Envision balance billed patients at approximately 68% of the sites that it staffed;

(c) that internal Envision documents, including the Company's collections data, show that in 2014, 2015 and 2016 Envision balance billed the nation's three largest commercial insurers (United, Cigna and Aetna) at more than half of EmCare's EDs;

(d) that in February 2016 defendant Owen received an email from RTI's Vice President of Reimbursement & Regulatory Affairs, Greg Hufstetler, stating that "[i]nvestors are

correct in being concerned about commercial reimbursements if any of these draconian bills [banning balance billing] should pass in one of our big states like Florida";

(e) that defendant Owen received presentation slides prepared for the Board's Audit Committee stating that balance billing legislation was a "top enterprise risk[]" contributing to the erosion of Envision's commercial reimbursements;

(f) that EmCare experienced material negative impacts to both revenue and cash-per-visit ("CPV") metrics when the Company considered turning ***off*** balance billing. For example, an April 2014 email notified EmCare's CEO, defendant Zimmerman, that "100% stoppage of nonpar commercial balance billing" at one large system of EmCare-staffed hospitals would result in a "total reduction [of] a significant $6.3M." And a November 2015 email stated that EmCare's new contract diligence "studies will always use a starting point of assuming the ability to balance bill the patient as needed . . . . If you negotiate a contract or instruct the Managed Care Executive upon installation to turn off balance billing there will be (should be) a negative CPV impact reported." Similarly, in another internal email, one of EmCare's divisional CEOs commented that "[t]he impact of turning off BB [balance billing] makes [certain] practices unsustainable";

(g) that, conversely, turning ***on*** balance billing was viewed internally as a material source of potential revenue to draw upon when EmCare was experiencing declining commercial reimbursements with insurers. For example, one internal Envision document discusses how balance billing patients could negate $15 million (or 20%) of a $75 million loss with Cigna. And another internal Envision email states that in response to declining non-par (out-of-network) reimbursement trends, that the only strategy to get the insurer to pay more for a par (in-network) deal is adding "the right to balance bill";

(h) that throughout the Class Period, EmCare consistently received a high volume of complaints from the ***hospitals*** that it staffed about hospital patients being balance billed by EmCare. For example, an October 2014 email states: "We have received several complaints from patients who were balance billed and/or sent to bad debt collections without being contacted in advance and given adequate opportunity to pay their bill." And a May 2016 email from hospital management to EmCare states: "one of our biggest pain points locally from a political standpoint has been Aetna patients with the City . . . and various school districts around town who are getting balance billed because Aetna is out of network with you guys." Another email, from October 2016, states: "All of my programs complain about this! Balance billing is a nightmare. We still do it at some of my sites but it's a PR nightmare." And a January 2017 email to Envision's President of Physician Services states: "[i]t looks like we do balance bill out of network responsibility to patients in some/many contracts . . . [Community Health Systems] is getting a lot of complaints from patients"; and

(i) that throughout the Class Period, Envision also consistently received a high volume of complaints from ***insurers*** about EmCare's balance billing practices. For example, one internal Envision email attaches a letter that UnitedHealthcare was sending to its subscribers warning them not to seek treatment at hospitals staffed by EmCare doctors, as "EmCare often charges more than 800 percent what the federal government's Medicare program allows for its emergency room physician services," and cautioning that the subscribers could be balance billed for EmCare's "excessively high out-of-network charges." Another internal Envision email attaches a different letter from UnitedHealthcare, this time sent to one of EmCare's physician groups, advising them that they had balance billed a patient for an amount that "is nearly 10 times higher than the Medicare reimbursement rate," warning them that EmCare's balance billing tactics

may be "unlawful," and informing them that any further attempts to balance bill the patient's family should be directed to UnitedHealthcare. A third internal Envision email attaches yet another UnitedHealthcare letter, this one sent to a hospital that contracted with EmCare to staff its emergency room, informing the hospital that EmCare "consistently bills between 500 and 800 percent of what the federal government's Medicare program allows for emergency room services," which results in UnitedHealthcare patients receiving "surprise bill[s] in the mail" from EmCare. Similarly, another internal Envision email attaches a letter sent by another major insurer, Blue Shield of Florida, to its subscribers encouraging them to utilize non-EmCare emergency facilities to avoid being balance billed by EmCare.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

### A. CD&R and Defendants' $4.5 Billion in Insider Trading

135. During the Class Period, CD&R, Sanger, Owen, Williams and Zimmerman sold Envision shares at artificially inflated prices. Most notably, during 2014 and 2015, CD&R liquidated its entire stake in Envision, disposing of nearly 129 million shares of Envision common stock for total proceeds of almost ***$4.4 billion***.

136. CD&R used its control over Envision to demand, orchestrate and complete four separate offerings to unload 100% of its ownership stake in the Company between February 5, 2014 and March 9, 2015. ***Only*** by requiring Envision to work with CD&R to effectuate these offerings could CD&R have disposed of its Envision stock; had CD&R attempted to sell its billions of dollars of Envision shares in the open market, the magnitude of the sale would have caused an immediate collapse of Envision's stock price and exposed defendants' scheme and wrongful course of business.

137. CD&R's first sale, in February 2014, came immediately following the expiration of a 180-day contractual lock-up that the underwriters required CD&R to agree to in connection

with the IPO. The final sale, in March 2015, came less than four years after CD&R invested in the Company, a suspiciously rapid exit for a private-equity firm. Private-equity firms like CD&R tout their "long-term" focus, typically hold their investors' funds for as long as ten years, and often hold their investments for nearly as long as that.[9] Indeed, as of January 2018, CD&R still lists on its website several portfolio companies in which it invested in between 2005 and 2010. In fact, the very Cayman Island fund through which CD&R held its investment in Envision (CD&R Associates VIII Ltd.) continues to own shares in NCI Building Systems Inc., Univar Inc. and Atkore International Group Inc. as of the filing of this Complaint, after originally investing in those companies in October 2009, November 2010 and December 2010, respectively.

138. Envision's other insiders also sold large numbers of shares during the Class Period. Between February 11, 2014 and the consummation of the Merger, defendant Sanger sold over 2.2 million of his personally held shares of Envision stock, about 91% of his Envision stock available for sale under the Company's equity ownership guidelines, for proceeds of approximately ***$80 million***.

139. During that same period, defendant Owen sold over 1 million of his personally held shares of Envision stock, almost 80% of his Envision stock available for sale under the Company's equity ownership guidelines, for proceeds of over ***$36 million***.

140. Also during that time period, defendant Zimmerman sold approximately 480,000 personally held shares of Envision stock for proceeds of almost ***$18 million***. Meanwhile, Envision

---

[9] *See* Brian Cheffins & John Armour, *The Eclipse of Private Equity*, 33 Del. J. Corp. L. 1, 11 (2008) ("Most private equity funds are established for a fixed term, typically ten years, consisting of an investment period when the general partners make capital calls and a holding period where existing investments are managed, developed, and ultimately sold. Unless an extension is secured, when the term has expired, the fund must sell its investments and return the capital to fund investors. Prior to this, however, there is typically little liquidity.").

Director, then-Chairman, CD&R operating advisor and investor in the CD&R Advisor Co-Investor fund defendant Williams also sold nearly 131,000 personally held shares of Envision stock for proceeds of over ***$4.3 million***.

141. In total, these officers and directors – while aware of the improper and unsustainable billing scheme driving the Company's stock to highly inflated levels – sold approximately 3.8 million shares of Envision or Envision stock for total proceeds of ***$138 million***. Just a few months after the last of the secondary offerings, the Company revealed its 3Q15 financial results, causing the Company's stock price to drop over 30%.

**Envision Healthcare Holdings, Inc. (EVHC)**
**Insider Sales: 2/11/14-12/2/16**

| Seller Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| CD&R Associates Viii Ltd | Beneficial Owner of More than 10% Class | 11-Feb-2014 | 30,710,920 | $29.51 | $906,279,249 |
| | | 16-Jul-2014 | 30,250,843 | $32.90 | $995,252,735 |
| | | 29-Sep-2014 | 17,080,652 | $34.97 | $597,310,400 |
| | | 11-Mar-2015 | 50,857,145 | $36.05 | $1,833,400,077 |
| | | | **128,899,560** | | **$4,332,242,462** |
| Owen (Randel G) | Chief Operating Officer | 11-Feb-2014 | 163,596 | $29.51 | $4,827,718 |
| | | 16-Jul-2014 | 249,375 | $32.90 | $8,204,438 |
| | | 29-Sep-2014 | 150,000 | $34.97 | $5,245,500 |
| | | 28-Oct-2014 | 30,820 | $35.00 | $1,078,700 |
| | | 31-Oct-2014 | 19,180 | $35.00 | $671,300 |
| | | 07-Jan-2015 | 100,000 | $36.00 | $3,600,000 |
| | | 08-Jan-2015 | 100,000 | $37.11 | $3,711,000 |
| | | 19-Mar-2015 | 50,000 | $38.04 | $1,902,000 |
| | | 17-Aug-2015 | 140,000 | $44.22 | $6,190,800 |
| | | 15-Sep-2015 | 20,000 | $42.00 | $840,000 |
| | | | **1,022,971** | | **$36,271,455** |
| Sanger (William A) | Chief Executive Officer | 11-Feb-2014 | 339,348 | $29.51 | $10,014,159 |
| | | 16-Jul-2014 | 543,900 | $32.90 | $17,894,310 |
| | | 29-Sep-2014 | 200,000 | $34.97 | $6,994,000 |
| | | 08-Jan-2015 | 185,979 | $37.52 | $6,977,932 |
| | | 09-Jan-2015 | 8,989 | $37.50 | $337,088 |

| Seller Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 23-Feb-2015 | 7,100 | $37.54 | $266,534 |
| | | 25-Feb-2015 | 146,682 | $37.50 | $5,500,575 |
| | | 16-Apr-2015 | 418,500 | $40.00 | $16,740,000 |
| | | 11-Aug-2015 | 136,900 | $43.84 | $6,001,696 |
| | | 12-Aug-2015 | 38,100 | $43.64 | $1,662,684 |
| | | 11-Sep-2015 | 152,542 | $40.97 | $6,249,646 |
| | | 14-Sep-2015 | 22,458 | $41.69 | $936,274 |
| | | | **2,200,498** | | **$79,574,898** |
| Williams (Ronald A) | Director | 16-Jul-2014 | **130,782** | $32.90 | **$4,302,728** |
| Zimmerman (Todd) | President EmCare | 11-Feb-2014 | 89,547 | $29.51 | $2,642,532 |
| | | 16-Jul-2014 | 85,000 | $32.90 | $2,796,500 |
| | | 22-Oct-2014 | 11,428 | $35.00 | $399,980 |
| | | 23-Oct-2014 | 6,816 | $35.00 | $238,560 |
| | | 24-Oct-2014 | 106,756 | $35.00 | $3,736,460 |
| | | 17-Aug-2015 | 180,000 | $44.21 | $7,957,800 |
| | | | **479,547** | | **$17,771,832** |

142. As CD&R, Sanger, Owen, Williams and Zimmerman were completing the sale of their shares, the Envision Defendants started looking to sell the Company and/or acquire competitors in an effort to mask Envision's illicit billing scheme, and declining out-of-network recovery rates. Defendants Holden and Sanger began discussing a possible combination of AmSurg and Envision in August and September 2015. After a slight delay resulting from Envision's 3Q15 results and from both companies exploring possible alternative mergers, the parties re-engaged in negotiations and due diligence through the first half of 2016. On June 15, 2016, Envision and AmSurg announced the Merger.

### B. Contemporaneous Information Known to Defendants Directly Contradicted Their Public Statements

143. The stark divergence between the Company's internal reports and defendants' public statements further supports defendants' scienter.

144. In June 2014, defendant Sanger assured investors and analysts that "we are not entering into these contracts blind. We have a very good understanding of the payer mix, [we've] got a great understanding of reimbursement." Similarly, Envision's 2014 Form 10-K confirmed that Envision typically has "visibility into payor mix prior to entering into new contracts."

145. As defendants later admitted, however, EmCare had entered into the underperforming contracts that were the cause of the October 22, 2015 financial results without conducting adequate due diligence. As a result, a number of EmCare hospital contracts defendants entered into during 2014-2015 were persistently unprofitable from "day one," and Envision had been experiencing slow "same-store" volume growth that was leading to the overstaffing of its facilities. Defendants failed to address the problems that had caused these new EmCare contracts to underperform and were allowing problematic new contracts to persist for ***12 months*** before finally renegotiating or terminating them, which had adversely affected Envision's financial results.

146. Similarly, with respect to the Company's lower than expected 3Q15 volume growth, Kneeley made clear that the issue was reported internally in July:

> What happened, frankly, in the – this year was, the volume growth decelerated. . . . And we have made adjustments, we were making adjustments during the quarter, ***this really came about as the July data came in***.

147. On July 30, 2015, however, defendants reaffirmed Envision's FY15 financial guidance, despite the deceleration in volume growth contained in the July data reports.

148. Defendants had no reasonable basis to believe and did not believe the Company would meet its FY15 EBITDA guidance because EmCare ***had not*** conducted adequate due diligence on dozens of EmCare hospital contracts defendants entered into during 2014-2015, and as a result these contracts immediately began to underperform and were adversely impacting Envision's FY15 EBITDA. In addition, the Company's own statements confirm that senior

management and the Board received regular reports about the Company's strategy, risks, and compliance issues. With respect to the strategic model under which the Company, including its EmCare division, provides and bills for its services, the Company confirmed that "senior management," including the Envision Officer Defendants, were directly informed of the pertinent facts relevant hereto as both the 2014 Form 10-K and 2015 Form 10-K each stated that "[s]enior management evaluates all aspects of each proposal, including financial projections, staffing model, resource requirements and competition."

149. Defendants also had access to contemporaneous information about its illicit out-of-network billing scheme, and the declining out-of-network recovery rates. With respect to the Board, the 2015 and 2016 annual proxy statements likewise stated:

> Our board as a whole has responsibility for overseeing our risk management. The board exercises this oversight responsibility directly and through its committees. ***The oversight responsibility of the board and its committees is informed by reports from our management team*** and from our internal audit department that are designed to provide visibility to the board about the identification and assessment of key risks and our risk mitigation strategies. ***The full board has primary responsibility for evaluating strategic and operational risk management***, and succession planning. . . . Our compliance committee provides oversight on compliance related legal and regulatory exposure and meets regularly with our chief legal and compliance executives. Our compensation committee evaluates risks arising from our compensation policies and practices . . . . The . . . compensation committee and compliance committees provide reports to the full board regarding these and other matters.

The 2017 annual proxy statement also confirms the same, except it was revised to reflect a change in name from the "compliance committee" as the "compliance and quality committee," and the fact that that committee also began meeting with the "clinical quality" executive.[10]

---

[10] Prior to the Merger, Envision's compliance committee consisted of defendants Riggs, Mactas, Sanger, Smith and Williams. After the Merger, Envision's compliance committee consisted of defendants Miller, Gawaluck, Shelton and Riggs.

150. Defendants' statements, therefore, make clear that Envision's officers and directors were directly informed of and thereby familiar with the Company's financial estimates and models. Those models, in turn, reflected the Company's improper practices described above, which were inconsistent with the Company's public statements.

151. In short, each of the Envision Individual Defendants and the AmSurg Defendants, other than Cigarran, Herr and Popp, had access to all of the relevant information and, in light of that access, they knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the truth by those Envision senior insiders named as defendants herein who admittedly evaluated the proposals to provide services, including financial projections, staffing model, resource requirements and competition, to determine how to best achieve Envision's business objectives and the customer goals. Thus, the Envision Individual Defendants and the AmSurg Defendants, other than Cigarran, Herr and Popp, had access to and/or were personally aware of the improper staffing and billing practices that EmCare used to inflate its reported results.

152. In addition, because of their positions with Envision, the Envision Individual Defendants and the AmSurg Defendants, other than Cigarran, Herr and Popp, controlled the contents of the Company's public statements, were responsible for the accuracy of Envision's corporate statements, and are therefore liable for the representations contained therein. Each of the Envision Individual Defendants and the AmSurg Defendants, other than Cigarran, Herr and Popp, was provided with or had access to copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-

public information, these defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

### C. Defendants Paid over $30 Million to Resolve a False Claims Act Lawsuit Containing Allegations Substantially Similar to Those at Issue in This Case

153. In December 2013 and January 2014, several lawsuits that had been filed under seal by whistleblowers on behalf of the federal and some state governments against HMA were unsealed.[11] The lawsuits charged that HMA billed federal health care programs for medically unnecessary inpatient admissions from the emergency departments at HMA hospitals and paid remuneration to physicians in exchange for patient referrals. Two of those cases also named EmCare as a defendant.

154. Although the DOJ did not, at the time the lawsuits were unsealed, intervene with respect to the claims against EmCare, the DOJ did so in January 2014 with respect to the claims against HMA. EmCare was served with a document subpoena, which Envision told investors "appear[ed] to be primarily focused on EmCare's contracts for services at hospitals that are affiliated with HMA." Apparently seeking to avoid the government joining in the claims against EmCare, the Company then "engage[d] in meaningful dialogue with the relevant government representatives."

155. On October 22, 2015 – with the DOJ not yet having intervened in the pending litigation – the Company announced that it had reserved $30 million in 3Q15 as an estimate of EmCare's exposure to the whistleblower lawsuits. According to Envision's 3Q15 Form 10-Q, this

---

[11] Under the *qui tam*, or whistleblower, provisions of the False Claims Act, private individuals may sue on behalf of the government for false claims and share in any recovery.

was because "the Company and these government representatives ha[d] made significant progress towards resolution of these matters." In a conference call held on October 22, 2015, defendant Owen represented that "[w]e believe that we have committed no wrongdoing in this matter."

156. On December 19, 2017, it was announced that Envision and the DOJ had finalized a settlement regarding the whistleblower claims under the False Claims Act, under which Envision would pay $29.8 million plus interest (for a total of approximately $31 million) to "resolve all federal government civil claims related to this matter," and would enter into a five-year CIA. Although no complaint by the DOJ was filed or made public, the settlement agreement revealed that the DOJ alleged as follows:

- "From January 1, 2008 through December 31, 2012, EmCare conspired with HMA hospitals to submit or caused HMA hospitals to submit claims for payment to the Government Healthcare Programs for certain inpatient admissions of Government Healthcare Program beneficiaries that were medically unnecessary and should have been billed as outpatient or observation services. Specifically, certain inpatient admission recommendations by EmCare ED physicians to admitting physicians, including but not limited to EmCare hospitalists, at HMA hospitals caused the medically unnecessary admission of Government Healthcare Program beneficiaries. Further, the United States alleges that certain inpatient admission decisions of EmCare hospitalists, whether acting on the recommendation of EmCare ED physicians or other ED physicians, or on their own initiative, caused medically unnecessary admissions of Government Healthcare Program beneficiaries."

- "HMA offered and provided remuneration to EmCare, in the form of service contracts and payments, in return for ED physician inpatient admission recommendations of Government Healthcare Programs made without regard to the medical necessity of admission, in violation of the Medicare and Medicaid Anti-Kickback Statute, 42 U.S.C. §1320-7b(b). The illegal remuneration included the award of service contracts, the retention of service contracts that HMA threatened to terminate unless ED admissions increased, payments under the HMA-EmCare hospital ED physician and hospitalist contracts, and bonus payments made to ED physicians where the bonuses were tied, in part, to meeting numerical targets for the percentage of attending physicians called by the ED physician."

157. The Company's early "engage[ment]" with the DOJ and entry into a CIA was designed to and did enable defendants to avoid protracted proceedings and public airing of the DOJ's evidence at trial. It also avoided an embarrassing jury verdict, and the DOJ allowed EmCare to avoid admitting liability in exchange for its agreement to the settlement payment and CIA. As stated in a March 9, 2000 open letter from the Office of Inspector General, entitled *An Open Letter to Health Care Providers*, CIAs are used when a provider has engaged in "serious misconduct," but as part of a settlement is being allowed to continue to participate in federal healthcare programs. In forcing Envision to accept a five-year CIA beginning December 19, 2017, the DOJ demonstrated that it did not view EmCare's violations as limited to the 2008-2012 time period or to the specific hospitals at issue in the whistleblower complaints, but rather that EmCare's wrongdoing was more serious and pervasive. Envision's agreement to negotiate right away and enter into a settlement with the DOJ (before the DOJ decided to intervene in the pending litigation) further supports the inference that defendants were eager to keep their improper coding and billing practices under wraps until after Envision insiders sold billions of dollars of their own shares and effectuated a sale of Envision.

**D. Defendants Intentionally Concealed Meaningful Metrics Regarding Envision's Out-of-Network Revenues**

158. The Company's financial disclosures related to its improper out-of-network billing practices are notable for their opacity. In particular, the Company's quarterly and annual reports containing a chart purporting to show "payor mix," *i.e.*, the percentage of net revenue and of total volume that was attributable to patients who would be paid for by Medicare, Medicaid, "commercial insurance and managed care," or "self-pay," did not disclose that portion of EmCare's revenue (either in total or as a percentage of revenue from commercial insurers) generated by out-of-network billing. This information was not publicly disclosed and thus

investors were not able to assess the extent to which the Company relied on its out-of-network billing strategy.

159. Even in 2016 when the Company finally did begin to provide some information about the portion of EmCare's business attributable to out-of-network billing, it continued to manipulate the information in a way that was designed to and did make it impossible to understand the true adverse implications of the disclosures.

160. Defendants first provided any data on this point when, in the wake of Florida's balance-billing legislation, an analyst on the May 5, 2016 earnings conference call asked defendants Sanger and Owen point blank "what percentage of your business is actually out-of-network?" Even when asked, defendants Sanger and Owen obfuscated, stating:

> [T]hat may fluctuate depending on what negotiations you are doing or whatever else, [but] it's probably around 20% of our EmCare ED collections, our commercial collections. . . . Of the commercial collections, the out-of-network is about 20% of the commercial collections. What we call in-network, which really includes contracts, directly with payers, and contracts with payers through intermediaries, that really is the bulk of the kind of commercial collections are those in-network. So, I just want to make – it wasn't 20% of total ED collections. It's 20% of the commercial collections.

161. By the time of the March 21, 2017 Oppenheimer Healthcare Conference, Kneeley was telling the audience that out-of-network billing

> represents perhaps 30% to 35% of legacy EmCare revenue, somewhere in the $700 million to $800 million of revenue that would be converted from an out of network relationship to . . . in network and for the benefit of those, the numbers, the composition that does include both traditional out of network as well as what is referred to as wrap or multiplan type accounts where you don't have a direct contract with a payer.

162. On June 7, 2017, at a Jefferies Healthcare Conference, an analyst inquiring about EmCare's out-of-network business noted that "that's been quantified anywhere from $700 million to $900 million." In response, defendant Holden said, "[w]e're about, and I think you said $800 million, if you take the [wrap] networks and everything that – because we've tried to be all-

inclusive." Tellingly, defendant Holden, in true Freudian fashion, noted "[t]here's no gamesmanship here," before saying "[i]t's about $1 billion worth of revenue."

163. Defendants' evasive responses were designed to and did leave analysts without any clarity on the Company's out-of-network exposure. On the Company's August 8, 2017 conference call to discuss financial results in the second quarter, a BofA Merrill Lynch analyst asked:

> I was wondering if you could maybe just provide a bit more color on the [out of] network sizing. I know that you've talked about it from time-to-time at conferences and on the calls. But it would be great to just kind of maybe reset and see if you could give us some numbers about how much revenue maybe at the beginning of the year was kind of in that out-of-network bucket.

Defendant Holden replied: "Sure, Kevin. I think I've said publicly that it was – and we've been, I think, the most comprehensive or inclusive in defining out-of-network. We've included [wrap] networks and everything else. We've said, including all of that, it's about $1 billion." Defendant Holden elaborated: "We've migrated about 20%, or a little north of that already. We expect that in – to move the majority of the $1 billion in-network over that remaining 12- to 18-month period that I outlined, and I think you're always going to have maybe 20% or 30% out-of-network." The analyst replied: "Okay, that's very helpful. I mean, I guess, I just want to clarify the 20% to 30% out-of-network, that's an ER number, right? You're saying that's well less than that as a percentage." Defendant Holden answered: "That's right. Right. And I think our Physician Services revenues north of $6 billion, so that kind of gives you a context."

164. Envision and its senior insiders continued to conceal the adverse information and practices detailed in §§IV, V and VII.A.-C. herein, failing to disclose anything other than the changing estimates described herein of the percentages of EmCare revenue attributable to out-of-network billing. Envision and its senior insiders purposefully concealed how those percentages compared to earlier periods, the declining out-of-network net recovery rates and all other

information that would have enabled investors to understand the Company's out-of-network strategy and the trends and risks associated therewith.

### E. EmCare's Improper Billing Practices Were Central to Envision's Operations

165. EmCare's billing practices with respect to its commercially insured patients (*i.e.*, as in-network or out-of-network) were central to the Company's business operations. During the Class Period, EmCare accounted for between 63% and 67% of Envision's total net revenue, and 60% to 66% of Envision's total adjusted EBITDA. Within EmCare, payments from commercial (*i.e.*, private) insurers and managed care (excluding Medicare and Medicaid managed care) averaged 50% of its net revenue during the Class Period. EmCare's payments from commercial insurers constituted a critically important part of Envision's business, and Envision's senior officers and directors oversaw the Company's undisclosed business conduct in this area.

### F. Envision's Key Executives Abruptly Departed at the End of the Class Period

166. On September 13, 2017, less than two months after revelations about the Company's improper practices in the *NY Times* exposé, the President of the Physician Services Division (which included EmCare), Coward, notified Envision that he intended to resign, effective October 2, 2017, to "pursue new opportunities." The ***same*** day, defendant Gulmi, Envision's CFO, also notified the Company that she intended to "retire," effective October 2, 2017. Envision publicly announced the sudden and unexpected departures on September 18, 2017. In a report issued that same day, an analyst at JPMorgan noted that Mr. Coward's "resignation" in particular would be "surprising to investors," and investors would understandably worry since "executives rarely depart when results are strong." One month later, on October 27, 2017, defendant Williams also "resigned" from the Board, effective immediately. In addition, while no public announcement

was made about this, the former CEO of EmCare, defendant Zimmerman, evidently left Envision in June 2017, just one month before the *NY Times* exposé.

### G. Defendants' Substantial Executive Compensation

167. The Officer Defendants were further motivated to keep the truth about EmCare's practices from the market by their self-interested desire to maximize their compensation and keep their jobs. By so doing, the Officer Defendants ensured that they could retain their positions of power, prestige and profit. Defendant Sanger earned nearly $10 million in compensation from 2014 to 2016, and after the Merger his target 2017 compensation was about $7.7 million. Defendant Owen received total compensation of over $3.6 million from 2014 to 2016, and after the Merger his target 2017 compensation was over $3 million. Defendant Holden's target 2017 compensation was about $9 million, and defendant Gulmi's target 2017 compensation was about $2.4 million.

168. By keeping the truth about EmCare's practices from the market, the Officer Defendants also ensured Envision stock would continue to trade at inflated, higher prices, providing the executives with direct economic benefits based on their stock holdings and options.

### H. Defendants' False Statements Were Made Close in Time to Envision's Disclosures

169. Defendants made multiple false statements and/or omissions in close proximity to the Company's later adverse disclosures.

170. With respect to the Company's out-of-network billing practices, beginning in March 2016, analysts began questioning defendants concerning the impact of "balance billing" legislation on Envision's results. But rather than admit the truth about the unsustainability of its improper billing practices, and that payors had increasingly been refusing to pay Envision's exorbitant out-of-network rates, defendants falsely characterized the new legislation as a

"positive," and concealed the "dramatic" changes in out-of-network reimbursements that had taken place over the preceding years and the implication of those changes on the Company's financial results. Even in March 2017, as defendants announced their plan to convert EmCare's $1 billion in out-of-network business to in-network, defendants continued to conceal what they would later admit: that Envision's out-of-network rates, which were vital to the Company's business strategy and inflated financial results, had been falling for "several years" and no longer could be "masked" by Envision's acquisition-driven model. Defendants' March 2017 false assurances came just four months before the *NY Times* exposé uncovered their illicit business practices and eight months before the 3Q17 miss and reduced guidance going forward. Defendants' repeated false assurances further disregarded contemporaneous adverse information defendants had been receiving for the "last several years" revealing the negative trend in out-of-network rates.

171. With respect to the Company's due diligence processes in connection with new contracts, the 2014 Form 10-K, filed on March 2, 2015, represented that "we typically have visibility into payor mix prior to entering into new contracts" and that EmCare "employ[s] a data-driven process to more effectively recruit and retain physicians." Just a few months later, however, on October 22, 2015, defendants were forced to admit Envision had entered into a significant set of contracts without conducting adequate due diligence. Moreover, most of these contracts were entered into during 4Q14, and began to underperform "immediately." Thus, these statements were made close in time to subsequent revelations and disregarded the most current available factual information.

## VII. DEFENDANTS' SEC DISCLOSURE VIOLATIONS

172. Defendants employed the scheme complained of herein in order to artificially inflate the revenue and profits of its largest division, EmCare. The scheme entailed EmCare over-billing its emergency room physician services at inflated out-of-network rates despite the fact that

most of its patients were being treated at in-network hospitals. This scheme carried material financial risk. As the scheme unraveled, EmCare's net recovery rates on its out-of-network bills, which had served to inflate EmCare's revenues, began to plummet. Rather than disclose this reality and its financial implications to investors, defendants misleadingly assured investors that any transition from out-of-network to in-network would be revenue neutral or even revenue positive.

173. In accordance with the explicit SEC disclosure rules described below, defendants were required to disclose the EmCare out-of-network scheme to investors in Envision's quarterly and annual financial statements filed with the SEC during the Class Period. In particular, SEC disclosure rules require that every Form 10-K and Form 10-Q contain a section titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). Item 303 of Regulation S-K and subsequent SEC guidance set the framework for required MD&A disclosures. For example, SEC Release No. 33-8350, *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, states:

> The MD&A requirements are intended to satisfy three principal objectives:
>
> - to provide a narrative explanation of a company's financial statements that ***enables investors to see the company through the eyes of management***;
> - to enhance the overall financial disclosure and ***provide the context within which financial information should be analyzed***; and
> - to provide information about the quality of, and potential variability of, a company's earnings and cash flow, ***so that investors can ascertain the likelihood that past performance is indicative of future performance***.

174. As detailed below, in accordance with the SEC's MD&A rules, defendants were required to disclose: (a) the impact of the out-of-network over-billing scheme on Envision's ***reported revenues***; (b) the ***material adverse trend*** in out-of-network recovery rates as defendants'

scheme unraveled; and (c) the negative impact of the unsustainable out-of-network over-billing scheme on Envision's ***future financial results***. Defendants failed to make these required disclosures, rendering Envision's Class Period financial statements materially misleading and in violation of SEC disclosure rules.

### A. The Impact of the Out-of-Network Scheme on Envision's Reported Revenues

175. As alleged herein, EmCare's out-of-network billing scheme had a material impact on Envision's reported revenues and EBITDA. Defendants concealed that EmCare was employing the out-of-network scheme to artificially inflate Envision's reported revenues and EBITDA. As the scheme unraveled, defendants concealed that EmCare's out-of-network net recovery rates had plummeted.

176. The material impact of EmCare's out-of-network scheme on Envision's financial results is precisely the type of information required to be disclosed under the SEC's MD&A rules. For example, within SEC Staff Accounting Bulletin No. 104 ("SAB 104"), the SEC Staff provided specific guidance on required MD&A disclosures pertaining to a Company's reported revenue and changes in reported revenue:

> Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also ***include an analysis of the reasons and factors contributing to the increase or decrease***.

177. EmCare failed to inform investors in its MD&A about EmCare's out-of-network billing scheme, including its material impact on revenues. Defendants knew the scheme was unsustainable and could only temporarily continue to inflate EmCare's revenues. As payors and patients pushed back on paying the exorbitant out-of-network rates, defendants continued to conceal from investors how the unraveling of their scheme was impacting EmCare's revenues.

178. The SEC has also provided a specific example of required MD&A disclosures regarding the financial impact of shifting from one type of customer to another type of customer with lower revenue or profitability:

> An increasing ***trend toward sales to a different class of customer***, such as a reseller distribution channel that has a ***lower gross profit margin than existing sales*** that are principally made to end users. Also, increasing service revenue that has a higher profit margin than product sales.[12]

179. As alleged herein, out-of-network payors versus in-network payors represented two distinct revenue sources for Envision, each of which had different billing rates, reimbursement processes, and profitability levels. As EmCare's out-of-network scheme unraveled and Envision raced to shift payors from out-of-network to in-network status, defendants were required to disclose the material impact associated therewith on Envision's reported revenues, margins and EBITDA.

### B. The Material Adverse Trend in Out-of-Network Recovery Rates as the Scheme Unraveled

180. As EmCare's out-of-network recovery rates, which had once served to inflate EmCare's revenues, began to plummet, defendants concealed this adverse trend from investors. The material adverse trend in EmCare's out-of-network recovery rates was explicitly required to be disclosed under the SEC's MD&A rules, which establish the following disclosure requirements set forth in Item 303 of SEC Regulation S-K:

> ***Describe any known trends*** or uncertainties ***that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations***.[13]

---

[12] SEC SAB 104 at 77.

[13] 17 C.F.R. §229.303(a)(1)-(3); *see also* SEC Release No. 33-8350.

181. As described in ¶84, defendants later admitted the material adverse trend in out-of-network recovery rates. In the fall of 2017, defendant Holden admitted "***over the last several years . . . the out-of-network rate has dropped precipitously***." Defendants also acknowledged that the trend had been "masked" from investors during the Class Period. Defendants' awareness of this material adverse trend while concealing it from investors is in directing contravention of the SEC's stated objective for the MD&A to "provide a narrative explanation of a company's financial statements that ***enables investors to see the company through the eyes of management***."

### C. The Impact of the Unsustainable Out-of-Network Scheme on Envision's Future Results

182. Defendants were aware that EmCare's out-of-network billing scheme was unsustainable and that the unraveling of the scheme would have a material adverse impact on Envision's future revenues and EBITDA.

183. The material impact of EmCare's out-of-network scheme on Envision's future financial results is explicitly required to be disclosed under the SEC's MD&A rules. The SEC has explicitly stated that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a ***particular emphasis on the registrant's prospects for the future***."[14]

184. Likewise, the SEC Staff has stated:

> MD&A must specifically focus on known material events and uncertainties that would cause reported financial information ***not to be necessarily indicative of future operating performance*** or of future financial condition.

* * *

[14] SEC SAB 104 at 76.

> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, ***so that investors can ascertain the likelihood that past performance is indicative of future performance***.[15]

185. As discussed herein, defendants were aware that during the Class Period Envision's out-of-network rates were declining precipitously and EmCare still had significant exposure to the declining rates as it shifted payors to in-network status starting in 2017. For example, by 1Q17, defendants had only managed the in-network transition for payors covering 20% of EmCare's $1 billion of out-of-network ED volume. The revenue associated with the remaining payors, covering 80% of EmCare's $1 billion of out-of-network ED volume, was still declining significantly and would continue to do so until EmCare could negotiate a final contract for in-network rates. This negative out-of-network reimbursement "trend," which was then adversely impacting and was reasonably expected to continue to have a material adverse impact on EmCare's future revenues and EBITDA, was concealed from investors in violation of SEC disclosure rules. As stated above, SEC disclosure rules required Envision to inform investors about its "***prospects for the future***" and that its reported financial information may not be ***necessarily indicative of future operating performance*** due to the adverse out-of-network reimbursement trend, of which defendants were aware.

186. The SEC has also provided a specific example of required MD&A disclosures regarding the future financial impact of shifting from one type of customer to another type of customer with lower profitability:

---

[15] SEC Release Nos. 33-8350, 34-48960; FR-72.

> Changing trends in shipments into, and sales from, a sales channel or ***separate class of customer that could be expected to have a significant effect on future sales*** or sales returns.[16]

187. As previously discussed in §IV.A., out-of-network status would be viewed as a different sales channel or class of customer than in-network status. As a result, defendants were required to disclose in their MD&A the impact on EmCare's future sales as it transitioned payors from out-of-network to in-network.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

188. During the Class Period, as detailed herein, defendants made false and misleading statements and/or omitted material information concerning Envision's business fundamentals and financial prospects and engaged in a scheme to deceive the market. By artificially inflating and manipulating Envision's stock price, defendants deceived plaintiffs and the class and caused them losses when the truth was revealed. When defendants' prior misrepresentations and fraudulent conduct became apparent to the market, it caused Envision's stock price to fall precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of Envision stock during the Class Period, plaintiffs and other members of the class suffered economic loss, *i.e.*, damages, under the federal securities laws.

### A. The 2015 Disclosures

189. On October 22, 2015, Envision revealed an earnings shortfall and reduced FY15 EBITDA guidance from $653-$665 million to $600-$605 million. As set forth herein, defendants admitted that the shortfall was due in large part to reduced volumes and underperforming contracts in its Physician Services segment of EmCare, including contracts it had been monitoring for a year.

---

[16] SEC SAB 104 at 77.

190. Following this news, Envision's stock price declined, falling $11.09 per share (or over 30%), on huge volume of over 20.5 million shares, (more than eight times the average daily volume) to close at $25.40 per share on October 22, 2015. By contrast, the market was up more than 1% for the day. That same day, UBS lowered its price target by a third, and explained that "the recent uptick in underperforming contracts suggests that the pace of new contract signings needs to be tempered." KeyBanc Capital Markets also lowered its price target by a third, and noted that "the mis-assessing of new contracts has shaken investor confidence to a degree, in our view, as that is core to the Company's growth strategy."

191. Nonetheless, Envision's stock continued to trade at artificially inflated levels as defendants failed to disclose the Company's illicit billing scheme and declining out-of-network recovery rates.

**B. The 2017 Disclosures**

192. On February 28, 2017, after the market closed, Envision issued its financial results for 4Q16 and FY16 and held an earnings conference call to discuss the results with investors. Defendants reported lower than expected 4Q16 results and reduced 2017 EBITDA projections that were previously reported in the Joint Proxy/Registration Statement for the combined Company. Specifically, on February 28, 2017, the Company reported 4Q16 adjusted EBITDA of $208.7 million, 10.1% below consensus estimates, and 2017 guidance of $1.365 billion to $1.415 billion adjusted EBITDA, 9% (at mid-point) below the adjusted EBITDA of $1.53 billion previously given in the Joint Proxy/Registration Statement, largely because of lower same store sales growth due to lower volumes and rates in the Company's Physician Services area, which included EmCare.

193. In response to this news, on March 1, 2017, the next trading day, the Company's stock price declined by $4.41 or 6.51%. In comparison, the S&P Composite 1500 Healthcare

Index rose 1.05% on the same day. Envision's stock price remained inflated, however, because defendants continued to conceal the full impact of their fraudulent scheme from investors.

194. Internal Envision documents show that the February 28, 2017 disclosure, and the corresponding stock price decline on March 1, 2017, were a direct result of the misconduct alleged, including the unraveling of Envision's out-of-network scheme and lower reimbursement rates. For example:

(a) a November 2016 internal Envision PowerPoint presentation confirmed that "Non-Par yields are declining to historical standards";

(b) a February 24, 2017 "CEO Report" provided to Envision's Board shows that for 4Q16 "Same Store growth was significantly below forecasted levels driving the vast majority of the shortfall" due to declining rates and volume. The CEO Report further stated that: "[o]ut-of-network exposure remains a key risk issue for our investors," as "the economics of OON billing are rapidly deteriorating";

(c) an October 2016 email shows that EmCare's "out of network status" with key commercial insurers was "having a significant negative impact on emergency department volumes"; and

(d) emails as early as 2015, and continuing forward, show that Envision's largest commercial insurers were sending letters to their subscribers discouraging them from visiting EmCare-staffed hospitals, which was also driving down ED volume.

195. On July 24, 2017, the *NY Times* exposé and NBER study described above were published. Following the release of the *NY Times* exposé online on the morning of Monday, July 24, 2017, the market price of Envision common stock declined 3.79% to close at $60.28 per share, on volume of over three million shares. By contrast, the market was flat for the day.

196. The price of Envision shares continued to decline 2.35% on July 25, 2017, as the article was published on the front page of the *NY Times* print edition, and as the market digested the lengthy NBER study which was protected by a pay-wall. By contrast, the market was up .35% for the day. Envision issued a statement attempting to rebut the NBER study, which served to continue to inflate Envision's stock price.

197. After the market closed on September 18, 2017, Envision announced a number of organizational changes, including the departure of its long-time CFO, the appointment of a newly created COO position, and the resignation of Coward, the President of the Physician Services Division. An analyst at JPMorgan noted that the Coward resignation would be "surprising to investors" and "potentially more concerning," in light of the fact that "executives rarely depart when results are strong."

198. On this news, Envision's share price fell 10.05% from a closing price of $47.67 per share on September 18, 2017 to close at $43.11 per share on September 19, 2017 on unusually high trading volume of more than eleven million shares. By contrast, the market was up .08% for the day.

199. On October 31, 2017, after the market closed, Envision announced that it missed its 3Q17 guidance, and was significantly reducing 4Q17 guidance and its expectations for 2018 results. Analysts were shocked by the reduced guidance: Canaccord/Genuity – "very disappointing"; JPM – "3Q17 Results Bad, the 4Q17 Guidance Is Worse"; Suntrust – "Difficult 3Q and a Sharp Guide Down"; Cantor Fitzgerald – "Surprising drop in volumes"; JPM – "Sorting Through the Ashes"; Oppenheimer – "Disappointing Outlook"; RBC – "Explanations for big guide down and path to higher run rate met with skepticism"; Stephens – 4Q guidance "surprising." Envision's stock price declined from $42.60 per share to $28.03 per share, a decline of 41.86% on

unprecedented volume of 50 million shares, on a day the market and its peers' stock prices increased.

200. Envision admitted that the poor results and reduced guidance were due to issues in its Physician Services business, including lower volumes, anesthesia rates, increased costs, and that Envision had moved 40% of the $1 billion in out-of-network revenue to in-network and expected to move another 35% in-network in 2018. Defendants further surprised investors by admitting that Envision's out-of-network revenue was below the in-network rate and the effect of that on future revenues as part of the reduced revenues and EBITDA for 2017 and 2018. Cantor Fitzgerald reported that the volumes would be "well below expectations of a year ago" at the time of the Merger, when defendants told the market Envision expected (a) $1.4-1.6 billion in EBITDA in 2017, versus $768 million now expected, and (b) growth in its Physician Services business which instead would suffer a decline.

201. Stephens's November 1, 2017 report noted the steep decline in margins in the Physicians Services to single digits, and the Company blaming ED volume but not quantifying the impact. A Stephens analyst report issued the next day questioned defendants' attempted explanations – this "leads us to wonder 'why are there so many moving parts.'"

202. The decline in the price of Envision stock after the corrective disclosures came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market and were a substantial cause of the decline. The timing and magnitude of the price decline in Envision stock compared to the market and its peers negate any inference that the loss suffered by plaintiffs and the other class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by

plaintiffs and the other class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Envision stock and the subsequent significant decline in the value of Envision stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

203. At all relevant times, the market for Envision stock was an efficient market for the following reasons, among others:

(a) Envision stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, Envision filed periodic public reports with the SEC and the NYSE;

(c) Envision regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) Envision was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(e) Envision's stock price reacted in response to new, material information about Envision's business.

204. As a result of the foregoing, the market for Envision stock promptly digested current information regarding Envision from all publicly available sources and reflected such

information in the price of the stock. Under these circumstances, all purchasers of Envision stock during the Class Period suffered similar injury through their purchase of Envision stock at artificially inflated prices and a presumption of reliance applies.

## X. INSIDER TRADING

205. On or about February 5, 2014, at the direction of CD&R, the Company conducted a registered offering of 31.625 million shares of common stock priced at $30.50 per share ($29.51 net selling stockholders), more than 30 million of which were sold by CD&R, 339,348 of which were sold by defendant Sanger, 163,596 of which were sold by defendant Owen, and 89,547 of which were sold by defendant Zimmerman. The Prospectus was dated February 5, 2014, filed with the SEC on February 7, 2014, and stated that the underwriters expected to deliver the shares on February 11, 2014. The UFCW Pension Fund and other class members acquired shares directly in this offering at the offering price. The Company received none of the proceeds from the February 2014 offering.

206. On or about July 10, 2014, at the direction of CD&R, the Company conducted a registered offering of 31.625 million shares of common stock priced at $34.00 per share ($32.90 net selling stockholders), more than 30 million of which were sold by CD&R, 543,900 of which were sold by defendant Sanger, 249,375 of which were sold by defendant Owen, 130,782 of which were sold by defendant Williams, and 85,000 of which were sold by defendant Zimmerman. The Prospectus was dated July 10, 2014, filed with the SEC on July 11, 2014, and stated that the underwriters expected to deliver the shares on July 16, 2014. The UFCW Pension Fund and other class members acquired shares directly in this offering at the offering price. The Company received none of the proceeds from the July 2014 offering.

207. On or about September 23, 2014, at the direction of CD&R, the Company conducted a registered offering of 17.5 million shares of common stock priced at the market ($34.97 for selling stockholders), more than 17 million of which were sold by CD&R, 200,000 of which were sold by defendant Sanger, and 150,000 of which were sold by defendant Owen. The Prospectus was dated September 23, 2014, filed with the SEC on September 25, 2014, and stated that the underwriters expected to deliver the shares on September 29, 2014. The UFCW Pension Fund and other class members acquired shares directly in this offering at the offering price.

208. On or about March 5, 2015,at the direction of CD&R, the Company conducted a registered offering of 50.8 million shares of common stock priced at $36.25 per share ($36.05 for selling stockholders), all of which were sold by CD&R. The Prospectus was dated March 5, 2015, filed with the SEC on March 9, 2015, and stated that the underwriters expected to deliver the shares on March 11, 2015. The UFCW Pension Fund and other class members acquired shares directly in this offering at the offering price.

209. ***In total, CD&R, Williams, Sanger, Owen and Zimmerman sold nearly 131 million shares in the 2014-2015 offerings at inflated prices, for approximately $4.4 billion in gross proceeds***.

210. Because of their roles as controlling shareholders, directors and officers of Envision during the Class Period, these insiders either knew, or recklessly disregarded the material, adverse, non-public information about the improper, unsustainable business practices of Envision (described herein in §§IV, V and VII), including, *inter alia*, that the false and misleading statements and/or omissions alleged herein caused the price of Envision stock to trade at artificially inflated prices at the same time these insiders were disposing of billions of dollars' worth of Company stock. CD&R, Williams, Sanger, Owen and Zimmerman were all in possession of

material, non-public information at the time of each offering in 2014 and 2015 and traded contemporaneously with the UFCW Pension Fund, and other Envision purchasers, on such information.

## XI. CLASS ACTION ALLEGATIONS

211. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or otherwise acquired Envision common stock during the Class Period, including persons who acquired Envision shares in the Merger, and were harmed thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

212. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, both before and after the Merger, Envision shares were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members in the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by Envision, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

213. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

214. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

215. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Envision;

(c) whether the price of Envision stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

216. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. CAUSES OF ACTION

### COUNT I

**Violations of §10(b) of the 1934 Act and SEC Rule 10b-5**
**Against Envision, Sanger, Owen, Holden and Gulmi**

217. Plaintiffs repeat and reallege every allegation contained above as if set forth herein.

218. This count is brought by all plaintiffs on behalf of themselves and the Class.

219. This count is brought against Envision, Sanger, Owen, Holden and Gulmi.

220. During the Class Period, each of the defendants named in this count disseminated or approved the statements as specified above in ¶¶65-134, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

221. The defendants named in this count violated §10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Envision common stock during the Class Period.

222. Defendants, individually and together, directly and indirectly, by the use, means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Envision's business, operations and financial condition as specified herein.

223. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

224. As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of Envision common stock was artificially inflated during the Class Period. In ignorance of the fact that the market

price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class Period), plaintiffs and the other Class members purchased or otherwise acquired Envision common stock during the Class Period at artificially high prices and were damaged thereby.

225. Plaintiffs and the Class, in reliance on the integrity of the market, paid artificially inflated prices for Envision common stock, and suffered losses when the relevant truth was revealed. Plaintiffs and the Class would not have purchased Envision common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

226. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other Class members suffered damages in connection with their Class Period transactions in Envision common stock.

227. By reason of the foregoing, defendants named in this count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

## COUNT II

### Violations of §20(a) of the 1934 Act Against the Envision Individual Defendants and the AmSurg Defendants Other Than Cigarran, Herr and Popp

228. Plaintiffs repeat and reallege every allegation contained above as if set forth herein.

229. This count is brought by all plaintiffs on behalf of themselves and the Class.

230. This count is brought against the Envision Individual Defendants and the AmSurg Officer Defendants, other than Cigarran, Herr and Popp.

231. The Envision Individual Defendants were each control persons of Envision during the Class Period by virtue of their positions as directors and/or senior officers of Envision.

232. Post-Merger, the AmSurg Defendants other than Cigarran, Herr and Popp were each control persons of Envision by virtue of their positions as directors and/or senior officers of Envision.

233. Each of the defendants named in this count acted as controlling persons of Envision within the meaning of §20(a) of the 1934 Act. By virtue of their high-level positions as officers and/or directors of Envision, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statement.

234. In particular, each of these defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I, and exercised that power.

235. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's common stock during the Class Period when the relevant truth was revealed.

236. By reason of the foregoing, the defendants named in this count violated §20(a) of the 1934 Act.

## COUNT III

**Violations of §20A of the 1934 Act**
**Against Williams, Sanger, Owen and Zimmerman**

237. Plaintiffs repeat and reallege every allegation contained above as if set forth herein.

238. This count is brought by the UFCW Pension Fund on behalf of itself and the members of the Class who purchased Envision common stock contemporaneously with Williams, Sanger, Owen and Zimmerman's sale of Envision common stock.

239. This count is brought against Williams, Sanger, Owen and Zimmerman.

240. During the Class Period, Sanger, Owen, Zimmerman and Williams were privy to confidential information concerning Envision's operations, finances, financial condition and future business prospects, including, but not limited to, the false statements disseminated to the investing public. Notwithstanding their duty to refrain from trading in Envision common stock without disclosing the foregoing materially adverse facts, and in violation of their fiduciary duties to Class members, Williams, Sanger, Owen and Zimmerman sold Envision common stock contemporaneously with UFCW Pension Fund's purchase and the purchases of Envision common stock by other Class members.

241. Williams, Sanger, Owen and Zimmerman sold their Envision shares as alleged above at prices artificially inflated by the non-disclosure of material adverse non-public facts, misrepresentations of fact, and the public statements released during the Class Period.

242. Williams, Sanger, Owen and Zimmerman were aware that they were in possession of material adverse information that was not known to the investing public, including the UFCW Pension Fund and other members of the Class. Williams, Sanger, Owen and Zimmerman were obligated to disclose the material non-public adverse information to plaintiffs and other members of the Class before selling their stock.

243. By reason of the foregoing, Williams, Sanger, Owen and Zimmerman directly and indirectly, by use of the means of instrumentalities of interstate commerce, electronic communications mailing and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, and engage in acts and transactions in a course of business which operated as a fraud or deceit upon members of the investing public who purchased Envision common stock contemporaneously with the sales by the defendants named in this count.

244. As a result of the foregoing, plaintiffs and the other members of the Class who purchased Envision common stock contemporaneously with the sale of Envision common stock by Williams, Sanger, Owen and Zimmerman have suffered substantial damages measured by the amount of profits gained or losses not incurred by reason of Williams, Sanger, Owen, and Zimmerman's stock sales.

245. This action was commenced within five years after Williams, Sanger, Owen and Zimmerman made sales while in the possession of material, non-public adverse information.

246. By reason of the foregoing, the defendants in this count violated §20A of the 1934 Act.

## COUNT IV

**Violations of §11 of the 1933 Act**
**Against Envision and the Envision Individual Defendants**

247. Plaintiffs repeat and reallege ¶¶21-36 and 211-216 as if set forth herein.

248. This count is brought by all plaintiffs on behalf of themselves and all other Class members who received shares of Envision common stock traceable to the Joint Proxy Registration Statement.

249. This count is brought against Envision and the Envision Individual Defendants.

250. Plaintiffs assert solely strict liability and negligence claims in this count.

251. On August 4, 2016, Envision filed the Joint Proxy Registration Statement, as amended, which was declared effective on October 19, 2016. Envision filed the final Merger Prospectus with the SEC on October 21, 2016 which formed part of the Joint Proxy Registration Statement. The Joint Proxy Registration Statement was mailed to Envision and AmSurg shareholders on or about October 21, 2016.[17] The Joint Proxy Registration Statement represented that:

(a) Envision would post FY17 EBITDA growth of 14% (to $1.5 billion) and FY18 EBITDA growth of 13% (to $1.7 billion);

(b) the Merger was "expected to achieve approximately $100 million in annual synergies by the third year following their completion, in part from operational cost savings and in part from an acceleration in revenue opportunities through the cross-selling of a broader array of offerings and access to a broader client base";

(c) in recommending the Merger, the Envision Director Defendants represented that:

- "the combined company would benefit patients by providing an integrated care model (ambulance, emergency/inpatient, anesthesia, radiology, ambulatory surgery and post-acute care) that improves quality and lowers costs";
- "the combined company would be better positioned to capitalize on key industry trends, including consumer demand for integrated health services and reform of traditional payment models";
- "the greater scale, specialization and local presence of the combined company would allow the combined company to be a trusted strategic partner for physicians, health systems and payors"; and

---

17 The Joint Proxy Registration Statement expressly incorporated by reference "Envision's Annual Report on Form 10-K for the year ended December 31, 2015, which was filed by Envision on February 29, 2016," as well as Envision's "Quarterly Reports on Form 10-Q for the periods ended March 31, 2016 and June 30, 2016, filed on May 6, 2016 and August 3, 2016, respectively."

(d) in recommending the Merger, the AmSurg Director Defendants represented that:

- "the combined company would be better positioned to capitalize on key industry trends, including consumer demand for integrated health services and reform of traditional payment models";
- "the greater scale and diversification of services of the combined company would allow the combined company to be a trusted strategic partner for physicians, health systems and payors."

252. The Joint Proxy Registration Statement also explicitly provided that "***the transactions contemplated thereby [were] advisable, fair to and in the best interests of [both companies and their] shareholders***" and based thereon recommended that shareholders vote in favor of the Merger.

253. The Joint Proxy Registration Statement and the Merger Prospectus incorporated therein, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, including:

(a) that defendants' statements attributing EmCare's "significant organic growth" to "integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs," omitted that such growth was, in fact, the product of the Company's ***unsustainable***, systemic out-of-network over-billing;

(b) that EmCare had been staffing the vast majority of emergency rooms with medical personnel with whom EmCare had no coverage contracts with any of the major healthcare insurance carriers, forcing unwitting patients and payors to incur and pay expensive "out-of-network" costs;

(c) that the mean out-of-network billing rate for hospitals managed by EmCare was 62% (a rate more than 1,000% greater than the less than 5% out-of-network billing rate for most other hospitals);

(d) that upon taking over management of emergency rooms, EmCare hospitals' out-of-network billing rates increased by between 81% to 90%;

(e) that upon EmCare taking over management of emergency rooms, physician payments increased by 117% and average physician charges increased by 96%;

(f) that, as defendants later admitted, Envision's net recovery rates for its out-of-network business had been declining since 2014, as payors (insurers) were balking at the higher rates;

(g) that the "significant" and "precipitous" decline in recovery rates was masked by the "tons" (or hundreds of millions of dollars) of revenue derived from Envision acquisitions, as defendant Holden admitted in the fall of 2017;

(h) that Envision's reliance on the improper out-of-network over-billing practices inflated its reported revenue and profitability and concealed that its reported results were not sustainable if this improper business practice came to light;

(i) that the negative out-of-network reimbursement "trend," which was then negatively impacting Envision's current results and was reasonably expected to continue to adversely impact Envision's FY17 and FY18 financial results, was not disclosed to investors in violation of SEC disclosure rules, *see* §VII, *supra*; and

(j) that Envision could not possibly post FY17 EBITDA growth of 14% (to $1.5 billion) and FY18 EBITDA growth of 13% (to $1.7 billion).

254. The Merger was approved on November 28, 2016 and completed on or about December 1, 2016, with Envision shareholders receiving 0.334 shares of newly issued new-Envision common stock for each share of Envision common stock they held (or 62,582,161 shares valued at approximately $4.26 billion), and the former AmSurg shareholders receiving one share of newly issued new-Envision common stock for each share of AmSurg they held (or 54,803,561 shares valued at approximately $3.73 billion). Upon completion of the Merger, Envision shareholders owned approximately 53% and former AmSurg shareholders owned approximately 47% of the then-outstanding new-Envision common stock.

255. Envision was the issuer of the common stock registered by the Joint Proxy Registration Statement. As the issuer of the common stock, Envision is strictly liable to the members of the Class who received Envision common stock pursuant to the Joint Proxy Registration Statement.

256. The Envision Individual Defendants each signed the Joint Proxy Registration Statement, and are therefore liable to the members of the Class who received shares of Envision common stock pursuant to the Joint Proxy Registration Statement.

257. The Envision Individual Defendants were responsible for the contents and dissemination of the Joint Proxy Registration Statement. The Envision Individual Defendants named herein failed to make a reasonable investigation and did not possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and/or did not contain untrue statements of material facts.

258. Each of the plaintiffs named in this count and other members of the Class received Envision common stock traceable to the Joint Proxy Registration Statement, and did not know, or

in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

259. Plaintiffs and the members of the Class who acquired Envision common stock traceable to the Joint Proxy Registration Statement suffered substantial damage as a direct and proximate result of the untrue statements of material facts and/or omissions described in this count.

260. This claim is brought within the applicable statute of limitations because less than one year has elapsed from the time that plaintiffs and the other members of the Class discovered or reasonably could have discovered the facts upon which this count is based. Less than three years have elapsed from the time that plaintiffs and other Class members received the shares of Envision common stock pursuant to the Joint Proxy Registration Statement.

261. By reason of the foregoing, the defendants named in this count have violated §11 of the 1933 Act.

## COUNT V

### Violations of §12(a)(2) of the 1933 Act Against Envision and the Envision Individual Defendants

262. Plaintiffs repeat and reallege the allegations in ¶¶21-36, 211-216 and 247-261.

263. This count is brought by all plaintiffs on behalf of themselves and all other Class members who received shares of Envision common stock in the Merger and pursuant to the Joint Proxy Registration Statement.

264. This count is brought against Envision and the Envision Individual Defendants.

265. Plaintiffs assert solely strict liability and negligence claims in this count.

266. Envision filed the final Merger Prospectus with the SEC on October 21, 2016, which formed part of the Joint Proxy Registration Statement. The definitive Joint Proxy

Registration Statement was filed with the SEC and mailed to Envision and AmSurg shareholders on or about October 21, 2016.

267. The defendants named in this count were statutory sellers who sold and participated in the sale of Envision common stock to plaintiffs and other members of the Class by means of the Merger Prospectus, and they did so for the benefit of Envision, and for their own personal gain, including compensation they received in connection with and as a result of the Merger.

268. Plaintiffs received Envision common stock pursuant to the Merger Prospectus, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

269. As a direct and proximate result of such violations, plaintiffs and the other members of the Class who purchased Envision common stock pursuant to the Merger Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Merger Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued in this count. Class members who have sold their common stock seek damages to the extent permitted by law.

270. This claim is brought within the applicable statute of limitations because less than one year has elapsed from the time that plaintiffs and the other members of the Class discovered or reasonably could have discovered the facts upon which this count is based. Less than three years have elapsed from the time that plaintiffs and other Class members received the shares of Envision common stock pursuant to the Merger Prospectus.

271. By reason of the conduct alleged herein, the defendants named in this count violated §12(a)(2) of the 1933 Act.

## COUNT VI

**Violations of §15 of the 1933 Act**
**Against the Envision Individual Defendants**

272. Plaintiffs repeat and reallege the allegations in ¶¶21-36, 211-216 and 247-271 as if fully alleged in this count.

273. This count is brought by all plaintiffs on behalf of themselves and all other Class members who received shares of Envision common stock in the Merger and pursuant to the Joint Proxy Registration Statement.

274. This count is brought against the Envision Individual Defendants.

275. Plaintiffs assert solely strict liability and negligence claims in this count.

276. The Envision Individual Defendants were each control persons of Envision at the time of the Merger in that they exercised actual power over Envision by virtue of their positions as directors and/or senior officers of Envision. As directors and/or senior officers of Envision, the Envision Individual Defendants were able to, and did, influence, directly and indirectly, the contents of the Joint Proxy Registration Statement, as well as Envision's decision to effectuate the Merger, and on what terms.

277. By reason of the foregoing, the defendants named in this count violated §15 of the 1933 Act.

## COUNT VII

**Violations of §14(a) of the 1934 Act and SEC Rule 14a-9**
**Against Envision, the Envision Individual Defendants and the AmSurg Defendants**

278. Plaintiffs repeat and reallege the allegations in ¶¶21-42, 211-216 and 247-271, as if fully alleged in this count.

279. This count is brought by all plaintiffs on behalf of themselves and all other shareholders who were eligible to vote on the Merger.

280. This count is brought against Envision, the Envision Individual Defendants and the AmSurg Defendants.

281. Plaintiffs assert solely negligence claims in this count.

282. The Joint Proxy Registration Statement was an essential link in the consummation of the Merger as Envision and AmSurg successfully solicited shareholders to approve the Merger using the Joint Proxy Registration Statement and the Merger Prospectus incorporated therein. Specifically, the Joint Proxy Registration Statement represented that Envision would post FY17 EBITDA growth of 14% (to $1.5 billion) and FY18 EBITDA growth of 13% (to $1.7 billion) despite the access to adverse facts that prevented the Company from achieving these inflated results. The Joint Proxy Registration Statement also incorporated other misrepresentations and omitted material facts necessary to make the statement therein not false or misleading as detailed in ¶¶252-254, including explicitly stating that "the transactions contemplated thereby [were] advisable, fair to and in the best interests of [both companies and their] shareholders" and based thereon recommended that shareholders vote in favor of the Merger.

283. Shareholders entitled to vote on the Merger exchanged their shares for shares in Envision and were damaged as a direct and proximate result of the untrue statements of material fact and/or omissions alleged in this count, including the inflated Envision EBITDA projections that were included in the Joint Proxy Registration Statement.

284. As a result of the false and misleading Joint Proxy Registration Statement, shareholders were induced to vote in favor of the Merger. The artificial inflation in Envision's stock price was removed when defendants' misrepresentations and omissions made in the Joint Proxy Registration Statement were revealed, causing plaintiffs' losses.

285. Plaintiffs and the shareholders entitled to vote on the Merger who received Envision shares pursuant thereto are entitled to a rescissory measure of damages sufficient to put them back in the economic position they were in before the consummation of the Merger.

286. Each defendant named in this count acted negligently in making false or misleading statements of material fact, omitting material facts required to be stated in order to make the statements contained in their solicitations not misleading, and failing to update statements that were rendered misleading by material information that arose after the dissemination of these statements and before the November 28, 2016, shareholder vote.

287. This count is brought within the applicable statute of limitations.

288. By reason of the foregoing, the defendants named in this count violated §14(a) of the 1934 Act and SEC Rule 14a-9.

## COUNT VIII

### Violations of §20(a) of the 1934 Act Against the Envision Individual Defendants and the AmSurg Defendants

289. Plaintiffs repeat and reallege the allegations in ¶¶21-46 and 278-288, as if fully alleged in this count.

290. This count is brought by all plaintiffs on behalf of themselves and all Class members who received shares of Envision common stock in the Merger and pursuant to the Joint Proxy Registration Statement.

291. This count is brought against the Envision Individual Defendants and the AmSurg Defendants.

292. Each of the Envision Individual Defendants acted as control persons of Envision within the meaning of §20(a) of the 1934 Act. By virtue of their high-level positions as officers and/or directors of Envision, their ownership and contractual rights, participation in and awareness

of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the statements that plaintiffs contend are false and misleading. These defendants were provided with or had unlimited access to copies of the Company's statements alleged by plaintiffs to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

293. The AmSurg Defendants were each control persons in connection with the Joint Proxy Registration Statement by virtue of their positions as directors and/or senior officers of AmSurg, which had the contractual right and obligation to "jointly prepare and cause to be filed with the SEC" the Joint Proxy Registration Statement together with Envision, as it did. The AmSurg Defendants participated in the solicitation of proxies through the Joint Proxy Registration Statement, recommended in favor of the Merger, and/or participated in the preparation of the Joint Proxy Registration Statement.

294. Each of these defendants had direct and/or indirect power to direct or cause the direction of the management and policies of the Company, particularly with respect to the preparation and filing of the Joint Proxy Registration Statement, and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count VII, and exercised that power.

295. As a direct and proximate result of the Envision Individual Defendants and the AmSurg Defendants' wrongful conduct, plaintiffs and members of the Class who exchanged

shares for Envision shares in the Merger suffered damages in connection with that acquisition of Envision common stock in the Merger.

296. By reason of the foregoing, the defendants named in this count violated §20(a) of the 1934 Act in connection with the Merger.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action, by certifying plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Awarding injunctive and such other equitable relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: December 13, 2021

ROBBINS GELLER RUDMAN & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS
SPENCER A. BURKHOLZ
DEBRA J. WYMAN
LAURIE L. LARGENT
JESSICA T. SHINNEFIELD
CHRISTOPHER D. STEWART
HILLARY B. STAKEM
J. MARCO JANOSKI GRAY
SEAN C. McGUIRE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

BARRETT JOHNSTON MARTIN
& GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

Local Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2021, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

J. Alexander Hood II
Jeremy A. Lieberman
**Pomerantz LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
ahood@pomlaw.com
jalieberman@pomlaw.com

Patrick V. Dahlstrom
**Pomerantz LLP**
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
(312) 377-1181
pdahlstrom@pomlaw.com

Paul Kent Bramlett
Robert P. Bramlett
**Bramlett Law Offices**
P.O. Box 150734
Nashville, TN 37215
(615) 248-2828
pknashlaw@aol.com
robert@bramlettlawoffices.com

Kenneth S. Byrd
Mark P. Chalos
**Lieff, Cabraser, Heimann & Bernstein LLP**
222 Second Avenue South, Suite 1640
Nashville, TN 37201
(615) 313-9000
kbyrd@lchb.com
mchalos@lchb.com

John T. Long
**Cavanagh & O'Hara**
2319 West Jefferson Street
Springfield, IL 62702
(217) 544-1771
johnlong@cavanagh-ohara.com

Jonathan L. Bobbitt
**McWherter Scott Bobbitt**
341 Cool Springs Boulevard, Suite 230
Franklin, TN 37067
(615) 354-1144
jonathan@msb.law

John S. Hicks
**Baker, Donelson, Bearman, Caldwell & Berkowitz PC**
211 Commerce Street, Suite 800
Nashville, TN 37201
(615) 726-5600
jhicks@bakerdonelson.com

Elliot Greenfield
Shannon Rose Selden
**Debevoise & Plimpton**
919 Third Avenue
New York, NY 10022
(212) 909-6772
egreenfield@debevoise.com
srselden@debevoise.com

James A. Holifield, Jr.
**Holifield Janich Rachal & Associates PLLC**
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
(865) 566-0115
aholifield@holifieldlaw.com

James Gerard Stranch IV
**Branstetter, Stranch & Jennings PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gerards@bsjfirm.com

Gregory F. Coleman
Lisa A. White
**Greg Coleman Law PC**
First Tennessee Plaza
800 South Gay Street, Suite 1100
Knoxville, TN 37929
(865) 247-0080
greg@gregcolemanlaw.com
lisa@gregcolemanlaw.com

Britt K. Latham
W. Brantley Phillips, Jr.
Joseph B. Crace, Jr.
Kathryn Hannen Walker
Briana T. Sprick Schuster
**Bass Berry & Sims PLC**
150 Third Avenue South, Suite 2800
Nashville, TN 37201
(615) 742-6200
blatham@bassberry.com
bphillips@bassberry.com
jcrace@bassberry.com
kwalker@bassberry.com
briana.sprick.schuster@bassberry.com

Peter E. Kazanoff
Craig S. Waldman
Amy L. Dawson
William T. Russell, Jr.
**Simpson Thacher & Bartlett LLP**
425 Lexington Avenue
New York, NY 10017
(212) 455-3525
pkazanoff@stblaw.com
cwaldman@stblaw.com
amy.dawson@stblaw.com
wrussell@stblaw.com

Benjamin B. Coulter
**Burr & Forman LLP**
420 North 20th Street, Suite 3400
Birmingham, AL 35203
(205) 251-3000
bcoulter@burr.com

Kathryn E. Grundy
**Burr & Forman LLP**
222 Second Avenue South, Suite 2000
Nashville, TN 37201
(615) 724-3200
kgrundy@burr.com

Seth McInteer
Howell O'Rear
**McInteer & O'Rear PLC**
2801 12th Avenue South
Nashville, TN 37204
(615) 724-6207
seth@mcolawfirm.com
howell@mcolawfirm.com

Richard A. Bodnar
Jarrett N. Sena
Marc B. Kramer
**Rolnick Kramer Sadighi LLP**
1251 Avenue of the Americas
New York, NY 10020
(212) 597-2800
rbodnar@rksllp.com
jsena@rksllp.com
mkramer@rksllp.com

Jerry E. Martin
**Barrett Johnston Martin & Garrison LLC**
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
jmartin@barrettjohnston.com

Christopher M. Wood
Christopher H. Lyons
**Robbins Geller Rudman & Dowd LLP**
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2203
cwood@rgrdlaw.com
clyons@rgrdlaw.com

Darren J. Robbins
Spencer Alan Burkholz
Debra J. Wyman
Laurie L. Largent
Jessica T. Shinnefield
Eric I. Niehaus
Christopher D. Stewart
Hillary B. Stakem
J. Marco Janoski Gray
Sean C. McGuire
**Robbins Geller Rudman & Dowd LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
darrenr@rgrdlaw.com
spenceb@rgrdlaw.com
debraw@rgrdlaw.com
llargent@rgrdlaw.com
jshinnefield@rgrdlaw.com
ericn@rgrdlaw.com
cstewart@rgrdlaw.com
hstakem@rgrdlaw.com
mjanoski@rgrdlaw.com
smcguire@rgrdlaw.com

s/Christopher M. Wood
CHRISTOPHER M. WOOD