## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re ENVISION HEALTHCARE CORPORATION SECURITIES LITIGATION | ) ) ) | NO. 3:17-cv-01112 |
| | ) ) | (Consolidated with Case Nos. 3:17-cv-01323 and 3:17-cv-01397) |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) | JUDGE CAMPBELL MAGISTRATE JUDGE FRENSLEY |

## MEMORANDUM

Pending before the Court is a Motion to Dismiss Newly Added Allegations in the Amended Consolidated Class Action Complaint and Motion to Strike Previously Dismissed Allegations filed by Defendants Envision Healthcare Corporation ("Envision"), William A. Sanger, Randel G. Owen, Craig A. Wilson, Todd G. Zimmerman, Carol J. Burt, Mark V. Mactas, Leonard M. Riggs, Jr., Richard Schnall, James D. Shelton, Michael L. Smith, Ronald A. Williams, Christopher A. Holden, Claire M. Gulmi, Kevin D. Eastridge, Thomas G. Cigarran, James A. Deal, John T. Gawaluk, Steven I. Geringer, Henry D. Herr, Joey A. Jacobs, Kevin P. Lavender, Cynthia S. Miller, and John W. Popp, Jr. (together, the "Individual Defendants") (collectively, with Envision, "Defendants"). (Doc. No. 373 (filed as a single docket entry)).

In support of the motions, Defendants submitted a memorandum of law (Doc. No. 374) and declaration of Joseph B. Crace, Jr. (Doc. No. 375) with complete transcripts of healthcare conferences on December 7, 2016 (Doc. No. 375-1), March 21, 2017 (Doc. No. 375-2), June 7, 2017 (Doc. No. 375-3), and September 7, 2017 (Doc. No. 375-4), and transcripts of earnings

conference calls on May 5, 2016 (Doc. No. 375-5), and August 8, 2017 (Doc. No. 375-6). Plaintiffs filed an Opposition to the motions (Doc. No. 378), and Defendants filed a reply. (Doc. No. 381).

For the reasons stated herein, the Motion to Dismiss and the Motion to Strike will be denied.

## I.     BACKGROUND

On August 4, 2017, Plaintiff Terry W. Bettis filed an initial complaint against Envision Healthcare Corporation and four individual defendants: William A. Sanger, Randel G. Owen, Christopher A. Holden, and Claire M. Gulmi (Doc. No. 1). The initial complaint alleged violations of the Securities Act of 1933 (the "1933 Act") and the Securities Exchange Act of 1934 (the "1934 Act"). (*Id.* ¶¶ 63-78). The case brought by Bettis was consolidated with two related cases: *Carpenters Pension Fund of Illinois v. Envision Healthcare Corporation*, Case No. 3:17-cv-01323 (M.D. Tenn., Sept. 29, 2017); and *Central Laborers' Pension Fund v. Envision Healthcare Corporation*, Case No. 3:17-cv-01397 (M.D. Tenn., October 23, 2017). (*See* Doc. Nos. 58 and 60). The Plaintiffs filed a Consolidated Class Action Complaint ("CC") on January 26, 2018 (Doc. No. 88), alleging violations of the 1933 Act and the 1934 Act against Envision Healthcare Corporation, the private equity firm, Clayton, Dubilier & Rice, LLP ("CD&R"), four CD&R-associated companies (together with CD&R, the "CD&R Defendants"), and twenty-three (23) individual defendants.

On November 19, 2019, the Court granted the CD&R Defendants' motion to dismiss and dismissed certain claims and individual defendants. (Doc. No. 152, 153). On December 13, 2021, Plaintiffs filed an Amended Consolidated Class Action Complaint (the "ACC") (Doc. No. 369),

2

which is the subject of the instant motion to dismiss and strike.[1] The ACC adds seven newly alleged misstatements and a "corrective disclosure." The newly alleged misstatements concern Envision's out-of-network revenue (*id.* ¶¶ 116, 121, 124, 127, 128, 129), and the related matter of balance billing (*id.* ¶ 131).

The background regarding these claims is thoroughly discussed in the Court's Memorandum concerning the motion to dismiss the CC. (*See* Doc. No. 152). To summarize, Plaintiffs allege Envision's subsidiary, EmCare, intentionally staffed its emergency rooms with out-of-network physicians, which allowed it to bill health insurers and patients at "vastly higher rates" – more than double the rates of in-network physicians – and reap the associated profits. (*See* ACC ¶ 5; *see also*, CC ¶ 5;). "Balance billing" refers to the practice of billing patients for the difference in the amount covered by a patient's insurance and the billed amount. (ACC ¶¶ 12, 47).

According to Plaintiffs, EmCare's out-of-network billing strategy was uncovered by a study published by the National Bureau of Economic Research (the "NBER study") and brought to public attention by a *New York Times* article (the "Article") published on July 24 (online) and 25 (print), 2017.[2] (*See* ACC ¶¶ 15-16). Envision's stock price declined following publication of the Article. (*Id.* ¶¶ 195-196).

---

[1] For ease of reference, the Consolidated Class Action Complaint filed on January 26, 2018, (Doc. No. 88), will be cited as "CC ¶__," and the Amended Consolidated Class Action Complaint filed on December 13, 2021, (Doc. No. 369), will be cited as "ACC ¶__."

[2] The Article is *The Company Behind Many Surprise Emergency Room Bills* by Julie Cresswell, Reed Abelson, Margot Sanger-Katz, NEW YORK TIMES, July 24, 2017 (Doc. No. 127-39). Defendants' filed a printout of the online version of the article as an exhibit to the motion to dismiss the CC (Doc. No. 127-39). The Article was also published on page A1 of the *New York Times* on July 25, 2017, with the headline: *Costs Shoot Up As a Company Runs the E.R.* The NBER study is *Surprise Out-of-Network Billing for Emergency Care in the United States* by Zack Cooper, Fiona Scott Morton, Nathan Shekita, NBER Working Paper Series, Working Paper 23623, National Bureau of Economic Research, July 2017, *available at* www.nber.org/papers/w23623 (last visited Sept. 28, 2022).

3

The instant motion to dismiss concerns the seven newly alleged statements. Defendants argue that claims based on these newly alleged misstatements should be dismissed because: (1) claims based on statements from 2016 are time-barred by the 1934 Act's statute of repose; (2) the statements are non-actionable statements of opinion and/or forward looking statements; (3) Plaintiffs have not plausibly alleged the statements are false or misleading; (4) Plaintiffs have not plausibly alleged loss causation; and (5) Plaintiffs failed to plead scienter with respect to any newly alleged misrepresentation or omission. (Doc. Nos. 373, 374). Defendants also move to strike factual allegations related to alleged upcoding, unnecessary medical procedures, the HMA qui tam action, CD&R's alleged insider trading, and due diligence, on grounds that claims arising out of these allegations have been dismissed. (*Id*.).

## II.     MOTION TO STRIKE

Motions to strike are governed by Federal Rule of Civil Procedure 12, which allows the Court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

Defendants move to strike allegations relating to dismissed claims on grounds that these allegations do not pertain to the issues in question and that inclusion of these allegations in the ACC is a violation of the Court's Order to "omit claims and parties that were dismissed by the Court's prior order." (Doc. No. 374 at 25 (citing December 12, 2021 Order, Doc. No. 368 at 6)). Plaintiffs respond that they have complied with the Court's Order to omit dismissed "claims and parties" and otherwise file an amended complaint that is "identical" to the Proposed Amended Complaint. (Doc. No. 378 at 24). Plaintiffs contend that the factual allegations are relevant background and context for their surviving claims and provide context for the scienter allegations. Defendants argue that Plaintiffs' narrow interpretation of the Court's order "underscores the bad

4

faith nature of their attempt to replead allegations previously dismissed, in an obvious effort to resurrect those claims and/or create prejudice for Defendants." (Doc. No. 381 at 10).

The Court does not find it necessary to strike portions of the ACC which have been found not to state a claim. The ACC does not restate claims or parties that have been dismissed and the Court is not persuaded that the inclusion of these allegations is prejudicial to the Defendants. While some of the allegations appear to have no bearing on the surviving claims, others arguably provide relevant background or context. Moreover, the December 12, 2021 Order directing Plaintiffs to omit claims and parties that were dismissed and otherwise file an identical complaint suggests Plaintiffs did not improperly include allegations related to dismissed claims.

Accordingly, the Motion to Strike will be DENIED.

## III.    MOTION TO DISMISS

### A.  Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), a court must take all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id*.  A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

In considering a Rule 12(b)(6) motion, the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to the motion to dismiss provided they are referred to in the Complaint and are central to

5

the claims. *Bassett v. National Collegiate Athletic Assn.*, 528 F.3d 426, 430 (6th Cir. 2008). In support of the motion to dismiss, Defendants filed transcripts from several healthcare conferences and earnings conference calls. (Doc. Nos. 375-1 through 375-6). Plaintiffs do not object to the Court's consideration of these transcripts for purposes of the motion to dismiss. Moreover, the new statements which are the basis of Plaintiffs' claims and the subject of the instant motion were made during the healthcare conferences and earnings calls for which transcripts have been provided. Accordingly, the Court finds that these transcripts are referred to in the Complaint and are central to the claims and are properly considered at this stage.

**B. Statute of Repose**

Defendants argue claims based on newly alleged misstatements made in 2016 are barred by the Securities Exchange Act of 1934's ("1934 Act") five-year statute of repose, 28 U.S.C. § 1658(b)(2). Plaintiffs disagree, asserting that the claims arising out of these statements relate back to the date of the consolidated complaint under Federal Rule of Civil Procedure 15(c) ("Rule 15(c)"). (Doc. No. 378 at 3-4). Defendants respond that Rule 15 is "inapplicable" when amendments are time-barred by statutes of repose and argue that the cases cited by Plaintiffs are "outliers" that are contrary to controlling authority. (*Id.* at 3, 5).

The Court begins consideration of this issue with the statutory language. Section 1658(b) provides:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)), may be brought not later than the earlier of –
>
> (1) 2 years after the discovery of facts constituting the violation; or
>
> (2) 5 years after such violation.

6

28 U.S.C. § 1658(b).

"The purpose of a statute of repose is to give the defendant full protection about a certain time." *Cal. Public. Employees' Retirement Sys. v. ANZ Securities, Inc.*, 137 S. Ct. 2042, 2053 (2017) ("*CalPERS*"). As such, statutes of repose are not subject to equitable tolling. *Id*. at 2053 ("[T]he object of a statute of repose, to grant complete peace to defendants, supersedes the application of tolling based in equity."). The Supreme Court explained that "the term 'action' … refers to a judicial 'proceeding,' or perhaps a 'suit' – not to the general content of claims." *Id*. at 2054.

*CalPERS*, however, does not directly address the question raised here. The plaintiff in *CalPERS* opted out of settlement of a timely filed class-action and filed a new separate complaint against the same defendants alleging identical securities law violations after expiration of the repose period. *Id*. at 2048. The Court held the new "action" was barred by the statute of repose. *Id*. at 2055. Here, on the other hand, Plaintiffs have not brought a new action or even added a new claim. Instead, they have added seven alleged misrepresentations as a basis for the claim in Count I for violation of Section 10(b) of the Securities Act of 1934 and Rule 10b-5. The Court is not persuaded that by adding additional alleged misstatements to an existing cause of action in an existing case, Plaintiffs have "brought" an "action" within the meaning of 28 U.S.C. § 1658(b). Consequently, the Court is also not persuaded that allowing Plaintiffs to proceed with the allegations in the ACC would enlarge or modify a substantive right afford by the statute of repose (in this case the right to be free from an "action" "brought" more than five years after the alleged violation) and violate the Rules Enabling Act, 28 U.S.C. § 2072(b).

The cases cited by the Parties, do not compel a different result. In urging the Court to conclude that the weight of controlling authority precludes relation back under Rule 15(c),

Defendants rely upon four out of circuit district court cases, two of which are not comparable to the circumstances presented here. *See De Vito v. Liquid Holdings Grp., Inc.*, Civ. No. 15-6969, 2018 WL 6891832, at *18-22 (D. N.J. Dec. 31, 2018) (barring addition of new plaintiff after the statute of repose had expired and declining to announce categorical rule that a statute of repose always bars relation back under Rule 15(c)); *Hogan v. Pilgrim's Pride Corp.*, No. 16-cv-02611-RBJ, 2021 WL 1534602, at *6, 8 (D. Colo. Apr. 16, 2021) (plaintiff's refiled case, which had been dismissed without prejudice two years earlier, was barred by the statute of repose).

The other two cases, both from the Southern District of New York, held that allegations added beyond the repose period were barred by the statute of repose. *See Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 264 (S.D.N.Y. 2019) (holding additional alleged misrepresentations and omissions in connection with 1933 Act claims were barred by statute of repose); *In re Longtop Fin. Techs Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 380 (S.D.N.Y. 2013) (barring plaintiffs from amending existing securities claim to allege violations arising out of conduct beyond the period of repose). While these cases suggest consensus within the Southern District of New York, the only Court of Appeals case cited by the parties reached a different conclusion. *See Se. Penn. Transp. Auth. v. Orrstown Fin. Svcs. Inc.*, 12 F.4th 337, 349-50 (3d Cir. 2021).

*Southeastern Pennsylvania Transport* concerns relation back of amendments after expiration of the statutes of repose applicable to securities actions under the 1933 Act and the 1934 Act. *Se. Penn. Trans.,* 12 F.4th at 343-44. In that case, the plaintiff amended the complaint to reassert securities fraud claims against previously dismissed defendants with additional allegations regarding scienter. *Id*. The court noted that "no circuit court has squarely considered whether Rule 15(c) allows relation back past statutes of repose in this context" – *i.e.*, not adding new claims or

8

parties or reasserting an entirely dismissed action. *Id*. at 346 and n.5. The court held that the amendment was not barred, reasoning that the plaintiff was bringing neither a new action nor new claims and that "it does not defeat the purpose of the statute of repose for a plaintiff to bring an action within the time allotted – even if the plaintiff later amends the precise form of its pleadings." *Id*. at 349.

The Court finds the reasoning the *Southeastern Pennsylvania Transport*, which closely tracks the statutory language, to be persuasive. The Sixth Circuit authority cited by Defendants is not to the contrary. *See Stein v. Regions Morgan Keegan Select High Income Fund, Inc*., 821 F.3d 780, 793-94 (6th Cir. 2016) (holding class certification in separate actions did not toll the repose period for filing new action). Accordingly, the Court finds that the statute of repose does not foreclose relation back under Rule 15(c).

Turning to relation back under Rule 15(c) – Rule 15(c)(1) provides that an amendment relates back to the date of the original pleadings when:

> (A)   the law that provides the applicable statute of limitations allows relations back;
>
> (B)   the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
>
> (C)   the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > (i)   received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > (ii)  knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1).

Although Defendants argue that the newly alleged statements were not included as a basis of liability in the original complaint, other than their arguments about the application of the statute of repose, they do not argue that the statements do not arise out of the conduct, transaction, or occurrence set out in the original pleading. Because the new statements, at least one of which was included in the original complaint as evidence of scienter (*see* CC ¶¶ 165, 166), concern Envision's revenue from out-of-network billing, they fall squarely within the conduct at issue in the original complaint, and, therefore, relate back to the date of the original complaint under Rule 15(c).

The Court next turns to the substance of the new allegations.

## C. Securities and Exchange Act of 1934 – Section 10(b) and Rule 10b-5

Plaintiffs bring claims for securities fraud under Section 10(b) of the Securities and Exchange Act and Rule 10b-5, which prohibit fraudulent, material misstatements in connection with the sale or purchase of securities. *Ind. St. Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009)(citing *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008)). To state a claim for violation of § 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

Because the Section 10(b) claims sound in fraud, the pleading strictures of Federal Rule of Civil Procedure 9(b) apply. *Frank v. Dana Corp.*, 547 F.3d 564, 569-70 (6th Cir. 2008). At a minimum, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent. *Id*. at 570. The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes additional requirements. *Id*. The complaint must "specify each statement alleged to have been misleading" along with "the reason or reasons why the statement is misleading." *Id*. (citing 15 U.S.C. § 78u-4(b)(1)). In addition, plaintiffs must "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id*. (citing 15 U.S.C. § 78u-4(b)(2)) (emphasis in original).

Materiality can be established by proof of a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Zaluski*, 527 F.3d at 571 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). "Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make … statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). However, "once a company chooses to speak, it must 'provide complete and non-misleading information with respect to the subjects on which [it] undertakes to speak.'" *Zaluski*, 527 F.3d at 572.

The Court previously held that a reasonable investor could view a significant level of out-of-network billing as material information. (Doc. No. 152 at 19). The same rationale applies to the materiality of the volume of out-of-network revenue and balance billing.

With this framework in mind, the Court considers each of the newly alleged statements.

11

**D. The Statements**

    1.  <u>The Twenty Percent Statements</u>

Plaintiffs claim that on two occasions – on a May 5, 2016 conference call and at a heathcare conference on December 7, 2016 – Envision officers misrepresented Envision's out-of-network revenue as "limited to 20% of EmCare's emergency department ("ED") commercial collections." (ACC ¶¶ 116, 122). Plaintiffs claim Envision's out-of-network revenue was, in fact, much higher – approximately $800 million to $1.1 million. (*Id*. ¶ 120(b)-(e)).

The specific statements as alleged in the ACC are as follows. On May 5, 2016, during a conference call to discuss Envisions first quarter 2016 financial results with investors and analysis, when asked what percentage of Envision's business was out-of-network, Randel Owen stated:

> **[I]f you look at really the kind of what you would really call out-of-network at any point in time**, and again, that may fluctuate depending on what negotiations you are doing or whatever else, **it's probably around 20% of our EmCare ED collections, our commercial collections.**
>
> * * *
>
> I do want to make sure, just because Josh had asked the question earlier, I just want to take a moment to make sure that my response is clear. We talked about – he asked about that out-of-network percentage and so when you look at commercial – commercial is about somewhere between 50% and 60% of total collections. Okay?
>
> **Of the commercial collections, the out-of-network is about 20% of the commercial collections. What we call in-network, which really includes contracts, directly with payers, and contracts with payers through intermediaries, that really is the bulk of the kind of commercial collections are those in-network.**
>
> So I just want to make – it wasn't 20% of total ED collections. **It's 20% of the commercial collections.** So, I just want to make sure that's clarified.

(ACC ¶ 116 (emphasis in original)).

Months later, when discussing the Envision AmSurg merger at a healthcare conference on December 7, 2016,[3] Christopher Holden and Claire Gulmi were asked to "just remind us on a combined basis what the [out-of-network] exposure is …" (ACC ¶ 121). Gulmi responded, "Sheridan is pretty much in network everywhere. **It's really at EmCare, it's really through the Envision piece, and I think 20% of the EmCare business is out of network**"; and Holden confirmed, "**That's right**, and is not carrier specific." (*Id*. (emphasis in original)).

Some analysts and investors interpreted the statements as representing that Envision's out-of-network collections were limited to twenty percent of EmCare's ED commercial collections and, based on this understanding, estimated Envision's out-of-network revenues at approximately $300 million. (*Id*. ¶¶ 117, 119, 122). Plaintiffs allege that, at the time the statements were made, Envision's total out-of-network revenues were, in fact, much higher – approximately $800 million to $1.1 million and that Owen, Holden, and Gulmi knew that the twenty percent number was inaccurate because they had received internal reports and analyses showing that Envision's out-of-network exposure was significantly higher. (*Id*. ¶¶ 120(b)-(e); 122(a)-(d)).

Plaintiffs suggest that some of this discrepancy may be attributed to Envision intentionally categorizing "contracts with payers through intermediaries" as in-network revenue rather than out-of-network revenue to keep reports about EmCare's out-of-network exposure as low as possible, while internally categorizing these revenues as out-of-network. (*Id*. ¶ 120(f)-(g)).

Defendants argue that these statements are couched in qualifying language rendering them too vague and non-specific to be viewed as material to reasonable investors. (Doc. No. 374 at 9-

---

[3]     Defendants state that the correct date of the healthcare conference is December 7, 2016. (*See* Doc. No. 374 at n.5; *see also* Envision Healthcare Corp. at Citi Global Healthcare Conference, Dec. 7, 2016, Doc. No. 375-1.

11). Defendants argue that Owen's statements on May 5, 2016, make clear that Envision's out-of-network revenue was a moving target given that negotiations with payers were always ongoing. (Doc. No. 374 at 11, n.7). In addition, Defendants assert Plaintiffs' interpretation of the statements – the interpretation being that Envision's out-of-network exposure was limited to 20% of EmCare ED commercial collections – is itself a mischaracterization of the statement because Owen's statements did not address Envision at all, but rather "estimated out-of-network exposure as it relates to a specific subset of collections (commercial emergency department collections) from an Envision subsidiary (EmCare))." (Doc. No. 374 at 13-14).

Although these statements do contain some degree of qualifying language from which a reasonable investor could conclude that the statements are not intended to convey a precise measure of out-of-network revenue, Plaintiffs allege the statements were so wildly inaccurate that the overall lack of precision is itself immaterial. The Court agrees. Plaintiffs are not quibbling with a de minimis inaccuracy. If the statements can be reasonably viewed as conveying that Envision's out-of-network exposure was limited to 20% of EmCare ED commercial collections, but the exposure was actually many times that amount, approximation itself is immaterial.

Construing the facts in the light most favorable to Plaintiffs, the Court finds that a reasonable investor could interpret Owen's statement in the manner Plaintiffs suggest. Defendants are correct that Owen's statements specifically cite out-of-network revenue for a subset of Envision's overall revenue – EmCare ED commercial collection. But the statement was in direct response to a question asking, "[W]hat percentage of your business is actually out-of-network?" (*See* Doc. No. 375-5 at PageID# 15128). In response to this question, Owen stated "it's probably around 20% of our EmCare ED collections, our commercial collections." (*Id*.). To be sure, Owen included some qualifying language, including that the number could fluctuate depending on

14

negotiations and "whatever else." (*Id.*). But these slight qualifications do not render the statement so vague that no reasonable investor would regard it as material. Moreover, given that Owen was answering a question about the volume of Envision's out-of-network business, a reasonable investor could view his statement in exactly the manner Plaintiffs propose. Indeed, several analysts and investor are alleged to have interpreted the statement as expressing Envision's overall out-of-network exposure – or at least a rough approximation. (¶¶ 117-119).

Gulmi's December 7, 2016 statement was also in response to a specific question: "[J]ust remind us on a combined basis what the [out-of-network] exposure is …" (Doc. No. 375-1 at PageID# 15094). Gulmi responded, "It's really at EmCare, it's really through the Envision piece, and I think 20% of the EmCare business is out of network." (Doc. No. 375-1 at PageID# 15094). Plaintiffs take issue not with Gulmi's statement that twenty percent of EmCare's business was out-of-network, but that by responding with this information to a question about out-of-network exposure on a "combined basis," Gulmi conveyed that Envision's exposure limited to twenty percent of EmCare's business. Again, in light of the overall context, particularly that the statement was made in response to a question about the "combined basis" of out-of-network exposure, a reasonable investor could interpret Gulmi's statement in the manner Plaintiffs suggest.

Defendants next argue that Plaintiffs misleadingly compare the values of out-of-network revenue with estimates made months earlier or with different revenue metrics. For example, Plaintiffs cite contemporaneous reports that an EmCare subsidiary had over $800 million in out-of-network revenues. (ACC ¶ 120(b)-(d)). Defendants argue that none of these facts show that Owen's statements about EmCare ED commercial collections were false.

Even if this were the case, Defendants miss the point of Plaintiffs' argument. Plaintiffs contend that Owen's statement misrepresented that Envision's out-of-network exposure was

15

limited to the subset of EmCare collections he identified. As stated above, the Court finds this is a reasonable interpretation of the statement. Therefore, evidence showing that Envision's out-of-network exposure was, in fact, much higher, and that certain subsidiaries had higher out-of-network revenue than that attributed to Envision as a whole, would show the falsity of Owen's and Gulmi's statements. This is, of course, contingent on the interpretation of the statement in the manner Plaintiffs suggest. Construing the allegations in the light most favorable to the Plaintiffs, the Court finds Plaintiffs have plausibly alleged materiality and falsity.

2. Statement Regarding the Dollar Value of Out-of-Network Revenue

On March 21, 2017, Bob Kneeley made the following statement on behalf of Envision at a healthcare conference:

> So for the benefit of the webcast the question is around the announcement we made with our earnings call to move in network with our physician services and this is really a legacy EmCare issue and it is an emergency department issue. **It represents perhaps 30% to 35% of legacy EmCare revenue, somewhere in the $700 million to $800 million of revenue** that would be converted from an out of network relationship to win [sic] in network and for the benefit of those, the numbers, the composition that does include both traditional out of network as well as what is referred to as wrap or multiplan type accounts where you don't have a direct contract with a payer.

(ACC ¶ 124 (emphasis in original)).

Plaintiffs argue the statement regarding the value of EmCare's out-of-network revenue was false and misleading because its parent company, Envision, actually had much higher out-of-network revenue of approximately $1.1 billion. (ACC ¶ 126(a)-(b)).

In a similar vein, Plaintiffs allege three statements that the total value of Envision's out-of-network revenue was "approximately" or "about" $1 billion were false and misleading because the actual value of out-of-network revenue was known to be between $1.1 billion and $1.3 billion. (¶¶ 127-130).

16

Defendants argue that these statements were obvious approximations and cannot be considered material and that Kneeley's statement is a non-actionable forward-looking statement because Kneeley was estimating how much revenue Envision planned to transition from out-of-network to in-network over the coming 18-24 months. (Doc. No. 374 at 9, 12, 18).

At this juncture, the Court cannot say as a matter of law that the difference between $1 billion and $1.3 billion (or even $1.1 billion) would be immaterial to an reasonable investor. Nor does the fact that the stated $1 billion number was an approximation render the difference immaterial as a matter of law, particularly when the approximation is alleged to have been inaccurate by upwards of thirty percent.

With regard to Kneeley's statement concerning the transition of physician services to in network, under the circumstances, a reasonable investor could view this statement as representing that Envision planned to move all physician services to in-network, and that the total revenue associated with out-of-network services was between $700 million and $800 million. While parts of the statement are forward looking, the part with which Plaintiffs take issue is the seeming representation that, as a matter of existing fact at the time the statement was made, the total revenue associated with out-of-network physician services was between $700 million and $800 million. (ACC ¶¶ 124, 126). Plaintiffs allege the actual revenue was at least $1.1 billion. (*Id*. ¶ 126). The Court finds that the approximation does not render Kneeley's statement immaterial as a matter of law, nor does the forward-looking aspect of the statement bring the statement within the safe-harbor.

17

3.  Statement About Balance Billing

During a conference call with investors and analysts on May 5, 2016, Randel Owen stated,

> **It's also important to note that we do not pursue a strategy of balance billing patients and for the most part, we do not balance bill our patients. Collections from balance billing of patients represents less than 1% of EmCare's collections.**

(ACC ¶ 131 (emphasis in original)).

Plaintiffs contend this statement is false and misleading because Envision did, in fact, engage in balance billing. (*Id*. ¶ 134(a)-(c)). Plaintiffs allege internal Envision emails and documents show that Envision "routinely balance billed its patients" as demonstrated by estimates that Envision balance billed 30% of its commercial business, reports showing that it balance billed patients at 68% of its sites, and balance billed the nation's three largest commercial insurers at more than half of EmCare's emergency departments. (Doc. No. 378 at 11 (citing ¶ 134(a)-(c)). Plaintiffs further allege that internal documents show that EmCare recognized that "turning off balance billing" would negatively affect EmCare's revenue. (ACC ¶ 134(f)-(g)). Plaintiffs contend this evidence shows that Owen's statements that Envision did not "pursue a strategy of balance billing patients for the most part" was false.

Defendants argue that Plaintiffs' examples of Envision engaging in balance billing fail to show the falsity of Owen's statement because the "**number of patients billed or sites where a bill might have been sent, is a <u>completely different metric</u> than the percentage of collections derived from balance billing**." (Doc. No. 374 at 18-19)(emphasis in original). Plaintiffs respond that they have alleged facts showing that Envision routinely balance billed its patients, thereby plausibly alleging that portion of Owen's statement in which he asserts Envision does not pursue a "strategy of balance billing patients" was false. Plaintiffs contend that by focusing on the

18

collections piece of Owen's statement, Defendants waived any argument against the balance billing strategy portion of the statement. (Doc. No. 378 at 12).

The Court disagrees that Defendants waived argument concerning the strategy portion of the statement. However, construed in the light most favorable to Plaintiffs, allegations that, for example, Envision balance billed thirty percent of its commercial business and that a potential ban on balance billing was considered a "top enterprise risk" plausibly allege that Envision did, in fact, pursue a strategy of balance billing. Accordingly, the Court finds Plaintiffs have plausibly alleged the statement was false or misleading.

## E. Loss Causation

In a securities action, the plaintiff bears the burden of pleading and proving loss causation. 15 U.S.C. § 78u-4(b)(4); *Indiana State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-48 (2005)). For loss causation claims, the Federal Rules require only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Dura Pharm.*, 544 U.S. at 346 ("[W]e assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss."). "This is 'not meant to impose a great burden upon a plaintiff,' but to 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Ohio Public Emp. Ret. Sys. v. Fed. Home Loan Mort. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (quoting *Dura Pharm.*, 544 U.S. at 347). The Sixth Circuit has explained:

> "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir. 2005)(internal quotation marks omitted). It partakes of the traditional elements of loss and proximate causation. *See Dura Pharm.*, 544 U.S. at 346. Any analogy to the common law tort concept,

19

however, would be imperfect because the alleged misstatements do not generally cause a security to drop in value, but rather, the "underlying circumstance that is concealed or misstated." *Lentell*, 396 F.3d at 173. Thus, in the securities fraud context, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Id.* (emphasis in original).

*Id.*

The Sixth Circuit has recognized two methods by which a plaintiff can show loss causation: (1) through a corrective disclosure; and (2) through materialization of a concealed risk. *Ohio Pub. Emp.*, 830 F.3d at 384-85. A corrective disclosure reveals the fraud and the market reacts negatively to the disclosure of fraud. *Id.* at 384 (citing *In re Omnicron Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). Price inflation alone is insufficient; rather, a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market. *Ind. St. Dist. Council*, 583 F.3d at 944 (citing *Dura Pharm.*, 544 U.S. at 346-47). This is the easiest loss causation to show because the stock price drop immediately follows the revelation of the fraud to the public. *In re KBC Asset Mgmt.*, 572 F. App'x. 356, 360 (6th Cir. 2014). Sometimes defendants reveal their own fraud via a corrective disclosure, *i.e.*, a statement that reveals what the defendants themselves previously concealed, but revelations can come from other sources, including whistleblowers, analysts, and news reports. *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017). A plaintiff need not rely on a single, complete disclosure; the truth may gradually be revealed through a series of partial disclosures. *Id.* "Of course, for the revelation to cause the plaintiffs' losses, the information must be in a practical sense be new; otherwise the market will have processed and reacted to that information already." *Id.*

Under the materialization of the risk theory, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed

by the misrepresentations and omissions alleged by a disappointed investor." *Ohio Pub. Emp.*, 830 F.3d at 384 (citations omitted); *see also*, *Norfolk Cty. Ret. Sys.*, 877 F.3d at 695.

Plaintiffs previously identified two corrective disclosures: (1) the July 25, 2017 *New York Times* article and NBER Study; and (2) the October 31, 2017 announcement of an earnings miss and guidance reduction. (CC, Doc. No. 88 ¶¶ 198-205). The Court found Plaintiffs plausibly alleged causation, noting that the *New York Times* article revealed previously undisclosed information regarding the nature and extent of EmCare's out of network billing. (Doc. No. 152 at 49-50). Among other things, the Court noted that although "it had been disclosed that out-of-network billing made up a significant portion of EmCare's revenue, the Article and NBER study revealed previously undisclosed details, such as the fact that emergency departments managed by EmCare had a comparatively high rate of out-of-network billing, which the study said showed a 'distinct out of network strategy.'" (*Id*. at 49).

In the ACC, Plaintiffs rely upon the same loss causation allegations the Court previously found plausibly allege causation and add the allegation that Envision's February 28, 2017 earning announcement was a corrective disclosure that resulted in a stock decline the following day. (ACC ¶¶ 192-202).

Defendants argue Plaintiffs fail to plead a direct, causal connection between the alleged misrepresentation and their loss with respect to the new out-of-network and balance billing allegations. (Doc. No. 374 at 19). Defendants assert that if Plaintiffs are correct that Envision's stock price was inflated because Envision misrepresented the amount out-of-network revenue, disclosure of a higher value should have been corrective and resulted in a decline in stock price. Defendants argue that because Plaintiffs cannot establish loss causation with regard to the new statements because they fail to show that the disclosure of the truth about the amount of out-of-

network revenue, which was allegedly revealed to be $1 billion in June, August, and September 2017, resulted in a decrease in the stock price. Defendants raise the same argument with regard to Plaintiffs' allegations related to balance billing – that Plaintiffs have not attributed a loss to any disclosure regarding Envision's balance billing practices. (*Id.*).

Plaintiffs respond that the alleged misrepresentations regarding the amount of revenue attributable to out-of-network billing relate to the same out-of-network business strategy the Court previously considered and, therefore, the Court's prior analysis concerning loss causation is equally applicable to the new allegations. Plaintiffs add that Defendants' suggestion that the market had no reaction to the disclosure of higher out-of-network revenue "ignore[s] the misleading mitigating statements they made to the market" each time they made such an announcement. (Doc. No. 378 at 23).

Defendants' attempt to disentangle Plaintiffs' allegations regarding alleged misstatements about the volume and nature of Envision's out-of-network business and statements regarding the value of that revenue is unavailing and fails to show Plaintiffs' allegations of loss causation are implausible. The Court's prior analysis concerning loss causation relation to Envision's alleged out-of-network billing is equally applicable to the new allegations, both of which concern the zone of risk related to Envision's alleged concealment of its out-of-network billing practices. (*See* Doc. No. 152 at 47-50). To find otherwise, would require construing the allegations in the light most favorable to the Defendants rather than the reverse, which is plainly not the standard on a motion to dismiss and would require pleading loss causation with more particularity than is required. At this stage, Plaintiffs are not required to prove loss causation, only to plausibly allege that the "risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged." *Ohio Pub. Emps.*, 830 F.3d at 385 (quoting *Lentell*, 396 F.3d at 173)(emphasis in

original). At this stage, the Court finds it impossible to divorce the statements regarding the volume of revenue from out-of-network billing from the statements related to the company's out-of-network business strategy. Defendants' argument that disclosures of higher of out-of-network revenue did not result in a stock price decline does not render Plaintiffs' allegations of loss causation implausible. Importantly, three of the statements Defendants characterize as "disclosures" of the higher value of out-of-network revenue – the statements that out-of-network revenue is "approximately" or "about" $1 billion – are themselves alleged to have misleadingly understated the out-of-network revenue by between ten and thirty percent. (*See* ACC ¶¶ 127-130). With regard to the statement about balance billing, the *New York Times* appears to have disclosed this issue, referring to patients being "ambushed" by EmCare's alleged out-of-network strategy. (ACC ¶ 16).

Accordingly, the Court finds Plaintiffs have sufficiently alleged loss causation with regard to the new allegations. Because loss causation is adequately pled, the Court will not undertake an analysis of whether the newly alleged February 28, 2017 earning announcement would adequately allege loss causation if standing alone.

## F. Scienter

The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "A strong inference of scienter 'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Doshi v. General Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)(quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). The proper inquiry for the Court in evaluating allegations of scienter is "whether

*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original); *see also*, *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency.").

The Sixth Circuit has held that the following factors are usually probative of scienter in securities fraud actions:

> (1) Insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending stock sale; (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi*, 823 F.3d at 1039 (quoting *Helwig*, 251 F.3d at 552).

Defendants argue Plaintiffs' scienter allegations, which Defendants' contend rely entirely on the alleged divergence between external statements and internal information, are insufficient because Plaintiffs have failed to show any real divergence between internal factual information and external reports. (Doc. No. 374 at 24).

As discussed above, *see supra* Part III.D., Plaintiffs have plausibly alleged the falsity of the alleged misstatements and have done so, in part, based on the divergence between internal reports and external statements. Defendants' contention that Plaintiffs have failed to show any

24

"real" divergence is unavailing. The Court finds Plaintiffs have alleged sufficient facts to give rise to a strong inference of scienter.

## IV.    CONCLUSION

For the reasons stated, Defendants' Motion to Dismiss and Motion to Strike (Doc. No. 373), will be **DENIED**. An appropriate Order will enter.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE